UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| ABU BAKKER QASSIM and A'DEL ABDU AL-HAKIM,<br><br>    Detainees,<br>    Guantánamo Bay Naval Station,<br>    Guantánamo Bay, Cuba;<br><br>    Petitioners/Plaintiffs,<br><br>v.<br><br>GEORGE W. BUSH, et al.,<br><br>    Respondents/Defendants. | Case No. 05-0497 (JR)<br><br>**APPLICATION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT THEREOF**<br><br>**Oral argument requested** |

## I.  INTRODUCTION

Petitioners Abu Bakker Qassim and A'del Abdu Al-Hakim, having reason to fear that there is substantial risk of transfer to the custody of a foreign government without a hearing and without consideration of the likelihood of torture by the transferee government, seek by this motion limited relief:  that Respondents give them adequate notice of any intent to transfer them. Pursuant to Fed. R. Civ. P. 65 and the All Writs Act, 28 U.S.C. § 1651, Petitioners seek a preliminary injunction barring their transfer from Guantánamo Bay Naval Station without at least thirty days advance notice to Petitioners and their counsel.[1]

---

[1] The petitioners in *Abdah , et al. v. Bush, et al.*, No. 04-1254, pending before Judge Henry Kennedy, filed a motion seeking similar relief.  In that case, on March 12, 2005, Judge Rosemary M. Collyer entered a temporary restraining order barring the Government from transferring the petitioners before a hearing on their motion.

Petitioners are citizens of China who have been wrongly classified as "enemy combatants," and are being held virtually *incommunicado* in military custody at Guantánamo Bay Naval Station ("Guantánamo"). As detailed in their habeas petition (the "Petition"), they are being held under color and authority of the executive branch, and in violation of the Constitution, laws and treaties of the United States and customary international law. The Respondents' documented practice of rendering Guantánamo detainees to foreign countries, if applied to Petitioners, would cause them irreparable physical and psychological harm and as a practical matter limit the Court's power to enter effective relief on the Petitions, all of which unquestionably would constitute irreparable harm.

To be sure, at the heart of the Petition is a request to be released from unlawful detention. Depending on the circumstances, transfer to another country may be an acceptable resolution of the Petition. There is strong evidence, however, that "release" and transfer may be simply a change of warden from Guantánamo to a foreign client state where abuse is routine and due process unavailable. Under such circumstances and in light of the Petitioners' total isolation from counsel and the outside world, notice, a hearing, and impartial fact finding are vital to ensure that any transfer (i) safeguards the Court's jurisdiction and the Petitioners' right meaningfully to challenge their detention; and (ii) will not subject the Petitioners to torture and abuse. The requested relief merely seeks to preserve the status quo. Petitioners are entitled to a preliminary injunction preventing their transfer absent proper notice and a hearing.

## II. STATEMENT OF FACTS

The full extent of undersigned counsel's knowledge about Petitioners is contained on a single page of handwritten notes (in Arabic, with scribbled English translation) stating their names and detainee numbers, that they are from "Turkistan-China," and that they are detained at Guantánamo. Counsel are precluded from having any contact with the Petitioners before the requisite security clearances are obtained.

Still, the Petitioners have every reason to fear that they could be transferred to countries where they will be tortured or detained indefinitely without due process of law. Upon information and belief, the United States has transferred Guantánamo detainees to other countries for interrogation without complying with legal procedures. Detainees are "rendered" to other countries where torture is routine. This practice, known as "rendition" or "extraordinary rendition" is used to facilitate interrogation through torture.

American and international news organizations have documented the Government's use of this practice. Citing CIA, FBI, and other government sources, The Washington Post, The L.A. Times, and The New Yorker have reported that the Government has transferred detainees such as the Petitioners into the custody of foreign governments that engage in torture. According to *The Washington Post*:

> Since Sept. 11, the U.S. government has secretly transported dozens of people suspected of links to terrorists to countries other than the United States, bypassing extradition procedures and legal formalities, according to Western diplomats and intelligence sources. The suspects have been taken to countries, including Egypt . . ., whose intelligence services have close ties to the CIA and where they can be subjected to interrogation tactics – including torture and threats to families – that are illegal in the United States, the sources said. In some cases, U.S. intelligence agents remain closely involved in the interrogation, the sources said.

Rajiv Chanrasekaran and Peter Finn, *U.S. Behind Secret Transfer of Terror Suspects*, WASH. POST, Mar. 11, 2002 (attached as Exhibit A to Declaration of Susan Baker Manning in Support of Application for Preliminary Injunction ("Manning Decl.")).

