# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JAMIL EL-BANNA, et al.,<br><br>    Petitioners,<br><br>v.<br><br>GEORGE W. BUSH, et al.,<br><br>    Respondents. | Civil Action No. 04-cv-1144 (RWR) |
| ISA ALI ABDULLAH ALMURBATI,<br>    et al.,<br><br>    Petitioners,<br><br>v.<br><br>GEORGE W. BUSH, et al.,<br><br>    Respondents. | Civil Action No. 04-cv-1227 (RBW) |
| JARALLAH AL-MARRI, et al.,<br><br>    Petitioners,<br><br>v.<br><br>GEORGE W. BUSH, et al.,<br><br>    Respondents. | Civil Action No. 04-cv-2035 (GK) |
| HANI SALEH RASHID ABDULLAH,<br>    et al.,<br><br>    Petitioners,<br><br>v.<br><br>GEORGE W. BUSH, et al.,<br><br>    Respondents. | Civil Action No. 05-cv-23 (RWR) |

| | |
|---|---|
| MAHMOAD SALIM AL-MOHAMMED, et al., | |
| Petitioners, | |
| v. | Civil Action No. 05-cv-247 (HHK) |
| GEORGE W. BUSH, et al., | |
| Respondents. | |
| MAJID ABDULLA AL JOUDI, et al., | |
| Petitioners, | |
| v. | Civil Action No. 05-cv-301 (GK) |
| GEORGE W. BUSH, et al., | |
| Respondents. | |
| AHMED ABDULLAH AL-WAZAN, et al., | |
| Petitioners, | |
| v. | Civil Action No. 05-cv-329 (PLF) |
| GEORGE W. BUSH, et al., | |
| Respondents. | |
| ABDULLA THANI FARIS AL-ANAZI, et al., | |
| Petitioners, | |
| v. | Civil Action No. 05-cv-345 (JDB) |
| GEORGE W. BUSH, et al., | |
| Respondents. | |

| | |
|---|---|
| JAMEL AMEZIANE, et al., | |
|      Petitioners, | |
|   v. | Civil Action No. 05-cv-392 (ESH) |
| GEORGE W. BUSH, et al., | |
|      Respondents. | |
| AYMEN SAEED BATARFI, et al., | |
|      Petitioners, | |
|   v. | Civil Action No. 05-cv-409 (EGS) |
| GEORGE W. BUSH, et al., | |
|      Respondents. | |
| ABDUL-SALAM GAITHAN MUREEF AL-SHIHRY, et al., | |
|      Petitioners, | |
|   v. | Civil Action No. 05-cv-490 (PLF) |
| GEORGE W. BUSH, et al., | |
|      Respondents. | |
| AHMED ABDUL AZIZ, et al., | |
|      Petitioners, | |
|   v. | Civil Action No. 05-cv-492 (JR) |
| GEORGE W. BUSH, et al., | |
|      Respondents. | |

| | |
|---|---|
| ABU BAKKER QASSIM, et al., | |
| Petitioners, | |
| v. | Civil Action No. 05-cv-497 (JR) |
| GEORGE W. BUSH, et al., | |
| Respondents. | |
| SALEH ABDULLA AL-OSHAN, et al., | |
| Petitioners, | |
| v. | Civil Action No. 05-cv-520 (RMU) |
| GEORGE W. BUSH, et al., | |
| Respondents. | |
| ABDULLAH IBRAHIM ABDULLAH AL RASHAIDAN, et al., | |
| Petitioners, | |
| v. | Civil Action No. 05-cv-___ (___) |
| GEORGE W. BUSH, et al., | |
| Respondents. | |

## RESPONDENTS' MEMORANDUM IN OPPOSITION TO PETITIONERS' MOTIONS FOR TEMPORARY RESTRAINING ORDERS AND PRELIMINARY INJUNCTIONS

Respondents hereby respond to the various motions for preliminary injunctions and temporary restraining orders filed by petitioners in the 15 above-captioned cases between March 14, 2005, and March 17, 2005. Because the 15 motions are coordinated, substantially similar, and in some cases identical, and in light of the expedited time frame for responding to preliminary injunction motions, respondents are filing this consolidated opposition.

Each of the motions requests (a) an injunction against the transfer, repatriation, or release of petitioners from Guantanamo; (b) an injunction requiring 30 days advance notice to counsel and the Court of any such transfer, repatriation, or release; or (c) both. The common denominator of all the motions is that they are based on rumors, myths, and hype that are refuted by sworn testimony of senior United States Government officials.

- Striving to convey a sense of unfolding crisis, petitioners persistently and prominently rely on a March 11, 2005, New York Times article, from which they derive the alarmist conclusion that the United States is about to carry out a secret plan to ship "hundreds" of Guantanamo detainees to prisons in Saudi Arabia, Afghanistan, and Yemen. However, the plain fact is that no such plan exists. See Second Declaration of Matthew C. Waxman, originally filed in Abdah v. Bush, Civ. A. No. 04-cv-1254 (HHK), ¶¶ 3-4 (hereinafter "Second Waxman Decl.") (attached hereto as Ex. A).[1]

- Drawing from a hodgepodge of newspaper and magazine stories, petitioners make allegations such as that respondents "clearly intend to transfer prisoners from Guantanamo to foreign countries where they may [be] imprisoned indefinitely and tortured without due process of law at this country's behest." El-Banna Mem. at 1.[2] However, sworn declarations unambiguously defeat that allegation, attesting to the specific policy of the United States not to transfer anyone to places where it is more likely than not that they will be tortured, and the specific steps that are taken to implement that policy with respect to these detainees. See Declaration of Matthew C. Waxman, originally filed in Abdah v. Bush, ¶¶ 6-7 (hereinafter "Waxman Decl.") (attached hereto as Ex. B); Declaration of Pierre-Richard Prosper, originally filed in Abdah v. Bush, ¶¶ 4, 8 (hereinafter "Prosper Decl.") (attached hereto as Ex. C).[3]

_____

[1] Indeed, government counsel informed petitioners' counsel before they filed their motions that the notion of such an imminent mass transfer was erroneous.

[2] The memoranda the various petitioners have filed in support of their respective preliminary injunction motions are cited herein as "[Case Name] Mem. at ___."

