UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

ABU BAKKER QASSIM and A'DEL ABDUL
HAKIM,

    Petitioners/Plaintiffs,

v.

GEORGE W. BUSH, *et al.*,

    Respondents/Defendants.

Case No. 05 cv 0497 (JR)

## SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION
## TO VACATE STAY ORDER AND ISSUE WRIT DIRECTING IMMEDIATE RELEASE
## OF PETITIONERS AND FOR OTHER RELIEF

### I. INTRODUCTION

Petitioners Abu Bakker Qassim and A'Del Abdul Hakim submit this Supplemental Memorandum in support of their Emergency Motion to Vacate Stay and Issue Writ Directing Immediate Release of Petitioners, and for other relief. This brief addresses several points raised at the August 1, 2005, hearing.[1]

In sum, continued, indefinite imprisonment of the petitioners is an unlawful option. Billeting at the Migrant Operations Center at Guantanamo Naval Base would be imperfect, but better. Reflecting on the issues raised by the Court and relevant authorities, however, we believe that the lawful and most practical option would be to order the Petitioners brought before the

---

[1] Petitioners submit herewith the August 4, 2005 Declaration of Sabin Willett ("Supp. Decl.") which addresses several points raised at the hearing. In addition, the Declaration sets forth facts that counsel did not raise in oral argument because he was uncertain whether the facts had been "declassified" by the Government's secrecy review team. Counsel visited the secure facility on August 2, 2005, and ascertained that these facts—that there are other, unrepresented prisoners who have been cleared by the Government's Combatant Status Review Tribunals ("CSRT"), and yet continue to be held in harsher conditions than the Petitioners—have been declassified. These facts are discussed below.

Court for a hearing, as provided for in the *habeas* statute. Thereafter, and in accordance with the settled law of this Circuit, the Petitioners could be granted interim release under terms of supervision agreeable to the Court.

## II. ARGUMENT

### A. THIS COURT HAS POWER TO GRANT INTERIM RELEASE PENDING FINAL RESOLUTION OF A *HABEAS* CASE.

#### 1. This Court Has Power to Order Conditional Bail or Release.

A district court having jurisdiction of a *habeas corpus* matter has the power to order interim release; that is, a temporary release from custody pending final adjudication of the writ. *Baker v. Sard*, 420 F.2d 1342, 1343 (D.C. Cir. 1969); *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001) (*citing to Baker*, 420 F.2d at 1343); *Ostrer v. United States*, 584 F.2d 594, 596 at n.1 (2d Cir. 1978); *Boyer v. City of Orlando*, 402 F.2d 966, 968 (5th Cir. 1968) (ordering the release of a habeas petitioner on bail pending exhaustion of state and federal remedies); *Whitfield v. Hanges*, 222 F. 745, 755-56 (8th Cir. 1915) (holding that an alien about to be deported without a fair hearing is entitled to relief by habeas corpus). In *Baker*, the Court of Appeals for the District of Columbia confirmed that a district court has "an inherent power to grant relief *pendente lite*, to grant bail or release, pending determination of the merits." *Baker*, 420 F.2d at 1343. The D.C. Circuit specifically noted that "*[r]elease is available in a habeas corpus action*, which is a civil collateral attack." *Id.* (emphasis added).

The Second Circuit Court of Appeals's recent decision in *Mapp* cites to *Baker* and is in accord with it. *Mapp* involved a *habeas* petitioner who had been detained by the Immigration and Naturalization Service ("INS") pending deportation pursuant to a statute authorizing such detention. The petitioner sought a writ of *habeas corpus*, and asked the district court to release

him from INS detention on bond, pending resolution of the writ. No provision of immigration law authorized this.

The Second Circuit closely reviewed the authorities addressing the question of whether a federal district court in a *habeas* case has the inherent power to order interim release. The court affirmed the proposition that "[a] district court has inherent power to enter an order affecting the custody of a *habeas* petitioner who is properly before it contesting the legality of his custody." *Mapp*, 241 F.3d at 226 (*quoting Ostrer*, 584 F.2d at 596 n.1). It specifically held that this principle applies not simply to *habeas corpus* challenges to criminal convictions, but also to cases involving immigration, alien status, and deportation.

