## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ABU BAKKER QASSIM, et al., <br><br> Petitioners, <br><br> v. <br><br> GEORGE W. BUSH, et al., <br><br> Respondents. | Civil Action No. 05-497 (JR) |

## RESPONDENTS' SUPPLEMENTAL MEMORANDUM PURSUANT
## TO THE COURT'S INVITATION AT THE AUGUST 1, 2005 HEARING

Respondents hereby submit this supplemental memorandum pursuant to the request of the Court at the August 1, 2005 hearing on Petitioners' Emergency Motion to Vacate Stay Order and Issue Writ Directing Immediate Release of Petitioners. As discussed below, the Court does not have the authority to order that petitioners be produced at a hearing before the Court. The power to admit aliens into the United States lies solely with the Executive Branch. Petitioners are not in the United States because, under the Immigration and Nationality Act ("INA"), the U.S. Naval Base at Guantanamo Bay, Cuba, is not part of the "United States." See INA § 101(a)(38), 8 U.S.C. § 1101(a)(38) (defining "United States" for geographical purposes as including only "the continental United States, Alaska, Hawaii, Puerto Rico, Guam, and the Virgin Islands of the United States"). Accordingly, petitioners cannot physically appear at a hearing in Washington, D.C. without first being brought into the United States. And because the decision to admit them into this country lies solely within the Executive Branch's unreviewable discretion, the Court cannot order respondents to physically produce petitioners at a hearing.

In any event, even if the Court possessed that authority as a theoretical matter, numerous considerations weigh heavily against exercising it in this case. Courts rarely order the production

of the body in habeas cases in general. Here, such an order would be imprudent in light of the fact that the Executive has the authority and responsibility to maintain custody of petitioners while it engages in diplomatic efforts toward their resettlement. Further, petitioners have not identified any way in which their live presence at a hearing would aid this Court in resolving any issue before it. However, bringing petitioners into the United States, even if ostensibly for only the limited purpose of a hearing, would materially and arbitrarily alter their standing under the immigration statutes, endowing them – individuals who, notwithstanding the determination that they are no longer classified as enemy combatants, were captured in a war zone after having received training at a military camp turned over to their group by the Taliban – with special immigration advantages enjoyed by no other similarly situated persons, and further impinge on the Executive's ability to resettle petitioners in a third country. Further, petitioners are housed in relaxed living conditions separate from detainees who are classified as enemy combatants, and to the extent petitioners complain about matters such as telephone access, those issues can readily be addressed by means short of the drastic measure of ordering their physical attendance at a hearing in Washington, D.C. Finally, petitioners' asserted "common-law" right to release and interim relief under the habeas statute is an issue currently pending in the appeals before the D.C. Circuit, which counsels against this Court's premature acknowledgment of such a right.

I.     **THE COURT LACKS THE AUTHORITY TO ORDER PETITIONERS BROUGHT INTO THE UNITED STATES TO APPEAR AT A HEARING.**

This Court does not possess the legal authority to order petitioners from Guantanamo Bay, Cuba, into the United States. Petitioners are not currently in the United States. <u>See</u> INA § 101(a)(38), 8 U.S.C. § 1101(a)(38) (defining "United States" for geographical purposes as

including only "the continental United States, Alaska, Hawaii, Puerto Rico, Guam, and the Virgin Islands of the United States").[1]  To make a "lawful entry . . . into the United States," petitioners would have to be "admitted."  INA § 101(a)(13)(A), 8 U.S.C. § 1101(a)(13)(A).  For three reasons, this Court cannot order the admission of petitioners.

First, under the well-established doctrine of consular non-reviewability, this Court cannot order the issuance of visas to petitioners.  See, e.g., City of New York v. Baker, 878 F.2d 507, 512 (D.C. Cir. 1989).[2]  Without a visa (or border crossing card, which is not relevant here), an alien is inadmissible and cannot lawfully enter the country.  See 8 U.S.C. § 1182(a)(7).  As the D.C. Circuit and "every other circuit to consider the issue" has made clear, only the Executive Branch can issue a visa.  See Baker, 878 F.2d at 512.  "[T]he authority to issue visas belongs solely to the consular officers of the United States."  See id. (citing 8 U.S.C. §§ 1101(a)(9) & (16), 1104 (a)(1), 1201(a)).  "[C]ourts are without authority to displace the consular function in the issuance of visas."  Id. (citing cases).  Accordingly, any "district court[] order that purports to direct the issuance of visas is without force and effect."  Id.; accord Saavedra Bruno v. Albright, 197 F.3d 1153, 1159-60 (D.C. Cir. 1999).  This Court cannot order the issuance of visas, and thus, cannot order the admission of petitioners.

---

[1] Rasul v. Bush, 124 S. Ct. 2686 (2004), a statutory decision concerning the scope of the habeas statute, 28 U.S.C. § 2241, plainly does not alter the express definition of the "United States" contained in the INA.

[2] See also Centeno v. Shultz, 827 F.2d 1212, 1213 (5th Cir. 1987) (per curiam); Li Hing of Hong Kong, Inc. v. Levin, 800 F.2d 970 (9th Cir. 1986); Wan Shih Hsieh v. Kiley, 569 F.2d 1179, 1181 (2d Cir. 1978); Gonzalez-Cuevas v. INS, 515 F.2d 1222 (5th Cir. 1975) (per curiam); Loza-Bedoya v. INS, 410 F.2d 343, 347 (9th Cir. 1969); Cobb v. Murrell, 386 F.2d 947, 950 (5th Cir. 1967); Braude v. Wirtz, 350 F.2d 702, 706 (9th Cir. 1965); Montgomery v. French, 299 F.2d 730, 735 (8th Cir. 1962); United States ex rel. Ulrich v. Kellogg, 30 F.2d 984, 986 (D.C.Cir. 1929).

