UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

ABU BAKKER QASSIM and A'DEL ABDUL
HAKIM,

       Petitioners/Plaintiffs,

v.

GEORGE W. BUSH, *et al.*,

       Respondents/Defendants.

Case No. 05 cv 0497 (JR)

## SURREPLY OF PETITIONERS

Petitioners submit this surreply to address issues raised in the Government's August 8, 2005 brief ("Gov't Suppl. Brief") and the declaration of General Hood ("Hood Decl.").[1]

**Argument**

A. **The Government's Effort to Influence an Interim Release Determination by Hearsay Innuendo While Simultaneously Concealing the CSRT Records Should Not be Countenanced.**

General Hood (who was not, so far as the record shows, in Afghanistan to make the observation himself) now says that the Petitioners received small-arms training in an Afghan camp "provided by the Taliban." Gov't Suppl. Brief at 13; Hood Decl. ¶ 2. Yet we know that the general's own secret tribunal found that each Petitioner was *not* "an individual who was part of or supporting Taliban ... forces, or associated forces." *See* Gov't Suppl. Brief at 13 n. 10

---

[1] Evidentiary material cited herein is set forth in the August 10, 2005 Declaration of Sabin Willett ("Willett Decl."). Petitioners have also moved to strike General Hood's declaration as inadmissible hearsay particularly inappropriate where the CSRT records continue to be concealed.

(quoting definition of "enemy combatant"). This sort of thing illustrates the danger of the Government's continued campaign of character assassination. The Government proceeds by hearsay and innuendo; it conceals the CSRT records, and it protests mightily against the prospect that a judge might actually conduct an old-fashioned hearing to get to the bottom of things.

General Hood says the Petitioners trained in "the use of small arms." See Hood Decl. ¶ 2. If they did so, then they did only what any Virginian lawfully may do within fifty miles of the Court House. In Woodbridge, Virginia, for example, BBSG Consulting, Inc. provides day-training in the use of AK-47s. Willett Decl. ¶ 1, Ex. A (materials from website, www.bbshootinggallery.com).[2]

None of this is a basis to imprison, but as we show below, it does point up the need for a hearing.

B.  The Government's Immigration-Law Arguments Have no Merit.

Petitioners do not ask the Court to interfere with immigration laws and procedures. Petitioners seek no visa. They do not ask the Court to substitute its judgment for any determination that has been made by the Executive on an immigration matter. All we have said is that (i) there are no grounds for imprisonment, (ii) *Rasul*[3] held that this Court has jurisdiction,

---

[2]  Small-arms training -- indeed, *machine-gun training* -- is legal in the United States and widely advertised on the Internet. See generally, Willett Decl. Ex. B (www.frontsight.com ("resorts" in Nevada and Alaska offering small arms and machine gun training)), C (www.scottsdalegunclub.com (advertising small-arms training courses and "machine gun adventures")), D (www.machineguntraining.com (training in small arms and automatic weapons headquartered in Virginia Beach, VA)), E (http://dmoz.org/Recreation/Guns/Education (listing more than 100 US small-arms training facilities, including six in Virginia alone)).

[3]  *Rasul v. Bush*, 124 S. Ct. 2686 (2004).

and (iii) a Court having jurisdiction of a *habeas* case may order interim release on appropriate conditions, pending that resolution.

It was the Executive that brought Petitioners to Guantanamo in chains. It is the Executive that created the conditions that establish jurisdiction. And it is the Executive that now protests against release at Guantanamo itself. Having created the problem -- and the facts giving rise to jurisdiction -- the Government can hardly complain of it now. By ordering the body produced and by ordering, on an interim basis, local release subject to conditions, the Court would not be "bringing" Petitioners here. *Rasul* held that, for the purposes of this case, they are already here.[4]

The Government cites to no authority for the proposition that a Court having *habeas* jurisdiction may not order the body produced where its order might confer a procedural benefit on the petitioner. The proposition is squarely contradicted by *Rasul*. There the Supreme Court: (i) observed that "Petitioners' allegations . . . unquestionably describe custody in violation of the Constitution or laws or treaties of the United States," 124 S. Ct. at 2698 n.15[5], (ii) held that 28 U.S.C. § 2241 confers on this Court[6] jurisdiction to "*hear* petitioners' habeas corpus challenges to the legality of their detention at the Guantanamo Bay Naval Base," *id.* (emphasis added), (iii) directed that the Government "make [its] response *to the merits* of petitioners' claims," *id.* at 2689 (emphasis added), and, most importantly, (iv) "remand[ed] for the *district court to consider in the first instance the merits* of the Petitioners' Claims." *Id.* (emphasis added).

