# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

| | |
|---|---|
| ABU BAKKER QASSIM and A'DEL ABDU AL-HAKIM,<br><br>  Detainees,<br>  Guantánamo Bay Naval Station,<br>  Guantánamo Bay, Cuba;<br><br>         Petitioners/Plaintiffs,<br><br>         v.<br><br>GEORGE W. BUSH, et al.,<br>         Respondents/Defendants. | Civil Action No. 05-0497 (JR) |

## SECOND SUPPLEMENTAL MEMORANDUM OF PETITIONERS IN SUPPORT OF MOTION TO VACATE STAY ORDER AND ISSUE WRIT DIRECTING IMMEDIATE RELEASE OF PETITIONERS AND FOR OTHER RELIEF

### I. INTRODUCTION

Petitioners Abu Bakker Qassim and A'Del Abdul Hakim submit this Second Supplemental Memorandum in support of their Emergency Motion to Vacate Stay and Issue Writ Directing Immediate Release of Petitioners, and for other relief. This brief addresses developments in the matter since the August 25, 2005 hearing. Specifically, we request that the Court schedule at hearing at which the Petitioners would be present in Court, to address conditions of interim release.

### II. FACTS

*Indefinite Imprisonment Without Cause.* Petitioners have been in the custody of U.S. forces for more than three and one-half years. According to news reports, it has been almost two

years since the Pentagon determined that they should be released.[1] According to the Government's filings in this case, September 26 will mark the six-month anniversary of the conclusion of the Combat Status Review Tribunal ("CSRT") process that confirmed that Petitioners were not enemy combatants. More than two months have passed since counsel was finally able to learn that Petitioners had been exonerated by the same government that imprisons them, and since counsel provided this critical information—which the government had withheld—to the Court.

No end to their imprisonment is in sight. The Government disclosed nothing of substance during either the on-the-record or the off-the-record sessions on August 25. Ambassador Prosper, quoted that same day on National Public Radio, reported a string of failed efforts involving a number of countries that bodes poorly as to any resettlement effort. *See also* Sept. 8, 2005 Declaration of Sabin Willett ("Sept. 8 Willett Decl.").[2] As of August 29, 2005, it appeared the kind of "due diligence" that would attend any real effort at resettlement had not commenced. The Prisoners had not been interviewed by any representative of a foreign government. *See* Sept. 8 Willet Decl.

*Conditions of Confinement.* The conditions of Petitioner's confinement may have improved incrementally, but they are still in jail. The area in which the prisoners are confined is small, the sense of isolation and loneliness powerful, and there is almost no access to the outside world. Id. For example, photographs of Petitioner Hakim's children (all under the age of seven) could not be left with him at the camp. They had to be "cleared" by the Department of Defense.

---

[1] Robin Wright, *Chinese Detainees are Men Without a Country*, Wash. Post, Aug. 24, 2005 at A1 ("In late 2003, the Pentagon quietly decided that 15 Chinese Muslims detained at the military prison in Guantanamo Bay, Cuba, could be released.").

[2] The Sept. 8 Willett Decl. was filed in conformity with the Protective Order, and has not been unclassified by the Government. Accordingly, counsel, in preparing this unclassified brief outside the secure facility, has no copy of that declaration at hand and is unable to cite to the precise paragraph numbers in it.

We do not know whether these photographs have yet reached him, or whether, like our clients' letters to us, they never escape the so-called "privilege review."[3] There is no access to news or information. See generally, 9/8 Willett Decl.

Since July, there has been only one brief family call for Petitioner Hakim. Petitioner Qassim has had no contact with friend or family. Petitioners had one joint call with counsel on August 19, 2005.

*Absence of Government Disclosure.* The Government has made no factual return to the petitions. Although it conceded that Petitioners were found not to be "enemy combatants" by the CSRT, it has never disclosed any record of the CSRTs. We have no way of knowing when these proceedings were conducted, or what evidence was put before the commission. Nor has the government ever revealed when Petitioners were first identified as non-enemy combatants, despite public information that this may have occurred as much as two years ago.