These "renditions" are based on agreements between the United States and foreign governments "to have local security services hold certain terror suspects in their facilities for interrogation by CIA and foreign liaison officers." Dana Priest, *Long-Term Plan Sought for Terror Suspects,* WASH. POST, Jan. 2, 2005 (Manning Decl., Exhibit B); *see also* Dana Priest and Barton Gellman, *U.S. Decries Abuse But Defends Interrogations,* WASH. POST, Dec. 26, 2002 (in cases involving "lower-level captives, the CIA hands them to foreign intelligence services – notably those of Jordan, Egypt and Morocco – with a list of questions the agency wants answered. These 'extraordinary renditions' are done without resort to legal process and usually involve countries with security services known for using brutal means.") (Manning Decl., Exhibit C).

The Government has acknowledged that Guantánamo detainees may be transferred to the control of another government, including their country of citizenship, for continued detention. *See Abdah, et al. v. Bush, et al.*, No. 04-1254, March 12, 2005, Memorandum and Order (the "*Abdah* Order") at 9 (Manning Decl., Exhibit D). It now appears to be the stated policy of the Department of Defense to accelerate the pace of renditions of Guantánamo detainees to foreign countries. Douglas Jehl, *Pentagon Seeks to Transfer More Detainees from Base in Cuba*, N.Y. TIMES, Mar. 11, 2005 (Manning Decl., Exhibit E). The article reports that, in the wake of recent judicial rulings that the habeas writ is available to Guantánamo detainees, "Defense Department officials said that the adverse court rulings had contributed to their determination to reduce the population at Guantánamo, in part by persuading other countries to bear some of the burden of

detaining terrorism suspects." *Id.* According to a senior Defense Department official quoted in the article, the government's near term goal is "to work with the home governments of the detainees in order to get them to take the necessary steps to mitigate the threat these individuals pose." *Id.*

According to the State Department, in China during 2004 "[f]ormer detainees reported credibly that officials used electric shocks, prolonged periods of solitary confinement, incommunicado detention, beatings, shackles, and other forms of abuse. . . . Deaths in custody due to police use of torture to coerce confessions from criminal suspects continued to occur." U.S. DEP'T OF STATE, COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES – 2004 (China Report), § 1(c) (2005), available at www.state.gov/g/drl/rls/hrrpt/2004/41640.htm.

The State Department reports particularly harsh abuse of the ethnic Uighur Muslims of Eastern Turkestan[2] in China's Xinjiang Province:

> The Government used the international war on terror as a justification for cracking down harshly on suspected Uighur separatists expressing peaceful political dissent and on independent Muslim religious leaders. . . . Uighurs were executed and sentenced to long prison terms during the year on charges of separatism. . . . In October 2003, Uighur Shaheer Ali was executed after being convicted of terrorism. He had been repatriated forcibly from Nepal in 2002, where he had been interviewed by the UNHCR and granted refugee status.

*Id.* at Introduction and § 5, subsection on National/Racial/Ethnic Minorities.

It may well prove that, depending on its terms, a proposed release of the Petitioners would be lawful and welcome. Without an opportunity to communicate with them or to evaluate the specific facts and conditions of any proposed transfer, it is impossible to say.

---

[2] Based on the limited information available, it is believed that Petitioners are Uighurs.

## III. PETITIONERS ARE ENTITLED TO A PRELIMINARY INJUNCTION REQUIRING THE RESPONDENTS TO GIVE THIRTY DAYS NOTICE OF ANY PROPOSED TRANSFER FROM GUANTÁNAMO.

The Petitioners' request meets the most fundamental purpose of preliminary injunctive relief, "to preserve the status quo between the parties pending a final determination of the merits of the action." 13 MOORE'S FEDERAL PRACTICE § 65.20 (3d ed. 2004).

Each of the four factors to be weighed in awarding preliminary injunctive relief favors the requested injunction here: (1) the Petitioners will suffer irreparable harm if the injunction is denied; (2) no harm will be suffered by Respondents if the injunction is granted; (3) Petitioners are likely to succeed on the merits of their claims; and (4) there is a clear public interest in preventing the Government from rendering individuals to foreign countries for detention and torture. *See Al-Fayed v. CIA*, 254 F.3d 300, 304 (D.C. Cir. 2001); *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998).

Where the balance of hardships tips decidedly in favor of the moving party, it will "ordinarily be enough that the [Movant] has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977) (quoted in the *Abdah* Order at 4).

**A.     Petitioners Are Likely to Succeed on the Merits of their Claims.**

Petitioners have properly invoked the jurisdiction of this Court. *See Rasul v. Bush*, 124 S. Ct. 2686, 2698 (2004); *see also Abdah* Order at 6 ("There is no doubt that the district courts have jurisdiction over the Petitioners' *habeas corpus* petitions."). Under the All Writs Act, 28 U.S.C. § 1651(a), this Court has the inherent power "to issue injunctions to protect its jurisdiction." *SEC v. Vision Communications, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996); *Abdah* Order at 6-7. On information and belief, the Government's response to recent "adverse court rulings" is a "determination to reduce the population at Guantánamo, in part by persuading other countries to bear some of the burden of detaining terrorism suspects." Jehl, *Pentagon Seeks to Transfer More Detainees from Base in Cuba* (Manning Decl., Exhibit E). "Releasing" the Petitioners from Guantánamo where their detention is subject to habeas review, to the custody of a foreign sovereign where it is not, may simply enable the Government to perpetuate the detention while doing an end-run around this Court's ability to grant effective relief.[3] The requested injunction is essential to protect the Court's jurisdiction. *See* 28 U.S.C. § 1651(a); *Vision Communications,* 74 F.3d at 291.