[3] The numbers of previous transfers in the Waxman and Prosper Declarations, see Waxman Decl. ¶ 4; Prosper Decl. ¶ 2, were current as of March 8, 2005, the date those Declarations were made. On March 12, 2005, three detainees (not petitioners herein) found by Combatant Status Review Tribunals to be non-enemy combatants were transferred for release. See Press Release dated Mar. 12, 2005, at <<http://www.defenselink.mil/releases/2005/

- Straining to ascribe malignant intent to respondents, petitioners say that any transfers and repatriations are part of a sudden calculated attempt to "strip" the Court's jurisdiction or to "flout" certain rulings of the Court. This is utter nonsense. Transfers and repatriations of enemy combatants detained at Guantanamo have been occurring for years, before the Supreme Court's decision in <u>Rasul</u> and long before any of these cases were filed. <u>See</u> Second Waxman Decl. ¶ 4; <u>see also</u> <<http://www.defenselink.mil/news/detainees.html>> (showing chronology of releases and transfers). Indeed, the Supreme Court in <u>Rasul</u> noted the intervening transfers of two named petitioners therein while that case was before it, without even a hint of disapproval. <u>Rasul v. Bush</u>, 124 S. Ct. 2686, 2690 n.1 (2004).

Preliminary injunctions should not be granted on the basis of conspiracy theories fueled by rumors and press reports, but refuted by the plain facts. Moreover, there is no legal basis for the Court to intervene in the transfer and repatriation of enemy combatants, either by virtue of the habeas corpus statute or otherwise, and either through an outright prohibition on such transfers and repatriations, or through an advance notice requirement to enable or facilitate seeking such a prohibition in the future. Thus, the motions should be denied.

## I. THE TRUE FACTS DO NOT SUPPORT AN INJUNCTION IN ANY FORM

It is possible that there has never been a preliminary injunction motion the factual basis of which was so divorced from reality. Except in a handful of instances, which will be discussed below, the entirety of petitioners' factual premise consists of "on information and belief" allegations and the unfounded suspicions of counsel. Rather than come forward with even a shred of competent evidence to suggest a need for an injunction in any of these cases, petitioners parade story after story containing graphic allegations of torture supposedly perpetrated at various corners of the globe, not one of which has anything to do with the transfer or repatriation

---

nr20050312-2226.html>>. The March 12 transfer brings the total number of detainees who have departed Guantanamo to 214 and the number transferred for release to 149.

of Guantanamo detainees.[4]  Having created this echo chamber of sensationalistic media reports, petitioners then insinuate that there is some kind of nefarious conspiracy at work to ship Guantanamo detainees off to countries where they will be tortured and detained indefinitely at the behest of the United States.  Typical of this feeding frenzy is one movant's reliance on third or fourth hand rumors of a surreptitious transfer that had been dispelled two days before that movant filed.  <u>Compare</u> <u>Al-Shiry</u> Mem. at 9 and Ex. 5 thereto (reporting a furtive transfer of petitioner-detainee Murat Kurnaz to a U.S. military base in Turkey on March 12), <u>with</u> Declaration of Terry M. Henry, originally submitted in <u>Doe v. Bush</u>, Civ. A. No. 05-cv-313 (CKK) (attached hereto as as Ex. D) (attaching March 13 email correspondence telling Kurnaz' counsel that Kurnaz had not been transferred and remained at Guantananamo).[5]

The notion that there is a conspiracy afoot to send detainees abroad for torture or indefinite detention under United States control is a product of petitioners' counsel's imaginations.  Respondents submit the sworn declarations of two high-level United States government officials that provide detailed description of the United States' policies and processes

---

[4] Presciently, movants in one case anticipated that respondents would argue herein "that the numerous recent news reports regarding the anticipated transfers of Guantanamo detainees are unfounded."  <u>Almurbati</u> Mot. at 8.  Incredibly, however, instead of countering that the news reports <u>are</u> well founded, petitioners seemingly take the position that the accuracy, or lack thereof, of the news reports on which they base their motion does not really matter because "Respondents can suffer no conceivable harm from complying with Petitioners' request."  <u>Id.</u>

[5] The same movant is so desperate for material to breathe life into the myths that petitioners have propagated that his counsel perceives something sinister about the Department of Defense transferring detainees found to be non-enemy combatants <u>for</u> <u>release</u>.  <u>See</u> <u>Al-Shihry</u> Mem. at 9 (urging irreparable harm on the basis that "[a]s recently as March 12, 2005, the Department of Defense announced three more 'transfers' – a term distinguishable from 'release' - of detainees from Guantanamo to Afghanistan, Maldives, and Pakistan, precisely the harm Petitioner seeks to avoid in this case").  The press release movant cites makes clear in its first sentence that the transfers in question were for release.

for transferring and repatriating Guantanamo detainees. These declarations conclusively and

unmistakably refute the factual scenario that petitioners portray:

- The United States pursues possible transfer and repatriation of detainees not because it wants them to be tortured or detained indefinitely, but because the United States has no interest in detaining enemy combatants longer than necessary. Waxman Decl. ¶ 3; Prosper Decl. ¶ 2. Since the detainees in question are foreign nationals in custody at a U.S. military base, ending their detention by the United States necessary entails repatriating or transferring them to their country of origin or a third country willing to accept their entry.

- The United States does not transfer individuals to countries where it is more likely than not that they will be tortured. Waxman Decl. ¶ 6; Prosper Decl. ¶ 4.

- To implement this policy, the Department of Defense undertakes a process in consultation with other agencies that takes into account the particular circumstances of the proposed transfer, the country, the individual concerned, and any concerns regarding torture or persecution that may arise. Waxman Decl. ¶¶ 6-7; Prosper Decl. ¶¶ 6-8. The United States seeks humane treatment assurances whenever continued detention is foreseen after transfer and pursues more specific assurances where circumstances warrant, including assurance of access to monitor treatment after transfer. Prosper Decl. ¶¶ 6-8. The Secretary of Defense or his designee approves a transfer with the involvement of senior United States Government officials, including Department of State officials most familiar with international legal standards and the conditions in the countries concerned. Waxman Decl. ¶ 7; Prosper Decl. ¶¶ 7-8.

- If any concerns about possible mistreatment of an individual in his home country or other prospective destination country cannot be resolved, the Department of Defense does not and will not transfer the individual to that country. Prosper Decl. ¶ 8; Waxman Decl. ¶ 7.