*Mapp* is very close to the present situation. Indeed, *Mapp* presented a much stronger case for the Government because the Attorney General there acted under specific statutory authority to detain aliens. *See id.* at 228-29. Yet the Second Circuit concluded that even in such cases the district court had the power to consider whether a petitioner should be released on bail or conditions pending final resolution of the petitions for *habeas corpus*. That is precisely the relief Petitioners seek.

Grants of such relief are, of course, to be exercised only in "special cases." *Id.* at 226. This is such a case. Here the Government has (i) imprisoned the Petitioners, (ii) indefinitely, (iii) absent statutory authority, (iv) after what amounts to an acquittal. Furthermore, the Government had kept this information a secret from the public, petitioners' counsel, and this Court. Such extraordinary circumstances warrant the remedy.

### 2. <u>Factors Governing Release.</u>

A district court reviewing a request for interim release should consider (i) whether the relief sought is appropriate to make the *habeas* remedy effective, and (ii) whether, upon release

subject to conditions, the petitioner represents a substantial threat to the community, or of flight. *See id.* at 224, 226 & 230.

        a.      *Interim Release is Necessary to Make the* Habeas *Remedy Effective.*

The first point is the logical one. The Government argues that it should be permitted to imprison until it arranges for release. Release from unlawful detention—the essence of *habeas*—cannot become "effective" if it is to be denied until moot. That is merely to prolong indefinite incarceration. In the Supreme Court's 2004 Guantanamo decisions, *indefinite* detention was a matter of great concern. *See Rasul v. Bush*, 124 S. Ct. 2686, 2699 (2004) (discussing the "legality of the Executive's potentially indefinite detention of individuals who claim to be wholly innocent of wrongdoing"); *id.* at 2701 ("[I]n light of . . . the indefinite pretrial detention of the detainees, I would hold that federal court jurisdiction is permitted in these cases") (Kennedy, J., concurring); *see also Zadvydas v. Davis*, 533 U.S. 678, 702 (2001) (finding it error to deny *habeas* petitions challenging indefinite detention, even where detention had been authorized by Congress).

The need here is urgent. To illustrate the depth of the problem, it appears that other Uighur prisoners, who have been denied access to outside counsel, have been cleared by the CSRTs, a fact the Government has never disclosed. Upon information and belief, at least two of these Uighurs are presently detained in harsher camps than the Petitioners. Supp. Decl. ¶¶ 3-6.

More practically, the presence of the Petitioners in this District would remove a significant impediment to the ultimate resolution of the case. In light of the situation in their homeland, the Petitioners are natural candidates for consideration in many countries as "refugees" of political persecution. In most countries, the usual practice is to accept a quota of

such refugees referred by the United Nations High Commissioner for Refugees ("UNHCR").[2] *See* Supp. Decl. ¶ 14. A refugee decision involves a two-step process. First, the petitioner must qualify as a victim of political persecution, a requirement that appears to have been met here by the situation in China. Second, however, the UNHCR must satisfy itself that no "exclusion" exists that would indicate that the petitioner is not a suitable candidate for asylum. Criminal records and similar history are typical exclusion factors. Supp. Decl. ¶14. Notably, and not surprisingly, the UNHCR undertakes its own "due diligence" in a refugee case. On information and belief, the restrictions on base access impede the smooth functioning of the review process. *Id.* ¶ 14. We believe that this problem may have contributed to substantial delays at Guantanamo. *Id.* ¶ 15. A UNHCR representative reported that the agency has not been to the base. *Id.* Were the petitioners to be present in the District, however, UNHCR representatives could more readily conduct their background checks directly, and the case could more readily move forward towards a consensual transfer abroad. None of this would interfere with whatever the State Department may be doing, and indeed it might assist that process.