Second, an order requiring the physical production of non-resident alien petitioners within the United States would not only conflict with Congress's express policy choice, but it would also run counter to over a century of Supreme Court jurisprudence recognizing that the admission of aliens is the quintessential sovereign function reserved exclusively to the political branches of government. As the Court explained back in 1893, "[t]he power to exclude or to expel aliens, being a power affecting international relations, is vested in the political departments of the government." Fong Yue Ting v. United States, 149 U.S. 698, 713 (1893). It is "to be regulated by treaty or by act of Congress, and to be executed by the executive authority according to the regulations so established, except so far as the judicial department has been authorized by treaty or by statute, or is required by the paramount law of the Constitution, to intervene." Id.; see also Lem Moon Sing v. United States, 158 U.S. 538, 546-547 (1895); Fok Yung Yo v. United States, 185 U.S. 296, 305 (1902) ("Congressional action has placed the final determination of the right of admission in executive officers, without judicial intervention, and this has been for many years the recognized and declared policy of the country.").

Because there is no constitutional right to enter the United States or otherwise be present in the country,[3] courts must honor Congress's prescriptions regarding the admission or exclusion of aliens. Indeed, for over a hundred years, the Supreme Court has faithfully refused to permit judicial intervention in this area when Congress did not provide for it. For example, in Nishimura Ekiu v. United States, 142 U.S. 651 (1892), an excluded alien filed a habeas corpus

---

[3] It is firmly established that non-resident aliens seeking admission into the United States (such as the present petitioners) have no constitutional rights regarding their admission applications, but enjoy only those rights granted by Congress, because the power to admit or exclude aliens is a sovereign prerogative. See, e.g., Landon v. Plasencia, 459 U.S. 21, 33 (1982); Knauff v. Shaughnessy, 338 U.S. 537, 542 (1950). Moreover, for purposes of the instant motion, petitioners disclaim reliance on any alleged constitutional rights. See Petrs' Supp. Mem. at 8.

petition challenging the inspecting officer's determination not to admit her.  Recognizing limits on its power, the Court held that, because Congress had provided only for administrative review and not judicial review of inspectors' exclusion determinations, the agency decision to deny admission to Nishimura Ekiu could not be disturbed by the courts.

Likewise, in Knauff v. Shaughnessy, 338 U.S. 537, 542-43 (1950), the Court again stated that the power to exclude aliens "is inherent in the executive power to control the foreign affairs of the nation," and that "it is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien."  See also INS v. Aguirre-Aguirre, 526 U.S. 415, 425 (1999); Shaughnessy v. Mezei, 345 U.S. 206, 210, 213 (1953); Heikkila v. Barber, 345 U.S. 229, 233-34 (1953).  And more recently, in Fiallo v. Bell, 430 U.S. 787 (1977), the Court reiterated that "[t]he conditions of entry for every alien . . . have been recognized as matters . . . wholly outside the power of [the courts] to control."  Id. at 796 (quoting Harisiades v. Shaughnessy, 342 U.S. 580, 596-97 (1952) (Frankfurter, J., concurring)).

Consistent with this principle, the Supreme Court has acknowledged that aliens located abroad have no basis for judicial review of exclusion decisions.  In Brownell v. Tom We Shung, 352 U.S. 180 (1956), the Court held that an alien physically present in the United States could contest the validity of an exclusion order by seeking a declaratory judgment.  At the same time, however, the Court limited the geographic reach of its ruling by cautioning that "[w]e do not suggest, of course, that an alien who has never presented himself at the border of this country may avail himself of the declaratory judgment action by bringing the action from abroad."  Id. at 184 n.3.  The Court quoted from a Senate Report's explanation that the pertinent legislation "was

not intended to grant any review of determinations made by consular officers, nor to expand judicial review in immigration cases beyond that under existing law." Id. at 185 n.6 (quoting S. Rep. No. 1137, 82d Cong., 2d Sess. 28 (1952)).  In short, whatever authority the courts possessed to review exclusion orders issued against aliens physically present within the United States, Congress did not intend to extend such authority to aliens located abroad.  For these reasons, the Court should conclude that it lacks the authority to order the government to bring petitioners into the United States.

Third, consistent with this jurisprudence, Congress has provided by statute that the decision to admit an alien is discretionary, is vested solely in the Executive Branch, and cannot be reviewed or overridden by any court.  Specifically, under the INA, the issuance of a visa is discretionary; a consular officer "may" issue an immigrant or nonimmigrant visa to an alien who has made a proper application for it.  INA § 221(a)(1); 8 U.S.C. § 1201(a)(1).  Because the decision is discretionary, it is unreviewable.  The INA unambiguously states that, "[n]otwithstanding any other provision of law," no court shall have jurisdiction to review "any . . . decision . . . the authority for which is specified . . . to be in the discretion of the Attorney General or the Secretary of Homeland Security other than the granting of [asylum]." INA § 242(a)(2)(B)(ii), 8 U.S.C. § 1252(a)(2)(B)(ii).[4]

Earlier this year, Congress clarified that this comprehensive preclusion of judicial review over discretionary decisions encompasses habeas review.  In the Real ID Act of 2005, Pub. L. No. 109-13, Div. B, 119 Stat. 302 (May 11, 2005) ("Real ID Act"), Congress amended the INA

---

[4]   Enacted by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009-628 (Sept. 30, 1996), and as amended by the REAL ID Act of 2005, Pub. L. No. 109-13, Div. B, 119 Stat. 302 (May 11, 2005).

to make explicit that no court has jurisdiction under 28 U.S.C. § 2241 or "any other habeas corpus provision" to review such discretionary decisions.  See Real ID Act § 106(a).  Further, the Real ID Act also clarified that the preclusion of review applies regardless of whether the context is inside or outside removal proceedings.  See Real ID Act § 101(f)(2) (providing that there is no jurisdiction "regardless of whether the judgment, decision or action is made in removal proceedings").  Both amendments took effect immediately upon the Real ID Act's enactment, and they expressly apply to pending cases.  See Real ID Act §§ 101(h)(4), 106(b).  Thus, the Real ID Act eliminates any doubt that the Court lacks jurisdiction to review discretionary decisions to deny petitioners admission.  And given that the Court cannot review and override a denial of admission, a fortiori the Court cannot arrogate the Executive's authority by ordering admission in the first instance.