---

[4] It is absurd to argue that groundless imprisonment must be continued lest, after three and one-half years of harsh confinement, the victim be afforded some trifling procedural advantage. Heaven forbid an act of charity result from all of this.

[5] The same allegations are made by Petitioners here. *See* discussion, *supra* ¶ 5.

[6] Rasul did not involve these petitioners, but did involve petitioners situated precisely as are these petitioners, save only for the determination that these petitioners are not enemy combatants.

Can the Executive really maintain that this Court has jurisdiction to hear the habeas case but not the habeas petitioner? The Government would have it that a Court charged to "consider in the first instance the merits" of a case has no power to lay eyes on the petitioner who brings it. The argument is absurd -- and far reaching. If it were the law, then no judge of this Court would have the power to actually hear testimony from any Guantanamo habeas petitioner before that judge.

But that is not the law. The cases cited by the Government deal with litigants who bring judicial proceedings to compel the Executive to act in some way with respect to immigration status; for example, to issue a visa or reconsider denial of a visa. In the principal case cited, *City of New York v. Baker*, 878 F. 2d 507 (D.C. Cir. 1989), the petitioners were foreigners seeking nonimmigrant (temporary) visas. In other cases, a visitor's visa was denied (*Centeno v. Shultz*, 817 F.2d 1212 (5th Cir. 1987) (per curiam)), an employee visa was denied (*Li Hing of Hong Kong, Inc. v. Levin*, 800 F.2d 970 (9th Cir. 1986)), and a permanent resident's family's visas were denied (*Wan Shih Hsieh v. Kiley*, 569 F.2d 1179 (2d Cir. 1978)). Other cases deal with applications for reversal of deportation decisions (*Gonzalez-Cuevas v. INS*, 515 F.2d 1222 (5th Cir. 1975); *Loza-Bedoya v. INS*, 410 F.2d 343 (9th Cir. 1969)). As for the statute, the Real ID Act[7] addresses judicial review of immigration decisions of the Attorney General. Petitioners challenge no such decision.

Talk of asylum is largely academic anyway. First, the Government's authorities suggest only that the Petitioners' presence in the District may give them standing to *request* that the Attorney General exercise his authority to permit a *discretionary* asylum. That is a far cry from a grant of asylum. Indeed, the Government then argues that the Executive has unreviewable

---

[7] Cited at Gov't Suppl. Brief 6-7.

discretion to deny such a request.[8] If that is so, what is the Government so worried about? The second point is more practical, and the Court may take it to the bank. If the Petitioners were present in the District of Columbia or its environs, a reenergized State Department would make a priority of arranging a resettlement solution abroad.

In short, without interfering with any diplomat, and without dictating to the Executive how it treats any enemy combatant, this Court may fashion an interim order (i) requiring the release of the Petitioners from prison, (ii) affording to the Government the right to transport the Petitioners to a suitable location outside the United States (such location, as previously ordered, subject to notice and the Court's approval), and, if the United States does not arrange for that, (iii) accommodating its preference that the Petitioners not be released to the civilian side of the base, by permitting their release here, where there is jurisdiction. Release by the Court on an interim basis would ensure that the Court retained jurisdiction over the petitioners and thus the power to compel their attendance with respect to lawful orders of resettlement.

The Government has, in the past, granted temporary accommodations to aliens. In 1892, the United States agreed to allow an alien who arrived aboard a steamer from Japan, to be housed pending final determination of her immigration status at a Japanese mission in San Francisco. *Nishimura Ekiu v. United States*, 142 U.S. 651 (1892).