*Practical Availability of Parole Option.* Several members of the Uighur community who live in or near the District of Columbia have offered to provide food and shelter to Petitioners should the court grant interim release. Such persons would be present at any subsequent hearing and Petitioners would then make a record as to practical terms of interim release.

*The Al-Odah Oral Argument.* On September 8, 2005, the United States Court of Appeals for the District of Columbia heard oral argument in the consolidated *Al-Odah* appeals. A copy of the transcript is attached to the September 19, 2005 Declaration of Sabin Willett. Questioning from an active panel gave an insight as to the panel's mode of analysis in Guantanamo habeas

---

[3] The November 8, 2004 Amended Protective Order and Procedures for Counsel Access to Detainees at the United States Naval Base in Guantánamo Bay, Cuba, entered in this action on May 5, 2005, provides procedures for correspondence between counsel and detainees, as well as for review by military authorities of all documents provided to a detainee. Extreme delays in the government's processing of attorney-client correspondence make effective mail communication impossible. For example, the government has confirmed that Petitioners sent letters to counsel as recently as June 13, 2005. On September 20, 2005—over three months later—the counsel was first informed that a single letter from one of the Petitioners had been received and soon would be available for counsel's review.

cases. As shown below, the tenor of the questioning suggested that the panel wished to explore (and the advocates differed on) the appropriate scope of district court review, but that all agreed on the root question such review would address: whether a prisoner was an "enemy combatant" or whether, as Judge Sentelle put it, he was "just a shepherd."

> THE COURT: And the claim here is there is no lawful authority to detain us because we're not affiliated with al Qaeda. Isn't that a factual question?
>
> MR. KATSAS: The question whether or not—there is a question, there is a legal question about lawful authority, which we'll discuss later I think. The factual question whether or not these detainees are affiliated with al Qaeda is precisely the question resolved against the detainees in the CSRT procedures.

Sept. 19 Willett Decl., Ex. A at 34. Even the Government suggested that only an enemy combatant finding could justify detention.

> MR. KATSAS: There are two separate questions. If the question whether the CSRT orders were properly—were a proper exercise of authority under the military orders and then ultimately under the authorization for the use of military force.
>
> * * *
>
> THE COURT: Well, suppose they simply picked up a shepherd and said we think you look like you might be al Qaeda and dragged him over to Guantanamo. Would it not be a factual question as to whether they had made a seizure that was outside their lawful authority under the orders and under the authorization?
>
> MR. KATSAS: But the question whether or not that individual is a shepherd was precisely the question put to the CSRT and if—my point is—
>
> THE COURT: Suppose the CSRT then says, well, there is no real evidence whether he's just a shepherd or whether he's al Qaeda, but we think he looks like an al Qaeda too. We have to defer to that finding?

*Id.* at 36-37.. What is striking about the exchange (for purposes of the *Qassim* case) is the proposition that there must be lawful authority to justify detention. Nothing in the Court's questioning indicates otherwise.

> THE COURT: [T]the question I still need an answer to, is what about a claim that we're detained without lawful authority? It's not a due process claim. It's a straight habeas corpus 1789 claim.

*Id.* at 41. Answering, the Government never suggested any power or right to detain outside of a determination of enemy combatant status.

> MR. KATSAS: And then the question—there would be a legal question whether the orders rendered—whether the CSRT tribunal has lawful authority to make the enemy combatant determination.

*Id.* at 41-42. The argument continued:

> THE COURT: And I think the premise of the question that you are hearing from us is let's assume [the due process clause does not apply]. What is left? And that is an issue that Judge Green never addressed.
>
> MR. KATSAS: The Court would be left, of the various other claims, I mean the ATS claim that they've asserted—
>
> THE COURT: Was a common law habeas claim. That's what's left. That's one thing that's left anyway.
>
> THE COURT: That's the hard claim that's left.

*Id.* at 45-46. Judge Randolph then engaged in this exchange with the Government:

> THE COURT: Do you agree that the authorization to use military force[4] is a law of the United States?