Moreover, the underlying Petition raises weighty issues that already have been resolved largely in Petitioners' favor by Judge Green of this Court. As Judge Collyer ruled in the *Abdah* Order, "the Petitioners . . . raise serious arguments that require more deliberative consideration concerning whether removing them from the Court's jurisdiction, while insisting on continued detention, is within the province of the executive." *Abdah* Order at 7. Petitioners here ask no more than the opportunity for this Court's deliberative consideration of their claims, claims

---

[3] The Court need not reach here the question of whether rendition would deprive it of jurisdiction. At a minimum, it would practically limit the Court's ability to fashion practical and effective relief.

which raise issues that are "so serious, substantial, [and ] difficult" as to warrant maintaining the status quo. *Id*. at 6 (*quoting Washington Metro. Area Transit Comm'n*, 559 F.2d at 844).

## B. The Balance of Harm Manifestly Favors the Petitioners.

Whether rendered to Egypt, China, or somewhere else altogether, Petitioners stand to suffer immeasurable and irreparable harm. Transfer to another country, even if "only" for continued imprisonment, may effectively circumvent Petitioners' right to adjudicate the legality of their detention in this Court.

> While the Supreme Court has granted them a right of access to our court system, such a transfer would terminate that right, insofar as it sounds in habeas corpus, because the U.S. courts would no longer have control over their warden. . . . With or without the allegation of improper forms of interrogation in a foreign country, the Court concludes that a continuation of their detention without redress to assess its legality could constitute irreparable harm to the Petitioners.[4]

*Abdah* Order at 7-8.

By contrast, Respondents, who on information and belief have already held Petitioners for more than three years, are asked only to give thirty-days advance notice prior to transferring the Petitioners from Guantánamo. This in turn would merely facilitate judicial review (to the extent necessary). Such a requirement clearly has no impact "on the Government's efforts to arrange transfers of Guantánamo Bay detainees but it will ensure that a judicial officer reviews the Petitioner's rights to prior notice and/or retention in this jurisdiction before the Government actually carries out any such transfer." *Id*. at 9-10.

---

[4] Judge Collyer suggested that transfer of the *Abdah* petitioners back to their native Yemen for release would cause them no harm because it is the goal of their habeas petition. *Abdah* Order at 8. Petitioners note that here, by contrast, such a presumption is unwarranted where, as minorities subject to official persecution based on their Islamic faith, "release" to China may be the functional equivalent of handing them over to Chinese custody and torture.

### C. There Is a Clear Public Interest in Preventing the United States from Rendering the Petitioners to Foreign Countries for Detention and Torture.

The final criterion does not warrant extensive discussion. Public policy favors requiring the Government to give adequate notice of any planned transfer of Petitioners away from Guantánamo and out of the Court's jurisdiction where there is a risk that the Petitioners will be delivered into the hands of torturers. No matter how satisfied the executive branch may be that its actions are lawful, the public good requires that a federal litigant – one properly before the Court and represented by counsel – be provided with a meaningful opportunity to contest his transfer to places with a demonstrated record of vicious torture of detainees. The notion that the public interest might favor permitting the Government make such a transfer without meaningful review is unthinkable. The Government has detained these individuals for more than three years without trial, without counsel, and without charges. There can be no possible harm to national security, or any other legitimate interest, if the Respondents are merely required to give adequate notice of a planned transfer.

### CONCLUSION

For the foregoing reasons, the Petitioners ask that the Respondents be required to give Petitioners and their counsel no less than thirty-days advance written notice of any proposed transfer of the Petitioners away from Guantánamo Bay Naval Station, the proposed destination, and of the proposed date of transfer.

| Dated: March 15, 2005 | /s/ |
|---|---|

Sabin Willett
Neil McGaraghan
Jason S. Pinney
Daniel Hunter Kiel
**BINGHAM MCCUTCHEN LLP**
150 Federal Street
Boston, MA 02110-1726
Telephone: (617) 951-8000
Facsimile: (617) 951-8925

/s/
_____

Susan Baker Manning
**BINGHAM MCCUTCHEN LLP**
1120 20th Street, NW, Suite 800
Washington, DC 20036
Telephone: (202) 778-6150
Facsimile: (202) 778-6155

/s/
_____

Barbara Olshansky
Deputy Director
**CENTER FOR CONSTITUTIONAL RIGHTS**
666 Broadway, 7th Floor
New York, NY 10012
Telephone: (212) 614-6439