- When the Department of Defense transfers detainees to the control of other governments, the detainees are no longer subject to the control of the United States once transferred, and any subsequent confinement in the receiving country is a function of the receiving government's law enforcement or prosecution interest or other reasons based on the domestic law of the receiving government. Waxman Decl. ¶ 5.

8

Quite simply, petitioners' portrait of how transfers and repatriations work at Guantanamo does not correlate with reality. When their fictional account is replaced by the true facts, the asserted need for a preliminary injunction evaporates.[6]

As noted above, a handful of petitioners supplement their reliance on media reports with particularized allegations pertaining to their individual situations. For various reasons, even these particularized allegations fall short of the factual showing that would be necessary to justify a preliminary injunction:

- In <u>Aziz</u>, petitioner's brief contains a vague statement that "[t]o [Aziz's wife's] knowledge, Mr. Aziz has already been threatened with rendition, and fears being transferred," <u>Aziz</u> Mem. at 3, but the only document cited for this proposition (Aziz's habeas petition) contains nothing about any such threat.

- In <u>Qassim</u>, petitioners supplementally submitted a March 16, 2005, <u>Financial Times</u> article, which they claim indicates that the United States is "considering releasing [petitioners] to China" despite concerns that they would be tortured there. See <u>Qassim</u> Second Decl. of Susan Baker Manning. However, far from justifying a preliminary injunction, the article actually shows respondents' policy at work: it reports that former Secretary of State Powell said that the United States would not send the Chinese detainees back to China; that the United States

---

[6] Many of the petitioners cite the recent decision in <u>Abu Ali v. Ashcroft</u>, 350 F. Supp. 2d 28 (D.D.C. 2004), as if it provides support for an injunction here. The <u>Abu Ali</u> decision did not involve detention by the Military pursuant to the Executive's war powers, or even by any part of the United States Government all. Rather, the decision involved an individual arrested in the first instance by the Saudis in Saudi Arabia – not transferred there by the United States – and held in Saudi custody there. In <u>Abu Ali</u>, Judge Bates held that as a legal matter the petitioners' theory of constructive custody, <u>if</u> borne out by the facts, <u>could</u> support jurisdiction under the habeas statute. <u>Id.</u> at 68. Judge Bates made no factual findings about such a theory. <u>Id.</u> at 67-68. Petitioners here are not proceeding under any theory of constructive custody; rather, all parties agree that petitioners are in the actual custody of the United States and that, in light of <u>Rasul</u>, there is jurisdiction under the habeas statute. Whatever <u>Abu Ali</u> may say about the reach of the Court's jurisdiction to cover a so-called "constructive custody" situation, it is irrelevant to the situation in the instant cases where sworn testimony makes clear that when the Department of Defense transfers GTMO detainees to the control of other governments, the receiving government is not asked to detain the individual on behalf of the United States, and the detainee is no longer subject to the control of the United States once transferred. Waxman Decl. ¶ 5.

has engaged the United Nations High Commissioner for Refugees and multiple third countries, and would continue to do so, in an effort to find a suitable transfer country for the Chinese detainees; and reaffirms that the United States would not return the Chinese detainees to China if it believed they would be tortured there.

- In <u>Almurbati</u>, petitioners submit their counsel's testimony that two of the six <u>Almurbati</u> petitioners told counsel that unidentified "U.S. personnel," at an unspecified time, in an unspecified context, told one of them that he might be sent to a prison where he would be "raped" and another that he might be sent to a prison where he would be "turned into a woman." <u>Almurbati</u> Mem. at 2. This hearsay is so vague, cryptic, and lacking in context that it is difficult to meaningfully evaluate, but in any case, it does not overcome the United States' sworn declarations attesting to a policy and practice that decidedly would not allow transfer to foreign prisons for torture, including rape or "turn[ing] into a woman."

- In <u>El-Banna</u>, petitioner El-Banna believes he may be extradited to Spain, but says he "welcomes" extradition to Spain. <u>El-Banna</u> Mem. at 8 n.4.[7] The other petitioner in <u>El-Banna</u>, an Iraqi national who states that his family fled Iraq during the Saddam Hussein era, claims to have been told by the Military that he might be repatriated to Iraq, but his resistance to repatriation is not based on any fears of torture or detention there, but on his not having family, a residence, or employment prospects there. <u>El-Banna</u> Mot. Ex. 5, ¶ 11.

Thus, the true facts – stripped of petitioners' hyperbole, speculation, and conspiracy theories – do not remotely support entry of a preliminary injunction. Moreover, as discussed below, there is no valid legal basis for the Court to supervise repatriation and transfer of enemy combatant detainees, either through an outright prohibition or through an advance-notice requirement to enable future litigation aimed at such a prohibition.

---

[7] Petitioners' memorandum in <u>El-Banna</u> states that government counsel "conceded that Petitioners will be transferred in several weeks." <u>El-Banna</u> Mem. at 12 n.8. In fact, what government counsel told petitioners' counsel was that any transfer of any petitioner-detainee, even if approved, would be weeks away. Petitioners' counsel has admitted to inadvertently misstating what government counsel said.

## II.    THERE IS NO BASIS IN LAW FOR ISSUING AN INJUNCTION IN ANY FORM

In order to justify an injunction, petitioners must demonstrate a legal entitlement, either through habeas corpus or some other substantive claim, to have judicial involvement in the circumstances of their transfer or repatriation.  This is so regardless of whether the injunction sought is an outright prohibition on transfer or repatriation, or an advance notice requirement to enable or facilitate future judicial intervention.

A.    Habeas Jurisdiction

All of the petitioners make some variant of the argument that respondents are "attempting to place the Petitioners outside the jurisdiction of the Court," El-Banna Mem. at 8, and that the Court needs to act, pursuant to the All Writs Act, 28 U.S.C. § 1651, or otherwise, to "protect its jurisdiction."  Again, the premise of this argument egregiously misstates respondents' motives.  There is no plan to evade the Court's jurisdiction.  Second Waxman Decl. ¶ 4.  To the contrary, transfers and repatriations merely continue a steady and longstanding pattern of numerous similar transfers and repatriations dating to long before the Supreme Court held in Rasul that the courts have jurisdiction over legitimate habeas claims of Guantanamo detainees, and long before these cases were filed.  See <<http://www.defenselink.mil/news/detainees.html>> (showing chronology of releases and transfers).  These transfers and repatriations have been effected because, although it is appropriate for DoD to detain enemy combatants as long as hostilities are ongoing, DoD has no interest in detaining enemy combatants longer than necessary.  Waxman Decl. ¶ 3.