The Government argues that the State Department is "diligently" pursuing resettlement. We are skeptical. Press accounts of remarks by then-Secretary of State Colin Powell from August 2004 indicate a knowledge that the Uighurs needed to be resettled. Decl. of Susan Baker Manning, Ex. E (Apr. 5, 2005). Yet UNHCR has not even been to the base to visit the Uighurs, Supp. Decl. ¶ 15, and we have seen no other indication of serious efforts. In the record offered by the Government there is no evidence that State Department activity is underway. No affidavit from any person with knowledge has been offered.

---

[2] This is the case, for example, in Sweden, where Petitioner Hakim's sister is living. Supp. Decl. ¶ 13.

b.  *Petitioners are Suitable Candidates for Release.*

No fact has been alleged suggesting that either Petitioner is unsuitable for release into the population, or that either would fail to remain present for the ultimate resettlement disposition. Rather than facts, the Government offers wordplay. We cannot know what the CSRT reports say until the Government produces them, but we can be quite sure from the Government's own rules that the Petitioners are not "NLECs," *i.e.*, persons properly described as "*no longer* enemy combatants." The phrase is pregnant with the suggestion that Petitioners once were "enemy combatants." That suggestion is false.

An enemy combatant is defined by the Executive this way:

> For purposes of this order, the term "enemy combatant" shall mean an individual who *was* part of or supporting Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners.

Memorandum of Deputy Secretary of Defense Paul Wolfowitz at ¶ a (July 7, 2004) (emphasis added). The definition uses the past tense. A person either *was* "part of or supporting" those forces, or he wasn't. As far as the definition goes, if one *was* affiliated, then one *is* an "enemy combatant." There is nothing in the regulations about people who used to be Taliban supporters but later traveled toward Damascus. There is nothing about people who renounced support but, we suspect, might support again. The rule is blunt. If one *did* support, one *is* an enemy combatant, otherwise not. The CSRT determined that the Petitioners are not enemy combatants. By definition, then, the Petitioners have *never* been enemy combatants.

This conclusion also follows from the official CSRT cover sheet, which provides:

The Tribunal has determined that he (is) (is not) designated as an enemy combatant.

Memorandum issued by Secretary of the Navy Gordon England implementing CSRT procedures (July 29, 2004) (Encl. No. 9 ).

It may be that this phrase, "is not designated an enemy combatant" is where the misdirection begins. Perhaps in the past, some unnamed lieutenant checked a box on a form, and so "designated" the Petitioners.[3] But to say that someone is no longer "designated" an enemy combatant is not to suggest that he ever really was one. It suggests only that the old designation was wrong. The government wants to elide the phrase, so that "no longer *designated* enemy combatant" becomes "no longer enemy combatant." This is a public relations exercise. Its object is to press the campaign of nonspecific innuendo already visible in the Government's brief. This campaign, of course, is easier to carry out when one doesn't turn over the actual CSRT findings. At all events it does not establish a basis to deny interim release, pending final adjudication of the writ.

 c. *Hearing on the Interim Relief.*

We assume that a hearing on the conditions of interim relief would assist the Court. We would welcome such a hearing. At that hearing, the parties may wish to supplement the record concerning the option of housing the Petitioners on the leeward side of the base, following the precedent of treatment of migrants on Guantanamo.

However, in light of the case authorities, local support, need for translation and diplomatic task ahead, and the base commander's concerns, the option of release in the District appears far preferable. The petitioners are without any means to post bail, of course, but (i) the

---

[3] There is no evidence in the record that even that is true; certainly no evidence of the basis for such a designation.

[4] There is no evidence in the record that this is true; certainly no evidence supporting such a designation.

Uighur community of legally-resident aliens in the area of the District of Columbia can provide refuge and a contact community, as we will show at hearing, and (ii) appropriate conditions of release can be fashioned for the situation. Conditions might include, for example, regular reporting to the INS or the State Department, and restrictions on travel. During the Petitioners' interim release, the Court would retain jurisdiction of the case until such time as the State Department arranges for an appropriate resettlement, advises the parties and the Court, and the case is resolved.