Nor can the Court order that the Government "parole," or temporarily let, petitioners into the country.  Although the INA authorizes the parole of aliens who have applications for admission pending, INA § 212(d)(5), 8 U.S.C. § 1182(d)(5),[5] the decision to parole – just like the decision to admit – is vested solely in the Executive Branch's unreviewable discretion.  The INA states that the Secretary of Homeland Security "may . . . in his discretion" parole aliens into the United States.  8 U.S.C. § 1182(d)(5)(A); see also 8 U.S.C. § 1103 (transferring various immigration functions to the Secretary of Homeland Security).  Thus, the INA's bar on review of discretionary decisions precludes judicial review of agency parole determinations.  See INA

---

[5]  Under the INA, any alien who is present without having been admitted is deemed "an applicant" for admission.  INA § 235(a)(1), 8 U.S.C. § 1225(a)(1).  See also Bamba v. Riley, 366 F.3d 195, 196 n.2 (3d Cir. 2004) (noting that Executive Branch may grant alien "temporar[y] permi[ssion] to remain in the United States" through "parole"); Leng May Ma v. Barber, 357 U.S. 185, 190 (1958) ("The parole of aliens seeking admission is simply a device through which needless confinement is avoided while administrative proceedings are conducted.").

§ 242(a)(2)(B)(ii), 8 U.S.C. § 1252(a)(2)(B)(ii).[6] And aside from admission and parole, there is no way for petitioners to be lawfully present in the United States. See 8 U.S.C. § 1182(a)(9) (defining as "unlawfully present" an alien who "is present in the United States without being admitted or paroled"); see also 8 U.S.C. § 1182(a)(6)(A) (aliens who have not been "admitted or paroled" are inadmissible).

Accordingly, the habeas statutes cannot be read as bestowing this Court with authority to order petitioners into the country. Even if it violated the Constitution or laws of the United States to continue to hold petitioners pending their release (and it assuredly does not),[7] any habeas authority the Court might have to order petitioners' release would not encompass the authority to order them brought into the United States. Further, despite petitioners' conclusory statement that the Court should "produce the body," Petrs' Supp. Mem. at 11, it cannot do so. This power is unmistakably limited by the doctrine of consular non-reviewability, over a century of Supreme Court jurisprudence, the INA, and the Real ID Act, all of which unmistakably limit habeas review and thereby preclude the Court from ordering the physical production of petitioners inside the United States.

---

[6] That proposition is not undermined by Haitian Centers Council, Inc. v. Sale, 823 F. Supp. 1028 (E.D.N.Y. 1993), in which a District Court held that the Attorney General abused her discretion in denying parole to certain Haitian detainees at Guantanamo. The Haitian Centers Council decision was issued both before the 1996 enactment in IIRIRA of the bar on review of discretionary decisions at INA § 242(a)(2)(B)(ii), and before the 2005 amendment of that provision by the Real ID Act to explicitly encompass habeas review as well as agency actions taken outside of removal proceedings. Further, the decision ultimately was vacated by a "Stipulated Order Approving Class Action Settlement Agreement" (Feb. 22, 1994), as recognized by Cuban American Bar Ass'n, Inc. v. Christopher, 43 F.3d 1412 (11th Cir. 1995).

[7] As non-resident aliens with no prior voluntary connection to the United States, petitioners do not enjoy constitutional rights. See, e.g., Khalid v. Bush, 355 F. Supp. 2d 311, 320-23 (D.D.C. 2005), on appeal, Nos. 02-5062, 02-5063 (D.C. Cir.). See also infra § II.A.

Indeed, even if the bar on judicial review of decisions to admit or exclude aliens were not explicit and unambiguous, this Court's power to produce the body in the rare case where such production happens to require entry of an alien into the United States would still be circumscribed by the recent congressional enactment.  As the Supreme Court has held, "a specific policy embodied in a later federal statute should control our construction of [a previously enacted] statute, even though it had not been expressly amended."  United States v. Estate of Romani, 523 U.S. 517, 530 (1998) (emphasis added).[8]  The Real ID Act, which was passed just three months ago, undoubtedly reflects a congressional policy of generally eliminating district court review over immigration decisions regarding the entry and expulsion of aliens.  See Real ID Act § 106(a)(1) (providing that review in the appropriate court of appeals "shall be the sole and exclusive means for judicial review of an order of removal"); § 101(f) (providing that bar on district court review of discretionary determinations applies "regardless of whether the judgment, decision, or action is made in removal proceedings"); see generally Conf. Rep. H.R. 109-72, at 172-76 (2005).  Thus, the application of the pre-existing habeas statute to aliens at Guantanamo does not provide for judicial authority to bring petitioners into the country.

Of course, this bar under the immigration laws to ordering a non-resident alien habeas petitioner admitted or paroled into the United States does not render the habeas statute a dead letter or prevent it from functioning.  The conflict here is not pervasive; rather, it could arise only in a very tiny intersection of cases where (1) the habeas petitioner is a non-resident alien located outside the United States, and (2) it is indispensable to the conduct of the proceedings to have

_____

[8]  See also Department of Housing & Urban Development v. Rucker, 535 U.S. 125, 133 n.5 (2002); Green v. Bock Laundry Machine Co., 490 U.S. 504, 524-26 (1989); Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 445 (1987).

physical production of the body, something done only in exceedingly rare circumstances today,

see infra pp.10-11, and something that has manifestly not been shown to be necessary or even

incrementally useful in this case, see infra § II.B.  And even in that narrow sliver of cases, a court

is not necessarily prevented by the INA from taking other action or granting any kind of ultimate

relief available or appropriate under the habeas statute.  To the extent physical production of the

body requires bringing into the United States an alien who is currently located outside the United

States, however, the Court manifestly lacks authority to preempt or supplant the orderly

processes reserved to the Executive Branch under the immigration laws and a century of

Supreme Court precedent regarding the admission of aliens.[9]

## II. EVEN IF THE COURT HAD THE AUTHORITY TO ORDER PETITIONERS BROUGHT INTO THE UNITED STATES, THERE IS NO VALID REASON TO EXERCISE THAT AUTHORITY HERE AND THERE ARE NUMEROUS COMPELLING REASONS NOT TO DO SO.