### C. The Appeal Will Not Address the Issues in this Case.

The pendency of the *Al Odah* appeal is not grounds for further delay. Nothing the Court of Appeals says in a case involving alleged "enemy combatants" is likely to elucidate the law governing indefinite imprisonment of non-enemy-combatants.

---

[8] Gov't Suppl. Brief at 7-8.

Whatever the Court of Appeals may be doing, the Supreme Court's mandate was in plain words. This Court has jurisdiction and was empowered (we have elsewhere contended, was bound) to hear the facts and law of the case and determine whether, on the merits, further detention is lawful. This mandate seems most compelling where everyone agrees that Petitioners are not enemy combatants. In short, given that the Court has jurisdiction in *habeas*, that the Supreme Court has directed the Court to hold hearings, and that Congress directed that the Respondents may be required to produce the body, the Court clearly has the power to use that statutory remedy here.

### D. The Government Should be Compelled to "Produce the Body" Here.

Why have a hearing? The Court asked the question on August 1, and the Government vigorously protests against any sunlight on this case. Yet there are compelling reasons.

First, a hearing is needed to address the terms of interim release into the community. Given what the Government has now improperly insinuated, that need is urgent. The Government's tender of hearsay from General Hood and refusal to disclose the CSRT records is exactly the sort of abuse a hearing would clear up. Would interim release of these petitioners present any realistic threat to the safety of any person? The Government's papers were intended to suggest to the Court that it would. *See* Gov't Suppl. Brief 13, 17. A hearing would answer the question. We believe the evidence would show that implication to be false, but we need evidence -- real evidence, not innuendo or offers of proof -- to show it so. At a hearing to address the suitability and conditions of interim release into the local community, we could (i) with the assistance of the Petitioners, cross-examine any witness called by the Government on the point, and (ii) call the Petitioners to address these innuendos themselves. As previously noted, counsel (whose source is, of course, the Petitioners themselves, given the failure to

produce the CSRT records) is aware of no conduct of Petitioners that would be unlawful in the Commonwealth of Virginia. *See* Willett Declaration at Exhibits A-E.

Second, what precise conditions of interim release are appropriate? A hearing would show. Representatives of the local community of lawfully-resident alien Uighurs (who express that inspiring devotion to the United States and its ideals that is perhaps unique to the immigrant who struggled to get here), have asked counsel whether they might offer refuge to the Petitioners in the event of their release. These representatives would be present in Court so that the Court might satisfy itself as to the suitability and safety of such arrangements.

Third, the Court should order Petitioners brought here to accommodate the preferences of the base commander that they not be released into the civilian population on Guantanamo.

We note that the government has not rebutted the assertion that presence in the United States will assist with the easy transmittal of information related to the Petitioners to foreign governments with whom a resettlement arrangement we hope can be effected. No such information would interfere with or substitute for any of the State Department's diplomatic efforts.

The bulk of the *habeas* jurisprudence[9] involves review of cases where a court has already adjudicated guilt. These habeas cases are quite different. "Producing the body" is rare, but so is this case.

### E. The Government Had Made No Case for "Wind-Up" Detention Authority.

The government offered no authority for an indefinite "wind-up right" with respect to non-consensual detention of non-combatants. The cited cases identify no such power, and deal only with lawful and unlawful combatants, not persons deemed *not* to be combatants. Thus the

---

[9] Including the *Braden* case, cited by Respondents at 10.

analogy does not hold. The Petitioners are not enemy combatants to be repatriated at the conclusion of hostilities. They are persons who were never combatants at all.

Even as to enemy combatants, the Executive's historic practice as to "wind-up" detention is far to the contrary of what the Government suggests.