---

[4] Judge Randolph here referred to the Authorization to Use Military Force enacted by Congress on September 18, 2001, which authorized the President "to use all necessary and appropriate force against those nations, organization or persons he determines planned, authorized, committed, or aided the terrorist attacks [of 9/11]" or "harbored such organization or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations, or persons." 115 Stat. 224. This contained no authorization to detain anyone. The President then expanded this authorization by order of November 13, 2001, in which he authorized the detention of terrorists in aid of war crimes tribunals. Military Order of November 13, 2001: Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism, 3 C.F.R. 918 (2002).

>MR. KATSAS: Oh, absolutely.
>
>THE COURT: Yeah. And it has extraterritorial effect, does it not?
>
>MR. KATSAS: Sure.
>
>THE COURT: It applies in Guantanamo, it applies in Afghanistan, it applies in France, Belgium, Bosnia, right?
>
>MR. KATSAS: Sure.
>
>THE COURT: Okay. So there is no problem with extraterritoriality or anything else. The question is whether the law authorized the detention of these individuals, and that's a factual question, and it's also a legal question.
>
>MR. KATSAS: It's a legal—
>
>THE COURT: Well, it's both. I mean you have to determine the scope of the law and whether these individuals fit within it.

*Id.* at 46. In the *Qassim* case, of course, there is no such question, because the Government has conceded that they are not combatants.

This argument continues:

>THE COURT: Your position is that the authorization to use military force empowers the unreviewable discretion of the military to detain anybody.

*Id.* at 50. The bare transcript is unequal to the task of expressing the Court's disdain.

---

Leaving aside whether he was constitutionally authorized to do so, the President's order was implemented by a July 7, 2004 order of Deputy Secretary Wolfowitz, which provided the first definition of those who might be detained (so-called enemy combatants: "an individual who was part of or supporting Taliban or al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners."), and created a secret military tribunal (the CSRT) to determine whether persons were properly so designated. This was the only authority cited by either the Court or the Government in the questioning as to the legal basis for detention.

## III. ARGUMENT

A. **THIS COURT HAS POWER TO GRANT INTERIM RELEASE PENDING FINAL RESOLUTION OF A *HABEAS* CASE.**

1. <u>**Conditional Bail or Release.**</u>

We have suggested a modest remedy: interim release without a final ruling on the writ. This is designed to address the Government's concerns regarding asylum status. Of course, that concern arises only because (i) the Government transported Petitioners to Guantanamo without legal authority in the first place, and (ii) the Government has asked the Court not to permit their release at Guantanamo itself. Any changes in asylum status are of the Government's own making.

More practically, a grant of this limited relief would reserve to the Government a practical method of appropriate resettlement, and to the Court power to require the Petitioners' presence should the Government in future arrange for an appropriate resettlement acceptable to the Court. As we pointed out before, this measured, limited remedy has been approved before by the Court of Appeals itself in *Baker v. Sard*, 420 F.2d 1342, 1343 (D.C. Cir. 1969), and *Baker v. Sard* has been cited with approval in later decisions, including *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001). This Court has "an inherent power to grant relief *pendente lite*, to grant bail or release, pending determination of the merits." *Baker*, 420 F.2d at 1343. The D.C. Circuit specifically noted that "*[r]elease is available in a habeas corpus action*, which is a civil collateral attack." *Id.* (emphasis added). This court has "inherent power to enter an order affecting the custody of a *habeas* petitioner who is properly before it contesting the legality of his custody." *Mapp*, 241 F.3d at 226 (*quoting Ostrer v. United States*, 584 F.2d 594, 596 at n.1 (2d Cir. 1978)).

## 2. Factors Governing Release.

The Court has previously indicated that it is inclined to honor the Government's request that the Petitioners not be released to the civilian side of the base. That leaves, as a practical alternative to continued indefinite detention, the Court's clear statutory power to compel the Government to produce the body, which would occur in the District, and in such a hearing consider any question of the appropriateness of parole conditions and then order appropriate conditions for release.