Petitioners essentially argue that the Court must "protect" its jurisdiction by ordering that their detention by the United States at Guantanamo be extended longer than the United States

deems warranted, and potentially for the duration of each case, or by ordering advance notice to facilitate imposing such an extension in the future. However, the fact that under <u>Rasul v. Bush</u>, 124 S. Ct. 2686 (2004), the courts have habeas jurisdiction to consider claims by detainees that present custody by the United States is unlawful does not carry with it the necessary corollary that the courts should stand in the way of decisions by the United States to end that custody in appropriate circumstances. Perhaps the most vivid refutation of petitioners' "protection of jurisdiction" theory is found in the very decision that inspired their petitions: The first footnote of <u>Rasul</u> observes, "When we granted certiorari, the petitioners also included two British citizens, Shafiq Rasul and Asif Iqbal. These petitioners have since been released from custody." <u>Rasul</u>, 124 S. Ct. at 2690 n.1; <u>see also</u> Press Release dated Mar. 9, 2004, at <<http://www.defenselink.mil/releases/2004/nr20040309-0443.html>> ("The Department of Defense announced today that it transferred five British detainees from Guantanamo Bay, Cuba, to the British government today."). The Supreme Court hardly objected to these releases from custody while <u>Rasul</u> was pending before it as some kind of affront to its jurisdiction; it simply moved on to consider the claims of the petitioners still in custody whose claims remained before it.[8]

The underlying purpose of detention of enemy combatants at Guantanamo is to remove

---

[8] Petitioners' "protection of jurisdiction" argument cannot be reconciled with the Supreme Court's lack of apparent umbrage at what, under that argument, would be considered a "deprivation" of its jurisdiction on the basis that the transfer there was apparently not objected to, or that the British government subsequently released those detainees. After all, the crux of petitioners' argument is that <u>no</u> transfer should take place that would "remov[e] Petitioners from the jurisdiction of this Court" (<u>El-Banna</u> Mem. at 1); such an argument does not leave any room to differentiate between transfers on the basis of what particular foreign country is involved, or expectations whether that country plans release. In fact, of the 65 detainees transferred by the Department of Defense from Guantanamo to the control of their home government, most were subsequently released from detention. Waxman Decl. ¶ 5.

them from the fight and negate the danger they would otherwise pose to the United States and its

allies, see Hamdi v. Rumsfeld, 124 S. Ct. 2633, 2640 (2004) (plurality opinion), not to create a

habeas corpus case for the Court to review.  If the Executive determines, for whatever reason,

that the Nation's security no longer requires it to detain a particular individual, then the obvious

and natural thing to do is to end the detention.[9]  What petitioners are suggesting is that, in such a

situation, the Court should paradoxically order the detention of a particular individual – detention

that, by hypothesis, the detaining authority would otherwise end – to be prolonged for however

long that particular case might last, solely to enable the Court to rule on its legality.  It turns the

idea of habeas corpus – the object of which is release from United States custody – on its head to

argue that, purely to preserve the Court's ability to issue a ruling, the custody attacked should be

indefinitely maintained.  It also begs the question what relief would follow after the Court's

determination of the legality of detention, i.e., supposing the Court adjudged the United States'

detention of an enemy combatant unlawful, where would the Court direct that he be sent,[10] and

---

[9] In this context, because the detainees at Guantanamo Bay are foreign nationals, ending their detention by the United States necessarily means transferring them to another country, generally their country of origin.  Although the United States does not have any power to require a foreign sovereign nation to let an ex-detainee who is transferred there walk free, by far the majority of such transfers to date have been in contemplation of release.  See Waxman Decl. ¶ 4; Prosper Decl. ¶ 2.  In other cases, such as where the home government may have a pending investigation of or criminal charges against the ex-detainee, the transfer has been in contemplation of continued detention, investigation, and prosecution, as appropriate.  See Waxman Decl. ¶¶ 3-4; Prosper Decl. ¶ 2.  In any event, of the detainees transferred to the control of their home government, most have subsequently been released.  Waxman Decl. ¶ 5.

[10] Notably, most of the counsel for petitioners herein object most vehemently to repatriation to their own countries of origin.  See, e.g., Ameziane (Algerian objecting to repatriation to Algeria); Al-Shihry (Saudi objecting to repatriation to Saudi Arabia); Batarfi (Yemeni objecting to repatriation to Yemen); Qassim (Chinese objecting to repatriation to China); Al-Mohammed (Syrian objecting to repatriation to Syria); Al Rashaidan (Saudi objecting to repatriation to Saudi Arabia); Al-Wazan (Moroccan objecting to repatriation to Morocco); al

13

how could the Court order that foreign sovereign nation (or, for that matter, order the United States require that foreign sovereign nation) to accept him, to set him free, or to forbear prosecuting, investigating or detaining him as appropriate under the laws of that nation?  It is no answer to say that these issues can simply be deferred to a later stage, because they are part and parcel of petitioners' bid for programmatic judicial involvement in repatriation and transfer matters.

Thus, the fact that the Court has habeas jurisdiction to consider the legality of petitioners' detention while it lasts does not mean that the Court should order the confinement to be indefinitely prolonged for no reason other than to maintain that jurisdiction and interfere in the foreign policy decisions involved in effecting transfers to foreign governments.  Likewise, the Court should not order an advance-notice requirement to serve that same end.