### B. THIS CASE DOES NOT PRESENT ISSUES NOW ON APPEAL.

The Government says the Court should not vacate its stay because Petitioners rely on "constitutional rights" now being tested in the Court of Appeals for the District of Columbia. At the outset, of course, the Court certainly has discretion to vacate its own procedural stay. It could grant interim bail or release even if it were true that the ultimate legal test were being reviewed on appeal.

But it is not true. The request for this interim relief does not rest on constitutional rights (although we believe it clear that Petitioners have them).[5] Rather, we rest on the Government's threshold obligation to point to some lawful basis for imprisonment. This obligation arises under the common law of *habeas corpus* that long predated our Constitution and exists independently of it. "*Habeas corpus* is," as the Supreme Court explained, "a writ antecedent to statute,...throwing its root deep into the genius of our common law." 124 S. Ct. at 2692 (*quoting Williams v. Kaiser*, 323 U.S. 471, 484 n.2 (1945)). This ancient writ is the right to require that the executive "show cause" for imprisonment. *See* 28 U.S.C. § 2243. The Constitution does not create this right. To the contrary, it acknowledges the writ's preexistence at common law and protects against its suspension. U.S. CONST. art. I, § 9, cl. 2. This case, *unlike all of the cases on*

---

[5] *Rasul*, 124 S. Ct. at 2698 n.15.

*appeal*, involves the Government's own finding that the Petitioners are not enemy combatants -- heretofore the sole claim to a lawful basis for detention.

Authorities have long acknowledged that the centerpiece of the common-law writ is its first-instance requirement that the Executive justify detention by pointing to law or adjudication. *See* 1 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND at 132-133 (1765) (in order to make imprisonment lawful, there must be a written warrant that "express[es] the causes of the commitment, in order to be examined into (if necessary) upon a *habeas corpus*. If there be no cause expressed, the gaoler is not bound to detain the prisoner....[I]t is unreasonable to send a prisoner, and not to signify withal the crimes alleged against him."). This rule has been acknowledged by our courts from the beginning of the Republic, and by English courts long before. For example, in *Ex parte Bollman*, 8 U.S. (4 Cranch) 75 (1807), the Court's grant of habeas relief did not depend on any finding of a violation of the Constitution or statute or regulation. The Court ordered the prisoners discharged simply because the Government had not demonstrated sufficient factual and legal cause for the detentions. *Id.* at 125, 136-37. The same was true in *Ex parte Burford*, 7 U.S. (3 Cranch) 448 (1806), where the Court issued a writ of habeas corpus and discharged a federal prisoner who had been committed to the custody of federal marshals. The prisoner neither did, nor could point to any federal statute or regulatory or constitutional provision violated by his detention. His sole claim was that the Government had not justified his detention by some cause in fact or law. The decision was that: "the Judges of this court were unanimously of opinion, that the warrant of commitment was illegal, *for want of stating some good cause certain* .... The prisoner is discharged." *Id.* at 453 (emphasis added). Nor does any of the numerous cases cited with approval by the Supreme Court in *Rasul* suggest

LITDOCS/610641.2

9

that the prisoner has an obligation to point to an independent constitutional, statutory or regulatory right. The obligation to show cause is the Executive's.[6]

The Government cites no authority for its claimed power to indefinitely imprison the innocent as a "wind up" to its claimed war powers. The law of war is quite to the contrary. "Prisoners of War shall be released and repatriated *without delay* after the cessation of active hostilities." Article 118 of the Geneva Convention (III) relative to the treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316 (1955) (emphasis added); *see also Hamdi v. Rumsfeld*, 124 S. Ct. at 2641. Of course, during World War II and the Korean conflict, the United States observed international law. Prisoner-of-war camps of the day adhered to the requirements, respectively, of the Hague Convention of 1929 and the Geneva Convention of 1949. No one in those facilities was deprived of contact with his family. Moreover, there is no record to show that the so-called "wind-up" of the detention was, as it is here, indefinite. *See also Rasul*, 124 S. Ct. at 2700 (recognizing that indefinite detention "suggests a weaker case of military necessity and much greater alignment with the traditional function of habeas corpus") (Kennedy, J., concurring); *INS v. St. Cyr*, 533 U.S. 289, 302-03 (2001); *Brown v. Allen*, 344 U.S. 443, 532 (1953) (Jackson, J., concurring), *overruled on other grounds, Williams v. Taylor*, 529 U.S. 362, 410-11 (2000); *Ex Parte Burford*, 7 U.S. at 453. This is, of course, not a case in which an avowed enemy combatant remains in a camp after the armistice. It is a case where men who never were combatants were imprisoned in secret, and remain imprisoned today, despite the fact that the Government itself has determined that there is no basis for detention.