Even if the Court could disregard the clear bar to ordering petitioners' entry into the

United States so that they could attend a hearing, there are no good reasons why the Court should

exercise that authority here and numerous reasons why it should not.  It is exceedingly rare in

modern habeas practice to order "production of the body," as the Court observed at the August 1,

2005 hearing.  See Braden v. 30th Jud. Cir. Ct. of Ky., 410 U.S. 484, 497-98 (1973) (noting that

"a petition for habeas corpus can in many instances by resolved without requiring the presence of

---

[9] Petitioners cite Baker v. Sard, 420 F.2d 1342 (D.C. Cir. 1969), and Mapp v. Reno, 241 F.3d 221 (2d Cir. 2001), as giving them a right under the habeas statute to release in the United States pending final adjudication of the writ.  Petrs' Supp. Mem. at 2-3.  However, Baker and Mapp both were habeas cases involving persons within the United States, so interim release did not concern, and posed no problem of, a non-resident alien needing to be admitted or paroled into the United States.  Indeed, petitioners completely avoid any discussion of the Court's authority to order the petitioners brought into the United States, seemingly treating this case as indistinguishable from any routine habeas case where the petitioners are already in this country.

the petitioner before the court that adjudicates his claim").  Indeed, one court has observed that "actual production of the petitioner's body in court is necessary" only in "a vanishingly small category of cases."  Roman v. Ashcroft, 162 F. Supp. 2d 755, 760 (N.D. Ohio 2001); see also 1 Randy Hertz & James S. Liebman, Federal Habeas Corpus Practice and Procedure 31 n.26 (4th ed. 2001) (citing 1990 Report of the Subcommittee on the Role of Federal Courts finding that district courts hold hearings in 1.17% of all habeas corpus cases).  It generally is done only where the petition literally cannot be adjudicated without a petitioner's live testimony or other compelling reasons exist.

Here, there are a multitude of compelling reasons why the Court should not exercise authority, if any, to order the petitioners brought to the United States for a hearing.  Indeed, to do so would interfere with the Executive's power, inherent in its authority to engage in war and detain suspected enemy combatants, to wind up such detentions in an orderly fashion and to engage in foreign diplomacy to achieve appropriate solutions with respect to individuals who cannot be sent back to their home country.  Further, there is not the slightest reason why it would be necessary to have petitioners' attendance to decide such issues or any other pending issues in the case; bringing petitioners into the United States, including for attendance at a hearing, on the other hand, would have a raft of far-reaching immigration consequences.  As to petitioners' living conditions during this transitory period pending their release, those conditions have been and continue to be ameliorated, and any issues such as those pertaining to telephone access can be suitably resolved by means short of the drastic measure of brining petitioners into the United States to attend a hearing.  Thus, bringing petitioners into the United States is unnecessary and inappropriate, especially at a time like this when, contrary to petitioners' representation, the legal

theories underlying petitioners' request for relief are about to be addressed by the Court of Appeals in pending appeals in an area of law in which the Supreme Court has directed that the courts proceed with caution.

> **A.** **Bringing Petitioners into the United States for Physical Appearance at a Hearing Would Be an Unwarranted Intrusion Into the Executive's Necessary Power to Wind Up Wartime Detentions of Battlefield Captures in an Orderly Fashion and to Arrange Relocation of Detainees Through Diplomatic Dialogue.**

The Court should refrain from ordering petitioners brought into the United States because to do so would be an unwarranted intrusion into the Executive's necessary power to wind up wartime detentions in an orderly fashion. Petitioners rest their current claim for interim relief on the argument that the Executive has no authority to maintain petitioners at Guantanamo pending resettlement efforts; in fact, they claim the military never had authority to detain petitioners from the outset. Petitioners thus assert that the habeas statute imbues them with a "common law" right to be brought to the United States for interim release and other relief. See Petrs' Supp. Mem. at 4-10. To the contrary, however, the Executive's authority regarding its initial detention of petitioners and the current custody of petitioners pending resettlement is straightforward. The Executive's power to wage war and detain suspected enemy combatants is firmly established. See, e.g., Hamdi v. Rumsfeld, 124 S. Ct. 2633, 2640 (2004) (explaining that "[t]he capture and detention of lawful combatants and the capture, detention, and trial of unlawful combatants, by 'universal agreement and practice,' are 'important incident[s] of war'" (quoting Ex parte Quirin, 317 U.S. 1, 28 (1942))); Johnson v. Eisentrager, 339 U.S. 763, 788 (1950) (stating that Article II, § 2 of the Constitution empowers the President as Commander-in-Chief and that "grant of war power includes all that is necessary and proper for carrying [it] into execution.").

As explained in the declaration of Brigadier General Hood, the Commander of JTF-GTMO, petitioners were not simply stray tourists or uninvolved civilians.  Rather, they received military training in Afghanistan, at a camp provided by the Taliban, and they were apprehended with other suspected enemy combatants.  <u>See</u> Declaration of Jay W. Hood ¶ 2 (attached hereto as Exhibit 1).  While the formal, rigorous review of enemy combatant status provided by the CSRT ultimately determined that petitioners did not fall with the definition of enemy combatant,[10] petitioners were reasonably and legitimately held as enemy combatants, or at least suspected enemy combatants, up to that time.  <u>See</u> Hood Declaration ¶ 2.

Petitioners continue properly to remain in military custody pending resettlement efforts consistent with the United States' policy not to return individuals to countries where it is more likely than not they will be tortured.  The Executive's power to detain a suspected enemy combatant necessarily includes the authority to wind up that detention in an orderly fashion after a detainee has been determined to no longer be an enemy combatant or after hostilities have ended.  The United States Military or its allies have continued the detention of prisoners of war following the end of major conflicts to which the U.S. has been a party in order to properly resolve repatriation issues or effectuate resettlement where repatriation was not appropriate due to humanitarian or other concerns.[11]  Here, of course, hostilities remain ongoing, but petitioners

---

[10] <u>See</u> Order Establishing Combatant Status Review Tribunal (July 7, 2004), <u>available at</u> <<http://www.defenselink.mil/news/Jul2004/d20040707review.pdf>> (defining "enemy combatant" as "an individual who was part of or supporting Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who has committed a belligerent act or has directly supported hostilities in aid of enemy armed forces.").