1. *The Gulf War.* The Government quotes selectively from the Final Report to Congress on the Conduct of the Gulf War ("Congressional Report").[10] In fact, the Congressional Report states that "[e]xpeditious repatriation of EPWs [enemy prisoners of war] became a high Coalition priority when offensive operations were suspended." Congressional Report at 605. Offensive operations ceased at 0800 on 28 February, 1991. *Id.* at 338. Repatriation began on 6 March, 1991. *Id.* at 671. By May 2, 1991, the last EPW had been transferred out of U.S. custody. *Id.* at 672.[11]

2. *World War II.*

*Italian Prisoners of War.* The situation of Italian prisoners of war during World War II is particularly instructive. During the war, more than 50,000 were transported to prisoner-of-war camps in the continental United States. *See* Prisoners in Paradise, www.italianpow.com/history.html. On September 29, 1943, the Badoglio government executed the instrument of Italian surrender with allied forces. 61 Stat. 2704. Northern Italy remained under control of the German army, and the Germans had purported to place Benito Mussolini at the head of newly-declared fascist "republic." Accordingly, in September 1943, the Italian peninsula remained in chaos and repatriation of Italians to Italy was impractical. The war against Germany would rage on for twenty months. What was to be done with the Italians in the interim?

---

[10] The report is cited at n. 11 of the Gov't Suppl. Brief.

[11] Many EPWs objected to return to Iraq and so were delivered to the custody of Saudi Arabia. On 23 August, 1991, representatives of the International Committee of the Red Cross announced that repatriation efforts were complete. *Id.* at 672.

More than 45,000 Italian prisoners of war joined "Italian Service Units," located throughout the continental United States. *See* Prisoners in Paradise, www.italianpow.com/history.html. These former enemy combatants were given increased freedom of movement among the civilian population: they held jobs and earned money. *Id.* Particularly in U.S. regions that had large Italian-American communities, liberty became the norm during the period between September 1943 and the end of the war. In San Francisco, California, and Ogden, Utah, for example, Italian-American families could take Italian Service Unit members out of POW camps for picnics and outings. *Id.* Fraternization was common: after the war, a significant number of American women traveled to Italy to marry former Italian prisoners of war. *Id.*

One example will suffice to illustrate the profound difference between how the Executive treats Messrs. Qassim and Hakim, and how it treated combatants in prior conflicts. After the Italian armistice, prisoners of war formerly held at Camp McKay in South Boston were transported to a housing facility on Peddocks Island in Boston Harbor, which was "not a stockade," according to the commander. *See* generally, Willett Decl. Ex. F (*Moved From So. Boston to Harbor Island; Two Sides of the Row*, Boston Globe, July 30, 1944). The Italians were permitted to work for pay. They received liberty to go among the civilian population of the city. *Id.* They would ride a ferry from Peddocks Island, where they were housed, to work at the Boston Port of Embarkation, where they were paid for work. *Id.* This was not unique to Boston: the War Department stated that "these service units of Italian prisoners of war are being used in *all major ports of embarkation the country*." *Id.* (emphasis added).

The commander reported that "they will be given some liberty on their days off in the way of passes out of the camp." *Id.* A brigadier general sent a commendatory telegram to local Italian-Americans in the Boston area who had provided social support for the Italian POWs. Even before the transfer to Peddocks, security was lax. The army sent out for ice cream and cookies. *Id.* The Globe reported that young women at Carson's Beach [were] "passing notes through the fence." *Id.*

On June 4, 1944, a group of Italian POWs was taken to St. Leonard's Church in Boston's North End[12], and thence to the Hatch Shell (an outdoor concert facility along the Esplanade most famous for its Fourth-of-July concerts) Willett Decl. Ex. G (*Former Italian Prisoners Enjoy Boston Hospitality*, Boston Globe June 5, 1944). The Globe reported:

> Following the church services, the men were conveyed by troop carriers down Prince St. in the North End. Crowds cheered them as they passed through Boston's closest facsimile to their beloved homeland. At the Hatch Memorial Shell on the Charles River Esplanada, they halted and sang a native song entitled, "A Bouquet of Flowers."