### B. THE *AL-ODAH* APPEAL.

Questioning at oral argument is only that: questioning. Still, this Court has rightly noted that district courts engage in a practical exercise. The law is, as Justice Holmes taught, "the prophecies of what the courts will do in fact." Holmes, *The Path of the Law*, 1 Boston Law School Magazine no. 4 (1897). We have submitted the transcript of the argument in *Al Odah*, which we believe reinforces the conclusion that the relief we seek here would not be disturbed by the Court of Appeals.

The non-enemy-combatant case was not presented by the consolidated *Al-Odah* appeals. Nevertheless, if one reviews the transcript of oral argument to explore the question whether the Court would be likely to impose an immediate stay in this case, the answer must be in the negative. As the passages cited above show, it is clear that the Government rested on "enemy combatant" status as the lynchpin of the right to detain, and that the Court of Appeal's questioning rendered extremely doubtful any suggestion that it would issue a blanket endorsement of detention by fiat—much less where the detention is indefinite—of someone who is concededly not an "enemy combatant."

We submit that an order from this Court, sound on appeal, would be unassailable through extraordinary relief such as a stay. The Court would be applying (i) the express terms of an Act of Congress, 28 U.S.C. § 2243 ("Unless the application for the writ and the return present only issues of law the person to whom the writ is directed *shall be required* to produce at the hearing the body of the person detained.")[5], and (ii) a remedy expressly authorized by the Court of Appeals itself in *Baker v. Sard,* and (iii) following the teaching of the Supreme Court in *Zadvydas, Rasul* and *Hamdi* regarding the prohibitions against indefinite detention. Were a reviewing court to consider the following facts (all of which are of record in this case) an order from this Court could be seen only as a model of restraint:

> a. Petitioners are not "enemy combatants";
>
> b. the Government continues to imprison them despite having made this final determination at least six months ago, on March 26, 2005;
>
> c. the Government clearly misled the Court as to the status of the Petitioners in its March 29, 2005 filing;
>
> d. Petitioners cannot be returned to China, because to do so would be to place them in grave, and possibly mortal, peril;
>
> e. the Government objects to releasing Petitioners at the base itself;
>
> f. the Government has had years to arrange a diplomatic solution;
>
> g. the Court gave the Government an opportunity on August 25, 2005 to provide specific assurances that a diplomatic solution was forthcoming, and the Government was unable to do so;
>
> h. the Court has given the Government a further month; and

---

[5] The Court has noted that in actual practice the requirement to produce the body is usually dispensed with. Nevertheless, the statute is mandatory. A trial judge could hardly be faulted for following that mandate.

i. Interim release, if it occurs, will occur only after hearing at which the Court will have had an opportunity to consider any risk of flight or to the community.

No reviewing Court could fail to mark the extraordinary restraint the Court has shown with the Government thus far.

### IV. REQUESTS FOR RELIEF.

Accordingly, Petitioners request that:

(i) the Court vacate its stay, and direct the Government immediately to produce the entire record of each Petitioner's CSRT (including those documents considered by the CSRT);

(ii) the Executive be ordered to "produce the body" of each Petitioner at the Courthouse, pursuant to 28 U.S.C. § 2243, and to disclose in advance of any hearing any evidence it would offer to suggest that either Petitioner presents a danger to himself or to the community, or to suggest that he is unlikely to comply with terms of release ordered by this Court;

(iii) upon a hearing, each Petitioner be released on an interim basis and subject to appropriate conditions. It appears that the most effective release conditions would involve release to the care members of the Uighur community in or near the District of Columbia (who can be present in Court), and subject to appropriate conditions.

Dated: September 20, 2005

_____
Sabin Willett
Neil G. McGaraghan
Jason S. Pinney
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA 02110-1726
Telephone: (617) 951-8000
Facsimile: (617) 951-8925

Susan Baker Manning
BINGHAM McCUTCHEN LLP
1120 20th Street NW, Suite 800
Washington, DC 20036
Telephone: (202) 778-6150
Facsimile: (202) 778-6155

Barbara Olshansky
Deputy Director
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Telephone: (212) 614-6439