B.     International Treaties

Petitioners cite various international treaties such as the International Covenant on Civil and Political Rights ("ICCPR"), the Convention Against Torture ("CAT"), and the Third and Fourth Geneva Conventions as the basis for the injunction they seek.  However, petitioners' contention that the transfer or repatriation they hypothesize would violate these treaties apparently depends on the same fiction that pervades their papers generally:  i.e., that transfer or repatriation of  Guantanamo detainees is part of a scheme to have them tortured in foreign countries.  As respondents have said repeatedly, there is no such scheme.  To the contrary,  it is the manifest policy of the United States not to transfer individuals to any country where it is

_____

Joudi (Saudi objecting to repatriation Saudi Arabia); Al Oshan (Saudi objecting to repatriation to Saudi Arabia).

more likely than not that they will be tortured. Transfers and repatriations are handled according to the policies and practices outlined in the declarations submitted herewith. Petitioners do not allege, nor could they, that a transfer for repatriation undertaken in accordance with those declarations would violate the treaties they cite.[11]

Moreover, numerous courts have held that the ICCPR and CAT do not, in and of themselves, give rise to judicially enforceable rights.[12] Therefore, the Court does not have jurisdiction to grant an injunction based on any perceived risk of a violation of the ICCPR or CAT. Whether the Geneva Conventions give rise to judicially enforceable rights, and whether Taliban and al Qaeda detainees are entitled to claim protections under those Conventions, are issues currently before the Court of Appeals in Hamdan v. Rumsfeld, D.C. Cir. No. 04-5393. In any event, petitioners fail to articulate any credible basis to expect that a transfer or repatriation

---

[11] Some of the movants take issue with the fact that respondents' analysis of the risk of torture in a particular country looks at whether it is "more likely than not" that an individual will be tortured upon return. See, e.g., Ameziane Mem. at 5. What petitioners ignore altogether is that this standard is not respondents' own creation, but rather is precisely the formulation that the United States Senate adopted as a condition of ratifying the CAT. See Resolution of Ratification, 136 Cong. Rec. S17486, S17492 (Oct. 27, 1990) ("The Senate's advice and consent is subject to the following understandings, which shall apply to the obligations of the United States under this Convention: . . . . That the United States understands the phrase, 'where there are substantial grounds for believing that he would be in danger of being subjected to torture,' as used in Article 3 of the Convention, to mean '"if it is more likely than not that he would be tortured."'").

[12] Sosa v. Alvarez-Machain, 124 S. Ct. 2739, 2767 (2004) (ICCPR); In re Guantanamo Detainee Cases, 2005 WL 195356, at *33 (D.D.C. 2005) (ICCPR); Khalid v. Bush, 2005 WL 100924, at *10 (D.D.C. 2005) (ICCPR and CAT); Auguste v. Ridge, 395 F.3d 123, 132 n.7 (3d Cir. 2005) (CAT); Iguarta de la Rosa v. United States, 32 F.3d 8, 10 n.1 (1st Cir. 1994) (ICCPR); Hawkins v. Comparet-Cassani, 33 F. Supp. 2d 1244, 1257 (C.D. Cal. 1999) (CAT and ICCPR), other orders rev'd, 251 F.3d 1230 (9th Cir. 2001); White v. Paulsen, 997 F. Supp. 1380, 1386-87 (W.D. Wash. 1998) (CAT and ICCPR); Matter of Extradition of Cheung, 968 F. Supp. 791, 802-03 & n.17 (D. Conn. 1997) (CAT and ICCPR).

in accordance with the United States policy expressed in the attached declarations would violate any aspect of the Geneva Conventions.

Petitioners may try to salvage their CAT argument by pointing to the Foreign Affairs Reform and Restructuring Act of 1998 ("FARR Act"), Pub. L. No. 105-277, § 2242, 112 Stat. 2681 (codified at 8 U.S.C. § 1231 note). The FARR Act directs the appropriate agencies to prescribe regulations to implement the obligations of the United States under the CAT. FARR Act § 2242(b). However, the FARR Act expressly provides that "nothing in this section shall be construed as providing any court jurisdiction to consider or review claims raised under the Convention or this section, or any other determination made with respect to the application of the policy set forth in subsection (a) [prohibiting the return of persons when there are substantial grounds for believing they will be tortured], except as part of the review of a final order of removal pursuant to section 242 of the Immigration and Nationality Act (8 U.S.C. § 1252)." See FARR Act § 2242(d); Soliman v. United States ex rel. INS, 296 F.3d 1237, 1241 n.1 (11th Cir. 2002) (noting lack of jurisdiction over FARR Act claims in the absence of a petition to review a final order of removal, and denial of emergency stay on that basis). This case does not involve a final order of removal under section 242 of the Immigration and Nationality Act. Therefore, the FARR Act does not create jurisdiction to review any CAT claims in the circumstances presented here.[13]

---

[13] In any event, the policy of the United States with respect to the transfer and repatriation of Guantanamo detainees is consistent with the policy expressed in the FARR Act. See FARR Act § 2242(a) ("It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States."), § 2242(f)(2) ("[T]he terms used in this section have the same meanings given those terms in the Convention, subject to any

C.     The Rule of Non-Inquiry

Even if some valid claim or other legal basis existed for judicial involvement in transfer

or repatriation decisions with respect to enemy combatants held abroad, or for an advance notice

requirement to support and facilitate such involvement, the separation of powers would bar such

relief.  "[I]t is beyond the judicial function for a court to review foreign policy decisions of the

Executive Branch."  People's Mojahedin Org. v. Dep't of State, 182 F.3d 17, 23 (D.C. Cir. 1999)

(citing Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 103 (1948));

see also Holmes v. Laird, 459 F.2d 1211, 1215 (D.C. Cir. 1972) ("In situations such as this, '[t]he

controlling considerations are the interacting interests of the United States and of foreign

countries, and in assessing them [the courts] must move with the circumspection appropriate

when [a court] is adjudicating issues inevitably entangled in the conduct of our international

relations.'") (quoting Romero v. International Terminal Operating Co., 358 U.S. 354, 383

(1959)).[14]  If the Court were to entertain petitioners' claims, it would have to inject itself into the

most sensitive of diplomatic matters.  Such judicial review could involve scrutiny of United

States officials' judgments and assessments on the likelihood of torture in a foreign country,

_____

reservations, understanding, declarations, and provisos contained in the United States Senate
resolution of ratification of the Convention.").  Thus, even if the FARR Act somehow conferred
jurisdiction, there quite simply is no basis for issuing an injunction presupposing that the United
States is going to violate the FARR Act.

[14] In Holmes, U.S. citizen servicemembers sued to prevent the United States government
from surrendering them to West German authorities to serve sentences for convictions by West
German courts on criminal charges relating to their conduct while stationed in West Germany.
Even in this situation involving U.S. citizens, the District Court and D.C. Circuit rejected the
plaintiffs' invitation to examine the fairness of their treatment by the West German courts and
declined to enjoin the transfer, the latter court holding that "the contemplated surrender of
appellants to the Federal Republic of Germany is a matter beyond the purview of this court."  459
F.2d at 1225.

including judgments on the reliability of information and representations or the adequacy of assurances provided, and confidential communications with the foreign government and/or sources therein. Prosper Decl. ¶¶ 9-12. Disclosure and/or judicial review of such matters could chill important sources of information and interfere with our ability to interact effectively with foreign governments. Prosper Decl. ¶¶ 9-12; Waxman Decl. ¶ 8. In particular, the foreign government in question, as well as other governments, would likely be reluctant to communicate frankly with the United States in the future concerning torture and mistreatment concerns. Prosper Decl. ¶¶ 10, 12. This chilling effect would jeopardize the cooperation of other nations in the war on terrorism. Prosper Decl. ¶¶ 10, 12; Waxman Decl. ¶ 8.