### C. COUNSEL ACCESS.

The job ahead for us is to help find a home for our clients. We can no longer do that job under a protective order designed for cases involving a contest over a prisoner's status. *See*

---

[6] *See* 28 U.S.C. § 2243.

Supp. Decl. ¶ 11. To offer effective counsel in these circumstances, we need personal and telephone contact with our clients, not the twenty-day delays and rejection of translators that to date have been the hallmark of the Government's "come-to-the-base" approach.[7] Access will enable us to locate and communicate with Uighur communities abroad, obtain information regarding work opportunities, establish family and cultural links, and readily provide information to the State Department. *See* Supp. Decl. ¶ 11. Most important, access would permit refugee organizations to make direct contact with our clients, which is perhaps the key to resolving the matter. Such access is presently ineffective without the Court's help.

D. **REQUESTS FOR RELIEF.**

First, we request that the Court vacate its stay, and direct the Government immediately to produce the entire record of each Petitioner's CSRT.

Second, we request that the Executive be ordered to "produce the body" of each Petitioner at the Courthouse, pursuant to 28 U.S.C. § 2243.

Third, upon a hearing, we request that each Petitioner be released on an interim basis and subject to appropriate conditions. It appears that the most effective release conditions would involve release to the care of lawful resident aliens in the District, who can be present in Court, and subject to appropriate conditions.

Fourth, we also request that the Court provide us with a few desperately-needed practical tools. We ask that Mr. Nury Turkel be granted immediate leave in all respects to act as interpreter (including theatre clearance to the extent necessary). To date, Mr. Turkel has not been approved for our use, although he has for several years performed translation work relied

---

[7] One attorney in our legal team submitted his request for clearance in March. He remains uncleared, and thus cannot communicate with our clients. Supp. Decl. ¶ 7.

on by government agencies including the Department of Homeland Security. *See* Supp. Decl. ¶¶ 8-10.

We also request that pending any release here, the Respondents afford to each of Mr. Qassim and Mr. Hakim one hour of telephone access per week. During this time, counsel, family members and interpreters would be permitted to speak with the Petitioner.

## III. CONCLUSION

The armed forces say that A'del is neither soldier nor terrorist. Why does the President of the United States forbid him to speak with his sister? Of the many dispiriting facts about this case, the refusal to permit an innocent man to use a telephone has a peculiar poignancy. We are at a loss to account for this remorselessness, the reflexive, single-minded cruelty of it.

We request that the Court order the Petitioners brought before it, and there impose such conditions for interim release as the Court deems just, and that the Court grant such other relief as may be just and proper.

Dated: August 4, 2005

Respectfully submitted,

COUNSEL FOR PETITIONERS:

_____
Sabin Willett
Neil G. McGaraghan
Jason S. Pinney
Daniel Hunter Kiel
**BINGHAM MCCUTCHEN LLP**
150 Federal Street
Boston, MA 02110-1726
Telephone: (617) 951-8000
Facsimile: (617) 951-8925

Susan Baker Manning
**BINGHAM MCCUTCHEN LLP**
1120 20th Street NW, Suite 800
Washington, DC 20036
Telephone: (202) 778-6150
Facsimile: (202) 778-6155

Barbara Olshansky
Deputy Director
**CENTER FOR CONSTITUTIONAL RIGHTS**
666 Broadway, 7th Floor
New York, NY 10012
Telephone: (212) 614-6439