[11] The United States and its Coalition forces were dealing with such issues with respect to Iraqi prisoners for several months after the Persian Gulf War concluded in March of 1991.

(continued...)

have been determined to no longer be enemy combatants; the principle of the Executive's

authority to wind up their detention in an orderly fashion is the same, however. And the Court

should not inject itself into such matters so firmly and traditionally committed to the Executive.[12]

See Hamdi v. Rumsfeld, 124 S. Ct. 2633, 2647 (2004) (plurality opinion) ("Without doubt, our

Constitution recognizes that core strategic matters of warmaking belong in the hands of those

---

[11](...continued)
See Final Report to Congress on the Conduct of the Persian Gulf War, Appendix O, at 708 (April 1992), available at <<http://www.ndu.edu/library/epubs/cpgw.pdf>>. Similarly, the United Nations Command continued to hold thousands of Chinese and North Korean prisoners of war following the end of the Korean War while it considered whether and how best to resettle them. See Christiane Shields Delessert, Repatriation of Prisoners of War to the Soviet Union During World War II: A Question of Human Rights, in World in Transition: Challenges to Human Rights, Development and World Order 81 (Henry H. Han ed., 1979). And after the end of World War II, Allied Forces spent several years after the end of hostilities dealing with such issues with respect to prisoners of war they detained during the war. See id. at 80.

Petitioners' attempt to distinguish these historical precedents for winding up the detention of prisoners of war by claiming that these periods of post-war transitional confinement were not indefinite is nonsensical. See Petrs' Supp. Mem. at 10. Of course, in hindsight, years after all of the prisoners have been released, none of the detentions turned out to be indefinite. But at the time, during the months and sometimes years it took to complete the repatriation or resettlement of each prisoner following the end of hostilities with no date certain, the wind up of their detention certainly must have appeared indefinite.

And while Article 118 of the Third Geneva Convention commands that "[p]risoners of war shall be released and repatriated without delay after the cessation of active hostilities," Article 118 of the Geneva Convention (III) relative to the treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316 (1955), the plain terms of this provision presuppose that repatriation is possible. As demonstrated above, in practice the diplomatic negotiations and mere logistics involved in repatriation or, in cases where repatriation cannot be effected for humanitarian reasons, resettlement of prisoners of war necessarily take some amount of time to accomplish. To construe Article 118 as requiring instantaneous release of all prisoners, even if they could not simultaneously be repatriated, the very moment an armistice is signed would mean turning loose former enemy forces and supporters en masse to fend for themselves in the foreign country where they had been held – an absurd and untenable situation.

[12] Petitioners' assertion of a "common law" right against such detention is without basis in law. See infra note 25.

who are best positioned and most politically accountable for making them."); <u>Curran v. Laird</u>, 420 F.2d 122, 130 (D.C. Cir. 1969) (en banc) ("It is – and must – be true that the Executive should be accorded wide and normally unassailable discretion with respect to the conduct of the national defense and the prosecution of national objectives through military means.").

Similarly, the Court should refrain from facilitating petitioners' desire to inject the Court into the Executive's role in pursuing petitioners' resettlement by bringing petitioners to the United States so that attempts at direct negotiations or meetings by petitioners with foreign embassies and refugee organizations can be attempted by petitioners' counsel. Such activities are squarely within the Executive's purview over foreign policy matters. <u>See</u>, <u>e.g.</u>, <u>Schneider v. Kissinger</u>, 415 F.3d 190, 195 (D.C. Cir. 2005) (noting that "the Supreme Court has described the President as possessing 'plenary and exclusive power' in the international arena and 'as the sole organ of the federal government in the field of international relations'" (quoting <u>United States v. Curtiss-Wright Export Corp.</u>, 299 U.S. 304, 320 (1936))). The government's attempts to pursue resettlement options for petitioners have been diligent, ongoing, and multifaceted. <u>See</u> Declaration of Ambassador Pierre-Richard Prosper (Exhibit 2).[13] The Court should not indulge petitioners' attempt to interfere in these dialogues.

### B. Petitioners' Attendance at a Hearing Would Not Help Resolve Issues Raised in Petitioners' Motion or Serve Any Other Useful Purpose.

The Court also should not order petitioners brought into the United States because a hearing attended by petitioners would serve no useful purpose, particularly at this juncture. As the Court noted at the August 1 hearing, to hold a hearing at which petitioners appear would not

---

[13] The full Prosper Declaration is classified and will be filed under seal through the Court Security Office. A redacted version of the Prosper Declaration suitable for public release is being electronically filed on the public record.

solve the "practical conundrum" that the Court noted; rather, it would merely beg the question of what happens next. Respondents cannot conceive of any respect in which petitioners' appearance at a hearing would be of value in adjudicating the instant motion or any other issues in this case. Petitioners have been determined to be no longer enemy combatants, and respondents' intent is to release them as soon as a suitable destination country can be located and the necessary arrangements made – an endeavor in which the Executive Branch has made and continues to make diligent efforts. See Prosper Declaration. Petitioners' presence at a hearing in the United States is not needed to resolve any legal issue concerning the Executive's authority to maintain custody (albeit a substantially relaxed version of custody) pending resettlement efforts. Further, none of the requests made by petitioners in their original motion, i.e., that the stay be lifted and that petitioners be immediately released to some other area on Guantanamo Bay, necessitates the petitioners' presence in order to resolve it. There is no live material factual issue requiring petitioners' testimony.[14] Instead, it seems inescapable that petitioners' primary interest in being brought to the United States is to derive various immigration-related benefits, as discussed below.