*Id.* The men posed for pictures; they played bocci; they "feast[ed] on native dishes." *Id.*

*Fort McLellan and the Texas POW Camps.* During World War II, a prisoner of war camp was maintained at Fort McLellan, Alabama. www.McLellan.army.mil/info.asp. POWs were permitted to work for pay in local farms. *Id.* Texas was home to as many as 33 prisoner-of-war camps. See generally, Robert J. Tissing, *Utilization of Prisoners of War in the United States During World War II; Texas, A Case Study (Master's Thesis)*, www.rootsweb.com/ds.rober2/TissingIII.htm (Baylor University 1973). German POWs worked in agricultural jobs for pay. *Id.* They cooked their own meals, maintained gardens, engaged in organized sports, painted murals, built clocks, at some camps formed POW orchestras, had access to mimeograph machines, distributed their own POW mail. With earnings from day labor they bought food, ice cream, and fresh flowers. *Id.*

The Hearne Camp in Texas contained prisoners until December 20, 1945, only four months after V-J Day. *Id.* It appears that *all* former Italian combatants were repatriated to Italy by January, 1946, fewer than six months following V-J Day. *See*

---

[12] Then as now, the North End of Boston has been home to large numbers of Italian-Americans. It appears that the spirit of welcome among the small group of Uighur expatriates in the District and its environs would be no less heartfelt.

www.italianpow.com/history.html. The POW camp at Fort McLellan closed in April, 1946, some nine months after the end of the war. www.McLellan.army.mil/info.asp.[13]

Imprisonment for 3 ½ years at Camp 4 is hardly the equivalent of this experience. It is still a high security prison and the living arrangements and privileges are Spartan. Indeed, the Government now concedes that for unspecified reasons, persons who are not enemy combatants have been sent to Camp 1. General Hood provides no details as to conditions in Camp 1, but those conditions are believed to be far harsher than those in Camp 4. The separation from family and loved ones is Draconian. There are no sweethearts passing notes through the fence at Guantanamo. There is no effective contact with the outside world at all.

We appreciate the tender of relaxed translation[14] and telephone rights in General Hood's declaration. By electronic and telephone messages on August 9 and 10, 2005, we requested that the Department of Justice communicate the specific arrangements. That has not yet occurred. We will keep the Court advised of all progress made, but this does not suffice. It remains the case that the Government has no authority to imprison.

---

[13] The Government's citation to the Delessert chapter (at 14 n.11) is quite misleading. The essay in question addresses the problem faced by Allied Forces in the post-war period, and United Nations peacekeepers after the Korean conflict, as to whether Article 118 required the repatriation of POWs against their will. It does not deal with the conditions under which such POWs would live during the interim period, except to say that "[t]he detaining powers, pressed by needs of reconstruction, transformed the status of hundreds of prisoners into one of 'civilian workers.'" Christiane Shields Delessert, Repatriation of Prisoners fo War to the Soviet Union During World War II: A Questin of Human Rights, in World in Transition: Challenges to Human Rights, Development and World Order 80 (Henry H. Han ed., 1979). That our Government should cite this article as authority is chilling: the prime example cited by Delessert for continued detention is that of the Soviet Union under Stalin. Id. at 80-81.

[14] The Government has proposed a (quite expensive) interpreter for base visits. We have consented to use this interpreter provided that access to our clients not be further delayed, but understand that the interpreter in question has not yet been given theater clearance. We have also requested a confirmed date for a base visit and received none.

## Conclusion

For the foregoing reasons, we request that the Court grant the relief set forth in our Supplemental Memorandum filed August 4, 2005.

Dated: August 10, 2005

Respectfully submitted,

COUNSEL FOR PETITIONERS:

_____
Sabin Willett
Neil G. McGaraghan
Jason S. Pinney
Daniel Hunter Kiel
**BINGHAM MCCUTCHEN LLP**
150 Federal Street
Boston, MA 02110-1726
Telephone: (617) 951-8000
Facsimile: (617) 951-8925

Susan Baker Manning
**BINGHAM MCCUTCHEN LLP**
1120 20th Street NW, Suite 800
Washington, DC 20036
Telephone: (202) 778-6150
Facsimile: (202) 778-6155

Barbara Olshansky
Deputy Director
**CENTER FOR CONSTITUTIONAL RIGHTS**
666 Broadway, 7th Floor
New York, NY 10012
Telephone: (212) 614-6439