Because of these foreign relations implications, as developed most extensively in the analogous context of extradition, courts have uniformly eschewed inquiry into "'the fairness of a requesting nation's justice system'" and "'the procedures or treatment which await a surrendered fugitive in the requesting country.'" United States v. Kin-Hong, 110 F.3d 103, 110 (1st Cir. 1997) (quoting Arnbjornsdottir-Mendler v. United States, 721 F.2d 679, 683 (9th Cir. 1983)). This principle is sometimes called the Rule of Non-Inquiry. For example, in Ahmad v. Wigen, 910 F.2d 1063 (2d Cir. 1990), a United States citizen was extradited from the United States to Israel to stand trial for an alleged terrorist attack. While the district court upheld the extradition only after receiving testimony and extensive documentation concerning Israel's law enforcement system and treatment of prisoners, the Second Circuit held that such inquiry was improper. "The interests of international comity are ill-served," the Second Circuit explained, "by requiring a foreign nation such as Israel to satisfy a United States district judge concerning the fairness of its laws and the manner in which they are enforced." Id. at 1067. "It is the function of the Secretary

of State to determine whether extradition should be denied on humanitarian grounds." <u>Id.</u>

<u>Accord</u> <u>Escobedo v. United States</u>, 623 F.2d 1098, 1107 (5th Cir. 1980) (refusing to bar

extradition based on allegations that appellant "may be tortured or killed if surrendered to

Mexico," because "the degree of risk to [Escobedo's] life from extradition is an issue that

properly falls within the exclusive purview of the executive branch" (internal quotation marks

omitted)); <u>Peroff v. Hylton</u>, 563 F.2d 1099, 1102 (4th Cir. 1977); <u>Matter of Extradition of</u>

<u>Sandhu</u>, 886 F. Supp. 318, 321-23 (S.D.N.Y. 1993). <u>See generally</u> Jacques Semmelman, <u>Federal</u>

<u>Courts, the Constitution, and the Rule of Non-Inquiry in International Extradition Proceedings</u>,

76 Cornell L. Rev. 1198 (1991).[15]

The force of these principles is not diminished by the fact that the relief petitioners seek

covers <u>any</u> kind of prospective transfer or repatriation – indeed, any "removal" from Guantanamo

– not merely an extradition. The considerations that underlie the Rule of Non-Inquiry are not

endemic to the specific context of extradition, but instead rest on the constitutional separation of

---

[15] In <u>Cornejo-Barreto v. Seifert</u>, 218 F.3d 1004 (9th Cir. 2000), two Judges on a panel of the Ninth Circuit stated in dicta that a permanent resident within the United States facing extradition could seek judicial review of his claim that he would be tortured if extradited. <u>But see id.</u> at 1017 (Kozinski, J., concurring) (not joining this part of the panel opinion). However, in a later appeal growing out of the same case, another panel of the Ninth Circuit disagreed with that statement, recognizing it as dicta, and held, consistent with previous Ninth Circuit precedent, <u>Lopez-Smith v. Hood</u>, 121 F.3d 1322 (9th Cir. 1997), that the Rule of Non-Inquiry barred judicial review of such a claim. <u>Cornejo-Barreto v. Seifert</u>, 379 F.3d 1057 (9th Cir. 2004). While that appeal was still pending (the Ninth Circuit having granted rehearing en banc), the case became moot when the foreign government seeking extradition withdrew its request. Accordingly, the Ninth Circuit dismissed the appeal, vacating as moot the 2004 panel opinion and the district court opinion it reviewed. <u>Cornejo-Barreto v. Seifert</u>, 389 F.3d 1307 (9th Cir. 2004).

powers.[16]  See Matter of Requested Extradition of Smyth, 61 F.3d 711, 714 (9th Cir. 1995)

("Undergirding this principle is the notion that courts are ill-equipped as institutions and

ill-advised as a matter of separation of powers and foreign relations policy to make inquiries into

and pronouncements about the workings of foreign countries' justice systems."); Sandhu, 886 F.

Supp. at 321 ("The rule of non-inquiry arises from recognition that the executive branch has

exclusive jurisdiction over the country's foreign affairs."); cf. Holmes, 459 F.2d at 1219-23

(holding, in a non-extradition context, that considerations similar to those embodied in the Rule

of Non-Inquiry made it improper for the Judiciary to examine allegations of unfairness in a

foreign nation's trial of a U.S. citizen).  Thus, petitioners cannot turn to the courts to second-

guess Executive judgments about matters such as custodial conditions and/or the adequacy of

---

[16] In another Guantanamo detainee case in which a similar motion already has been fully briefed, petitioners argued that the Rule of Non-Inquiry is contingent entirely on the existence of an extradition treaty, citing In re Extradition of Howard, 996 F.2d 1320, 1329 (1st Cir. 1993). However, the applicable language from Howard was characterized as dicta by the First Circuit in a subsequent decision.  Kin-Hong, 110 F.3d at 111 n.12.  In that later case, while pretermitting the question "[w]hether the doctrine is constitutionally mandated" as "immaterial here," the First Circuit cited an analogy to the act-of-state doctrine and described the doctrine using language imbued with constitutional significance.  See id. at 110-11 ("The rule of non-inquiry, like extradition procedures generally, is shaped by concerns about institutional competence and by notions of separation of powers.  It is not that questions about what awaits the relator in the requesting country are irrelevant to extradition; it is that there is another branch of government, which has both final say and greater discretion in these proceedings, to whom these questions are more properly addressed.") (citation omitted).