    **C.**    **Bringing Petitioners into the United States Would Have Transformative Significance and Far-Reaching Impacts Under the Immigration Laws.**

As discussed above, the Court lacks authority to order petitioners brought into the United States. See supra § I. If the Court were nevertheless to conclude that it somehow possesses such authority, it should decline to exercise it because of the substantial immigration considerations

_____

[14] Even if the Court were interested in petitioners' testimony to determine, for example, what their preferences for resettlement might be, or how they perceive their present interim living arrangements, there is no reason such testimony could not be obtained through less intrusive means than physically transporting them to the United States and into Washington, D.C.

involved. Specifically, if the Court were to order petitioners brought into the United States, it would arbitrarily and materially alter petitioners' standing under the immigration laws and perhaps unwittingly invest them with a panoply of immigration-related rights, privileges, and processes that are not and have never been available outside the United States. And it would do so in a case involving wartime detainees, not immigrants. See Hood Declaration ¶ 2.

First, once inside the United States, see INA § 101(a)(38), 8 U.S.C. § 1101(a)(38) (defining "United States" for geographical purposes as including only "the continental United States, Alaska, Hawaii, Puerto Rico, Guam, and the Virgin Islands of the United States"), petitioners would be able to apply for asylum, which is available to aliens in the United States demonstrating past persecution or a well-founded fear of persecution on account of a protected characteristic. INA § 208(a)(1), 8 U.S.C. § 1158(a)(1). Such relief is currently unavailable to the petitioners because, as discussed previously, the Guantanamo detention facility is not within the United States as defined in the INA, and an alien can apply for asylum only if he is "physically present in" or has "arrived in" the United States, see id. § 1158(a)(1).

Second, being brought into the United States would enable petitioners to apply for withholding of removal. That form of protection from removal is available to aliens in the United States who can demonstrate a clear probability of a threat to life or freedom on account of a protected characteristic. 8 U.S.C. § 1231(b)(3); see also INS v. Stevic, 467 U.S. 407 (1984) (addressing essentially identical predecessor remedy of withholding of deportation under former 8 U.S.C. § 1253(h)). In contrast, in their current location at Guantanamo, the petitioners cannot apply for withholding of removal because the Supreme Court held in 1993 that the "withholding of deportation" remedy (which is essentially identical to the current withholding of removal

remedy) was not available to aliens who had been interdicted outside the United States'

boundaries. Such protection could be sought only by aliens who were physically present here.

See Sale v. Haitian Centers Council, Inc., 509 U.S. 155 (1993). Accordingly, when the

Department of Homeland Security finds that an alien interdicted in the Caribbean region has a

"credible fear" of persecution or torture, its longstanding practice is to bring that alien to

Guantanamo for additional protection screening and third country resettlement, as warranted.

However, migrants transferred to Guantanamo for protection screening and resettlement are not

entitled to apply for statutory-based protections such as asylum or withholding of removal. See

Haitian Refugee Center, Inc. v. Baker, 953 F.2d 1498, 1509-10 (11th Cir. 1992).

An order by this Court commanding the allowance of the petitioners into the United

States for a hearing would directly intrude upon the Executive's legitimate authority in this area,

and set a precedent for other courts to issue orders allowing aliens interdicted on the high seas

and held at Guantanamo to enter the United States where they too would then become eligible to

submit asylum applications. The Court should not issue an order that would have such potential

dramatic and adverse consequences for immigration matters.[15]

Third, and perhaps even more critically, petitioners' objective is made plain in their

_____

[15] A court order that, contrary to the clear text of the INA, effectively extended the INA
to Guantanamo would likely encourage danger-frought maritime exodus of migrants from
traditional migrant-sending countries such as Haiti, Cuba, and the Dominican Republic. An
increase in such migration would divert scarce resources of the U.S. Coast Guard and other
agencies from other critical missions. U.S. interdiction operations are carefully balanced to
promote two critical U.S. interests: protecting national security and migrants' lives by deterring a
mass migration, while at the same time affording protection against persecution and torture
through extra-territorial protection screening and third country resettlement. An unprecedented
court order compelling the Executive Branch to bring two individuals detained by the Military at
Guantanamo into the United States would upset the careful balance achieved over the years in
implementing U.S. interdiction policies.

supplemental brief: once brought into the United States for release, petitioners seek to have the Court order them released from detention into the general populace in the Washington, D.C. area, even if ultimately found ineligible for asylum and withholding of removal. <u>See</u> Petrs' Supp. Mem. at 7-8. Indeed, as petitioners have noted, aliens subject to being removed from the United States can generally be detained for only six months after being ordered removed, irrespective of whether they are eligible for relief from removal or whether they present a flight risk.

<u>See</u> <u>Zadvydas v. Davis</u>, 533 U.S. 678 (2001) (holding with respect to deportable aliens); <u>Clark v. Martinez</u>, 125 S. Ct. 716 (2005) (holding with respect to inadmissible or excludable aliens). By insisting on being brought here for a habeas hearing at which their presence is not even necessary, petitioners essentially seek to achieve through judicial fiat benefits that may only be conferred through orderly processes under the immigration laws and regulations. Particularly where it is not necessary for any reason connected to these proceedings to have petitioners attend a hearing within the United States in the first place, these concerns under the immigration laws and the proper role of the Executive and Judiciary in this area should carry great weight.

> **D.      Petitioners' Living Conditions Have Been and Continue to Be Ameliorated During the Transitional Period Pending Their Release and Such Issues as Telephone Access Can Readily Be Addressed Without Bringing Petitioners Into the United States for a Hearing or Other Forms of Judicial Involvement.**