Moreover, to the extent that petitioners' argument may evolve into a contention that they may not be repatriated or transferred except in accordance with an extradition treaty or statute, such a contention would be wholly without merit.  See United States v. Alvarez-Machain, 504 U.S. 655 (1992); Ker v. Illinois, 119 U.S. 436 (1886); Coumou v. United States, 107 F.3d 290, 295 (5th Cir. 1997) (reversing lower court's holding, 1995 WL 2292, *11 (E.D. La. Jan. 3, 1995), that "[n]or did the United States, or its officers or agents, have the discretion to deliver an arrested person to the government of Haiti, unless the extradition laws of the United States were followed").

legal procedures in a foreign country as well as the credibility and adequacy of a foreign government's assurances – matters "'for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.'"  People's Mojahedin, 182 F.3d at 23 (quoting Chicago & Southern, 333 U.S. at 111).

***

Thus, there is no basis in law for an injunction in any of the varying forms different petitioners have requested.  The Court's habeas corpus jurisdiction does not support the notion of ordering custody that respondents wish to relinquish to be artificially and indeterminately extended purely to preserve a live case for the Court.  Likewise, the treaties petitioners cite are not judicially enforceable, but, more importantly, are not violated by respondents' policies concerning transfers and repatriations.  And, apart from the absence of affirmative legal authority, separation of powers considerations and foreign relations sensitivities preclude a judicial inquiry in which this Court would substitute its judgment regarding the appropriateness of repatriation for that of the appropriate Executive Branch officials.

## III.    THE BALANCE OF HARMS AND PUBLIC INTEREST DISFAVOR AN INJUNCTION

It is critical that the balancing of harms and public interest components of the preliminary injunction analysis take into account the actual facts on the ground at Guantanamo, not the misleading portrayal of the facts that petitioners have made based on inaccurate media reports, hysteria, and innuendo.  Thus, the balancing of harms and public interest analyses must be predicated on a recognition that the United States does not transfer or repatriate detainees to

countries where they are likely to be tortured; that the United States is not preparing to effect a mass transfer of detainees from Guantanamo to elude the jurisdiction of the Court; and that the United States does not transfer detainees from Guantanamo into the custody of foreign countries to be held on behalf of the United States or in contemplation of the United States continuing to exercise control over those detainees.

Viewed properly in this light, petitioners do not stand to suffer any harm in the absence of an injunction. What will occur absent an injunction is that the United States will act consistently with its policy reflecting the principles of the Convention Against Torture: petitioners will not be repatriated or transferred if the Executive Branch finds that it is more likely than not that they will be tortured in the country of destination. As detailed in the Prosper and Waxman Declarations, the United States Government would seek appropriate assurances from their destination country and would evaluate whether they are sufficient or whether additional assurances or, potentially, measures such as access to enable monitoring of the individual's condition, are needed. If specific concerns about the treatment after transfer cannot be resolved satisfactorily, the United States would not transfer the individual. Thus, the policy of the United States is structured to guard against exactly the risks that petitioners fear.

On the other hand, the presence of an injunction, either in the form of an outright prohibition or an advance-notice requirement to set the stage for future judicial intervention, would result in considerable harm to the United States and to the public interest. Judicial intervention in transfer and repatriation decisions would prevent the United States from speaking with one voice in its dealings with foreign governments, particularly when such intervention, as here, would be by as many as 14 different Judges in scores of cases. It would cause foreign

governments to become more reluctant to communicate frankly with the United States concerning particular mistreatment or torture concerns, undermining the United States Government's ability to investigate and resolve allegations of mistreatment or torture that come to its attention. Prosper Decl. ¶¶ 9-10; Waxman Decl. ¶ 8. It would undermine the United States' ability to reduce the numbers of individuals under U.S. control and our effectiveness in eliciting the cooperation of other governments in the war on terrorism. Prosper Decl. ¶ 12; Waxman Decl. ¶ 8. And it would encumber and add delay to an already elaborate process leading up to transfers or repatriations. Prosper Decl. ¶ 12.

As shown in the caption, because these motions have been filed in a number of cases, these harms take on large scale proportions. These motions raise the prospect of pervasive and programmatic judicial management of the transfer and repatriation of enemy combatant detainees, effectively reducing the Executive Branch to an advisory role in this core military function. The separation of powers and the public interest cannot tolerate such an arrogation. Therefore, the motions should be denied.

## IV.    THE TRO ENTERED IN __ABDAH__ WITHOUT NOTICE TO RESPONDENTS AND ON AN ERRONEOUS FACTUAL PREDICATE DOES NOT SUPPORT ISSUANCE OF A PRELIMINARY INJUNCTION

All of the motions for preliminary injunction lean heavily on an ex parte Temporary Restraining Order entered by Judge Collyer, acting as Emergency Judge, on Saturday, March 12, 2005, in Abdah v. Bush, Civ. A. No. 04-cv-1254. As explained below, the Abdah TRO was issued in expedition on the basis of an erroneous factual predicate in circumstances where respondents were not afforded an opportunity to bring the correct information to the attention of the Court. Further, the Abdah TRO, like all TROs, does not purport to stand as a final judgment

on the matters it addresses, but merely bridges the gap for a short period of time until the Court

can give those matters more deliberative consideration. Thus, notwithstanding petitioners' pleas

to follow in lockstep with the <u>Abdah</u> TRO, the issues before the Court demand its independent,

<u>de novo</u> consideration.[17]

The TRO was the product of a filing by <u>Abdah</u> petitioners at 10:30 p.m. on Friday

evening, March 11, 2005, without notice to respondents' counsel or inquiry regarding the veracity

of facts upon which they were acting. The next day, without prior notice to respondents' counsel,

Judge Collyer entered a TRO restraining respondents from removing the <u>Abdah</u> petitioners from

GTMO pending a March 24, 2005 hearing on petitioners' previously pending motion for 30-

days' advance notice of any transfer of petitioners, or for ten days, whichever was less. In the

Memorandum Opinion supporting the TRO, Judge Collyer recounted the alleged factual basis for

the TRO, stating:

> [T]he <u>New York Times</u> ran a story on March 11, 2005, describing a proposal by
> the Pentagon and Secretary of Defense Donald Rumsfeld to transfer more than
> half of the GTMO detainees to prisons in Saudi Arabia, Afghanistan, and Yemen.
> Petitioners' counsel also learned from co-counsel at the Center for Constitutional
> Rights, "citing information from a person, who, for professional reasons, refuses
> to make her sources public – that the government intends to transfer many
> detainees very quickly." Petitioners' <u>Ex Parte</u> Motion for Temporary Restraining
> Order to Prevent Respondents From Removing Petitioners From Guantanamo
> Until Petitioners' Motion for Preliminary Injunction Is Decided ("Pets.' Motion"),
> Declaration of Marc D. Falkoff ("Falkoff Decl.") ¶ 3. Petitioners seek an <u>ex parte</u>
> TRO "because they are apprehensive that a public filing will provoke respondents
> to initiate the exact dark-of-night transfers that petitioners seek to prevent." Pets.'
> Motion at 2.