Nor is the Court's close superintendence of petitioners' living arrangements even needed, let alone justification for bringing petitioners to the Court. Currently, petitioners are housed in Camp 4, where detainees have a communal living arrangement consisting of 10-man bays in which they can move about freely with nearly all-day access to exercise yards and other recreational opportunities. <u>See</u> Declaration of Col. Michael I. Bumgarner ¶¶ 4-7 (submitted

with Respondents' Memo. in Opp. to Petrs' Mot. to Vacate Stay Order and Issue Writ Directing Immediate Release of Petitioners (dkt. no. 25)).  Camp 4 detainees can play soccer and volleyball and are provided games such as chess, checkers, and playing cards, as well as books through a librarian.  Id. ¶ 4.  They are served meals family-style on picnic benches under an awning.  Id. ¶ 5.  These detainees are also provided weekly movies and special food items.  Id.  Further, the living arrangements for petitioners are continuing to evolve.  For several weeks, the Military has been in the process of renovating a separate camp facility, Camp Iguana, to house NLECs such as petitioners.  Hood Declaration ¶ 5.  Renovation is scheduled to be completed on August 15, 2005.  Id.  The NLECs at Camp Iguana will reside in a communal living situation at this camp, which overlooks the Caribbean Sea.  Id.  When petitioners are moved to Camp Iguana, in addition to receiving the additional amenities and privileges that they currently receive at Camp 4, they will have their own bunk house, activity room, air conditioning in all living areas, recreational yard, round-the-clock access to a television set with VCR and DVD capability, a stereo system, additional recreational items (such as soccer, volleyball, ping pong table), unlimited access to a shower facility, additional food items, and library materials.  Id. ¶ 6.  In addition, the Military is considering providing additional amenities and recreational activities in the future.  Id.

Of course, a classification of "no longer an enemy combatant" simply reflects an informed determination that an individual is not one "who was part of or supporting Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners.  This includes any person who has committed a belligerent act or has directly

supported hostilities in aid of enemy armed forces."[16]  It does not necessarily imply a finding that

an individual is benign in all respects, provide a character reference, or serve as a guarantee

regarding future conduct.[17]  Safety and security of the camp, its personnel, and the detainees

themselves remain serious concerns, requiring appropriate precautions and measures.  See Hood

Declaration ¶ 4; Bumgarner Declaration ¶¶ 10-11.  Likewise, the ability to provide responsible

health, food,[18] and other services in an appropriate fashion are key.  See Hood Declaration ¶ 4;

Bumgarner Declaration ¶¶ 10-11.  The current and contemplated housing of petitioners balances

these concerns,[19] and there is no need for the Court to inject itself into and second-guess the

details of such matters in the current circumstances and context.[20]  Certainly, there is no need for

---

[16] See Order Establishing Combatant Status Review Tribunal (July 7, 2004), available at <<http://www.defenselink.mil/news/Jul2004/d20040707review.pdf>>.

[17] Petitioners' counsel attempt to make an issue out of other Uighur individuals who have been determined to be no longer enemy combatants and are not currently residing in Camp 4. There are two Uighur NLECs who have been housed in Camp 1 for several weeks as a disciplinary sanction for refusing to cooperate with guard instructions. This sanction is only temporary, and when Camp Iguana is ready for occupancy, these two Uighur NLECs will move there, subject to disciplinary rules.  See Hood Decl. ¶ 7.

[18] This would include the serving of culturally appropriate halal meals.

[19] To house petitioners at migrant facilities in Guantanamo overseen by the Department of Homeland Security, if even possible (the facilities were established pursuant to Executive Order 13276 pertaining to the "delegation of responsibilities concerning undocumented aliens interdicted or intercepted in the Caribbean Region"), would not properly account for such concerns; thus, it would not be appropriate to house NLECs, including petitioners, there. Housing NLECs there would distance them from the culturally appropriate and specialized security and services currently provided NLECs and would create security concerns.  See Hood Declaration ¶¶ 3-4; Bumgarner Declaration ¶¶ 9-11.   Petitioners do not devote any substantial argument to the notion that they have a right to be housed in these facilities.

[20] Cf. Bell v. Wolfish, 441 U.S. 520, 548, 562 (1979) (in domestic prison context, it "is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial" to administer prisons; courts should avoid becoming "enmeshed in the minutiae of

(continued...)

the Court to order that petitioners be brought to Washington, D.C., in connection with such issues, while the government continues its efforts to find appropriate resettlement opportunities for petitioners.

Nor is it necessary for the Court to bring petitioners to Washington, D.C., in order to facilitate telephonic access to counsel or the use of an interpreter who does not have a security clearance.  Under the protective order and counsel access procedure regime applicable in this and other Guantanamo cases, requests related to telephone access to detainees are to be brought through counsel to the Commander, JTF-GTMO.  <u>See</u> November 8, 2004 Amended Protective Order and Procedures for Counsel Access to Detainees at the United States Naval Base in Guantanamo Bay, Cuba, Ex. A, § VIII (entered in this case by dkt. no. 16) (reproduced at <u>In re Guantanamo Detainee Cases</u>, 344 F. Supp. 2d 174 (D.D.C. 2004)).[21]  That procedure was not followed here, where counsel for respondents sprang the request for telephonic access for the first time in the August 1, 2005 hearing.[22]  Nonetheless, the Commander, JTF-GTMO is willing to approve a reasonable schedule of telephone communications between counsel and petitioners, taking into account the resources required for moving detainees for such conferences and subject

_____

[20](...continued)
prison operations").

[21] This includes requests for telephone access by counsel and by family members.

[22] Petitioners' counsel also failed to adhere to the applicable protective order provisions in filing their Supplemental Memorandum (dkt. no. 26) on the public record and not with the Court Security Officers.  <u>See</u>, <u>e.g.</u>, Nov. 8, 2004 Amended Protective Order, ¶ 46; Dec. 13, 2004 Order Supplementing and Amending Filing Procedures Contained in November 8, 2004 Amended Protective Order (entered in this case by dkt. no. 16).  Petitioners' classification as NLECs does not alleviate all security concerns in this case, <u>see</u> Hood Declaration ¶¶ 2, 8-9 (noting security concerns), nor should it automatically exempt petitioners' counsel from the applicable provisions of the governing protective orders in the case.

22

to making arrangements that address security concerns related to possible disclosure of sensitive information, including about the camp and information related to the status of other detainees. See Hood Declaration ¶ 8. Also, given petitioners' representations concerning difficulty in locating Uighur translators, the Commander is willing to accommodate the use of the translator they have proposed, who does not have a security clearance, and for whom they requested access for the first time in a communication dated July 21, 2005 (without actually applying for a security clearance), subject to appropriate arrangements to address security concerns. Id.

In addition, the prospect of monthly calls for NLECs such as petitioners with family members was already being considered prior to petitioners' motion in this matter, and the Commander, JTF-GTMO, is willing to permit such calls, subject to arrangements to address security concerns. Id. ¶ 9.