TRO Mem. Op. at 2 (footnote omitted). Judge Collyer rested her TRO, and apparently the lack

---

[17] For the same reason, the Court should not give precedential weight to the various other
orders that some of the Judges of the Court have entered to cover the transitory period until these
preliminary injunction motions can be heard.

of notice to government counsel regarding the TRO motion, upon the correctness of these allegations. However, as discussed above, these allegations are demonstrably erroneous: There is no plan being considered, nor has a plan been considered in the recent past, to effect an immediate transfer of large numbers of DoD detainees held at GTMO, such as petitioners, out of GTMO, including to other countries, and no transfer of any current habeas petitioner in these cases would occur, if at all, for several weeks, at a minimum. *See* Second Waxman Decl. ¶ 4. Thus, the factual basis for the TRO was erroneous and it should never have been entered.[18]

To some extent, Judge Collyer's memorandum opinion appears to construe certain averments in respondents' declarations as corroborating the concerns that led Abdah petitioners to file the TRO. Judge Collyer apparently read the Prosper Declaration as admitting some aspects of petitioners' alleged factual framework. See Mem. Op. at 9 (citing Prosper Decl ¶¶ 2, 6). However, the Prosper Declaration does not support any inference that the United States arranges for transferee countries to detain transferred individuals indefinitely on behalf of the United States and without redress, and the concurrently submitted Waxman Declaration undercuts any such inference. See Waxman Decl. ¶ 5.

In any event, the very purpose of a TRO is to facilitate a later resolution on the merits, not to go ahead and provide that resolution. As Judge Collyer plainly stated, "[t]he Court expresses no opinion on the likelihood that Petitioners will succeed in their request for a 30-day notice prior to any transfer to a foreign country." Mem. Op. at 7. These motions for a preliminary

---

[18] When respondents moved to vacate the TRO on this ground, albeit unsuccessfully, Abdah petitioners did not stand behind the newspaper stories and rumors that they had originally peddled to the Court, but merely argued that the TRO should be continued on the grounds that the situation could change and that the TRO resulted in no "practical prejudice" to respondents.

injunction should therefore be resolved <u>de novo</u> on the basis of a full and complete airing of the weighty issues at stake, not prejudged by a TRO that was the product of one-sided briefing and an erroneous factual submission.[19]

## V. CERTAIN PETITIONERS' REQUESTS FOR PRELIMINARY INJUNCTION DISCOVERY SHOULD BE DENIED

A few of the movants append boilerplate requests for discovery to their motions. Discovery is disfavored in habeas corpus cases and not allowed except by leave of court for good cause shown. See <u>Harris v. Nelson</u>, 294 U.S. 286, 296-97 (1969) (discovery is "ill-suited to the special problems and character of [habeas] proceedings" and tends to "be exceedingly burdensome and vexatious" in such cases). In the rare case where it is appropriate, a habeas petitioner seeking discovery is required to attach the proposed discovery requests for which leave is sought, <u>see</u> Rule 6(b) of the Rules Governing Section 2254 Cases in the United States District Court (applicable in the Court's discretion to non-§ 2254 cases via Rule 1(b)), a practice also normally followed with respect to requests for preliminary injunction discovery, <u>see</u> <u>Merrill Lynch, Pierce, Fenner & Smith, Inc. v. O'Connor</u>, 194 F.R.D. 618, 624 (N.D. Ill. 2000) ("where a plaintiff seeks expedited discovery to prepare for a preliminary injunction hearing, it makes sense to examine the discovery request, as we have done . . . ."). None of the movants who request discovery has done so. Moreover, without a specific, concrete proposed transfer on which to

---

[19] While petitioners do not pass up any opportunity to cite the <u>Abdah</u> TRO, they fail to bring to the attention of the Court a ruling in another Guantanamo detainee case in which a preliminary injunction motion very similar to those presently before the Court was denied on the basis that the petitioner's theory of irreparable harm based principally on media reports was speculative and conjectural. <u>See</u> Order dated Dec. 7, 2004, in <u>Paracha v. Bush</u>, Civ. A. No. 04-2022 (PLF).

focus, there would not even be any context for any discovery.[20]  Therefore, these requests must be denied.

In any event, and most importantly, for the reasons discussed above there is no viable legal basis upon which the Court could grant the injunction in either form requested.  Thus, no amount of factual discovery can salvage petitioners' flawed motions.  Indeed, discovery both underscores and would aggravate the serious separation of powers problems posed by petitioners' motions generally.  See, e.g., Cheney v. United States Dist. Ct. for the Dist. of Col., 124 S. Ct. 2576, 2586-88 (2004) (noting availability of mandamus to restrain discovery that interferes with the ability of a coequal branch of Government to carry out its constitutional duties).  Thus, petitioners' requests to engage in unfettered and unspecified discovery in search of after-acquired support for already-filed motions that are legally non-viable should be denied.

## VI.  CONCLUSION

For the reasons stated above, respondents respectfully request that petitioners' motions be denied.

Dated:  March 21, 2005                     Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

KENNETH L. WAINSTEIN
United States Attorney

BRIAN D. BOYLE
Principal Deputy Associate Attorney General

---

[20]  Respondents do not mean to imply that discovery would be appropriate if and when there comes about such a concrete transfer proposal.  To the contrary, it seems unavoidable that any such discovery would intrude on the most sensitive of diplomatic matters and pose serious separation of powers problems.

DAVID B. SALMONS
Assistant to the Solicitor General

DOUGLAS N. LETTER
Terrorism Litigation Counsel


   _/s/_ Terry M. Henry
JOSEPH H. HUNT (D.C. Bar No. 431134)
VINCENT M. GARVEY (D.C. Bar No. 127191)
TERRY M. HENRY
JAMES J. SCHWARTZ
PREEYA M. NORONHA
ROBERT J. KATERBERG
ANDREW I. WARDEN
NICHOLAS J. PATTERSON
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel:  (202) 514-4107
Fax:  (202) 616-8470

Attorneys for Respondents