These accommodations, as well as the continuing developments with respect to petitioners' living arrangements, counsel strongly against the Court bringing petitioners to Washington, D.C., for any reason.

E.    **Bringing Petitioners into the United States for Physical Appearance at a Hearing is Inappropriate While the Key Issues Are On Appeal and in Light of the Supreme Court's Guidance to Proceed Cautiously in this Area.**

In any event, the basis for petitioners' current claims for interim relief, a "common-law" right to release that allegedly inheres in the habeas statute, counsels against the Court acting to address these matters or provide the relief sought. The D.C. Circuit, in the pending appeals in Khalid v. Bush, 355 F. Supp. 2d 311 (D.D.C. 2005), appeals docketed, Nos. 05-5062, 05-5063 (D.C. Cir. Mar. 2, 2005), and In re Guantanamo Detainee Cases, 355 F. Supp. 2d 443 (D.D.C. 2005), appeal on petition for interlocutory appeal, No. 05-5064 et al. (D.C. Cir.), will soon

address key issues that will be applicable to this proceeding, including the rights of alien wartime detainees at Guantanamo, appropriate bases or showings by the Executive necessary to justify the detention of aliens taken in connection with hostilities, and the powers provided the courts through the habeas statute with respect to wartime detentions.[23]

In their most recent brief, petitioners disclaim reliance on constitutional rights, and boldly proclaim that "This Case Does Not Present Issues Now On Appeal." Petrs' Supp. Mem. at 8. But that conclusory section heading is belied completely by the two pages of argument that follow it. See Petrs' Supp. Mem. at 8-10. That argument – that there is an independent "common law" right to release under the habeas statute, 28 U.S.C. § 2241, even if no violation of constitutional or other cognizable rights has been shown – is similar, if not identical, to one of the main arguments being pressed by the detainee-petitioners in the present appeals. Compare Petrs' Supp. Mem. at 8 ("The request for this interim relief does not rest on constitutional rights . . . . This obligation arises under the common law of habeas corpus that long predated our Constitution and exists independently of it. 'Habeas corpus is,' as the Supreme Court explained, 'a writ antecedent to statute, . . . throwing its root deep into the genius of our common law.'") (footnote omitted), with Brief for the Guantanamo Detainees, Nos. 05-5064, 05-5095, et seq. (D.C. Cir.) (attached hereto as Exhibit 3) at 18 ("Relief under the habeas statute . . . does not depend on showing a violation of the Constitution. . . . As the Supreme Court pointed out in Rasul, the statutory entitlement to judicial review of federal detentions is part of our common law

---

[23] The D.C. Circuit has set oral argument in Khalid and In re Guantanamo Detainee Cases for September 8, 2005.

heritage, throwing its root deep into the genius of our common law.'").[24]  Indeed, an affirmance

of Khalid by the Court of Appeals would likely spell defeat of this very argument.  See Khalid v.

Bush, 355 F. Supp. 2d 311, 324 n.17 (D.D.C. 2005) (rejecting petitioners' argument "that they

need not allege their detainment violates the Constitution or laws or treaties of the United

States . . . because . . . they have common law due process rights to judicial review" on the

ground that "the habeas statute does not give them more rights than they would otherwise possess

under the Constitution"), on appeal, Nos. 05-5062, 05-5063 (D.C. Cir.).[25]

The Supreme Court in Hamdi adjured the lower courts generally to "proceed with the

caution that is necessary" and to take only "prudent and incremental" steps when faced with

novel issues pertaining to petitions for writs of habeas corpus by detainees held by the Military

incident to military operations in the global war on terror.  See 124 S. Ct. at 2652.  Given the

serious issues presented in the matter currently before the Court, including the analogous

historical basis for the transitional custody of wartime detainees pending resettlement efforts after

their underlying detention as enemy combatants has ended, as well as the fact that applicable

legal principles are the subject of the pending appeals in the D.C. Circuit, the Court here should

not proceed precipitously by ordering that petitioners be brought to Washington, D.C., interfering

with the Executive's authority to wind up petitioners' custody in an orderly fashion, or otherwise

--------------------------------------------

[24] Even the authorities relied upon for this argument are largely the same as those cited to
the D.C. Circuit.  Compare Petrs' Supp. Mem. at 9 (relying on, inter alia, 1 W. Blackstone,
Commentaries on the Laws of England 132-33 (1765), and Ex parte Bollman, 8 U.S. (4 Cranch)
75, 125, 136-37 (1807)), with Brief for the Guantanamo Detainees (Ex. 3) at 21 (relying on
Blackstone's Commentaries at 132-33 and Bollman, 8 U.S. at 125, 136-37)

[25] For the reasons explained in respondents' briefing in the Court of Appeals, petitioners'
argument based on a free-form "common-law" right to relief through the habeas statute is
erroneous.  See Reply/Cross-Appellee Br. of the United States et al., Nos. 05-5064, 05-5095, et
seq. (D.C. Cir.), at 4-8 (attached hereto as Exhibit 4).

superintending petitioners' housing arrangements during this transitory period.

## CONCLUSION

For the foregoing reasons and those stated in their earlier brief opposing petitioners'

motion, respondents respectfully request that petitioners' motion be denied.

Dated: August 8, 2005                    Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

KENNETH L. WAINSTEIN
United States Attorney

DOUGLAS N. LETTER
Terrorism Litigation Counsel

JOSEPH H. HUNT
Director
Federal Programs Branch

VINCENT M. GARVEY
Deputy Director
Federal Programs Branch

LINDA S. WENDTLAND
Assistant Director
Office of Immigration Litigation

[*signature block continued on next page*]

___/s/ Terry M. Henry_____
TERRY M. HENRY
JAMES J. SCHWARTZ
PREEYA M. NORONHA
EDWARD H. WHITE
ROBERT J. KATERBERG (D.C. Bar No. 466325)
ANDREW I. WARDEN
NICHOLAS J. PATTERSON
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel:  (202) 616-8298
Fax:  (202) 616-8460

Attorneys for Respondents