IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ABU BAKKER QASSIM, et al., | ) ) ) | |
| Petitioners/Plaintiffs, | ) ) | Civil Action No. 05-0497 (JR) |
| v. | ) ) | |
| GEORGE W. BUSH, et al., | ) ) | |
| Respondents/Defendants. | ) ) ) | |

**RESPONDENTS' OPPOSITION TO PETITIONERS' MOTION
TO GRANT THEM ACCESS TO REPRESENTATIVES OF
THE UNITED NATIONS COMMISSION ON HUMAN RIGHTS**

**INTRODUCTION**

Petitioners' request to meet with a representative of the United Nations Commission on Human Rights (UNCHR) during a visit by their counsel on November 16, 2005, has already been overtaken by events – petitioners met with their counsel over two weeks ago. But even setting aside that unalterable fact, petitioners' request should be denied as legally and factually groundless. As petitioners essentially concede, a federal court has no authority, at least in a situation of this kind, to compel military authorities to provide unauthorized persons access to a military installation. Nor is there reason to believe that allowing petitioners to meet with U.N. Special Rapporteurs would aid in their resettlement, as the Special Rapporteurs are not engaged in any known resettlement activities on behalf of petitioners, or any other Guantanamo Bay detainees. Granting petitioners' request would only risk impinging on respondents' own diplomatic efforts to arrange for petitioners' resettlement, as well as efforts to arrange for a visit by the Special Rapporteurs to Guantanamo Bay to observe the conditions of detention there. For these reasons, as elaborated below, petitioners' motion should be denied.

## BACKGROUND

On October 28, 2005, the Department of Defense extended invitations to three Special Rapporteurs of the UNCHR (not to be confused with the United Nations High Commissioner on Refugees) to visit detention facilities at the Guantanamo Bay Naval Station.[1] The three Special Rapporteurs to whom these invitations were made include Professor Leila Zerrougui, Chairperson-Rapporteur of the UNCHR Working Group on Arbitrary Detention.[2] Although Defense Department policy does not ordinarily provide for such visits to military detention facilities, the Defense Department extended this invitation, on an exceptional basis, in an effort to broaden public understanding of detention operations at Guantanamo Bay, and to demonstrate that detainees there are treated humanely. The visit was to include observation of detention operations, including nutritional, medical, recreational, religious, and cultural practices, with tours of detention facilities and opportunities to question senior command, medical, and interrogation staff. The invitations did not include access to, or the opportunity to meet with, individual detainees. Media Note, Department of State, supra n. 1. This is the same level of access to the facilities at Guantanamo Bay that has been given to Members of Congress.

The Special Rapporteurs nominally accepted the Defense Department's offer for a proposed visit on December 6, 2005, as part of a joint study they have undertaken for the

---

[1] See Media Note, Office of the Spokesman, Bureau of Public Affairs, U.S. Department of State, "Invitation to UN Special Rapporteurs To Visit Guantanamo Bay Detention Facilities" (Oct. 28, 2005) (available at http://www.state.gov/r/pa/prs/ps/2005/55756.htm) ("Media Note, Department of State"); News Release, Office of the Assistant Secretary of Defense (Public Affairs), U.S. Department of Defense, "Invitation to U.N. Special Rapporteurs"(Oct. 28, 2005) (available at http://www.dod.gov/ releases/2005/nr20051028-4994.html) ("DoD News Release").

[2] See Press Release, United Nations (Nov. 11, 2005) (available at http://www.ohchr.org/ english/press/newsFrameset-2.htm) ("U.N. Press Release").

UNCHR "on the situation of detainees in Guantanamo Bay." U.N. Press Release, supra n. 2. In addition, however, the Special Rapporteurs renewed an earlier request for "free access to all detainees and the opportunity to carry out private interviews with them." Id. When the Defense Department declined to reverse its earlier decision not to permit access to detainees, the Special Rapporteurs announced, on November 18, that they would not be traveling to Guantanamo Bay on December 6, as proposed. Id. The Defense Department's offer to the Special Rapporteurs to visit Guantanamo Bay still stands, however, and the government is prepared to continue its dialog with the Special Rapporteurs in the hope that they will accept the offer to visit the Guantanamo Bay Naval Station under the conditions set forth in the original invitation.

In the meantime, counsel for petitioners contacted Professor Zerrougui and invited her to meet with petitioners at Guantanamo Bay on November 16, 2005, during counsel's pre-scheduled visit with petitioners on that date. Their asserted hope was that a meeting with Professor Zerrougui might "be a 'gating event' to more active United Nations' assistance with Petitioners' resettlement." Petitioners' Motion To Grant Them Access to Representatives of the United Nations Commission on Human Rights ("Pet'rs' Mot.") (dkt. no. 44) at 2. According to petitioners Professor Zerrougui accepted their invitation, and their counsel, on November 7, less than a week before their scheduled departure for Guantanamo Bay, requested that respondents authorize Professor Zerrougui to meet with petitioners during counsel's November 16 visit. Id.

**ARGUMENT**

Petitioners' request to meet with Professor Zerrougui (or other representatives of the UNCHR) during their counsel's visit to Guantanamo Bay should be denied for the basic reason that their counsel's visit already took place as scheduled on November 16, more than two weeks

3

ago. No future visit by their counsel is currently scheduled or has been requested. Simply put, petitioners' request is presently moot.

Even if it were not moot, petitioners' motion for an order directing respondents to grant persons access to a military installation to which respondents, including General Hood, Commander of Joint Task Force Guantanamo, have not consented, should nevertheless be denied for lack of any conceivable legal basis. "The control of access to a military base is clearly within the constitutional powers granted to both Congress and the President," Cafeteria & Rest. Workers Union, Local 473 v. McElroy, 367 U.S. 886, 890 (1961), not to the courts, and the power in turn delegated to a commanding officer "summarily to exclude civilians from the area of his command" is both "historically unquestioned," Greer v. Spock, 424 U.S. 828, 838 (1976) (citation omitted), and expressly conferred by law, see McElroy, 367 U.S. at 890-92. As the Supreme Court observed in McElroy,

> The power of a military commandant over a reservation is necessarily extensive and practically exclusive, forbidding entrance and controlling residence as the public interest may demand * * * It is well settled that a [p]ost [c]ommander can, under the authority conferred on him by statutes and regulations, in his discretion, exclude private persons and property therefrom, or admit them under such restrictions as he may prescribe in the interest of good order and military discipline.

Id. at 893 (internal quotation marks and citations omitted).

For their part, petitioners cite absolutely no authority under the *habeas corpus* statute, or otherwise, permitting a federal court to direct that persons be granted access to a military installation without the consent of its commanding officer, or his superiors. Indeed, for all intents and purposes, petitioners concede the absence of such authority in the present circumstances when they expressly disclaim reliance on any "judicial power . . . to order the Government to afford United Nations representatives access to the base." Pet'rs' Mot. at 4.

4

Instead, they rest their motion on nothing more than a naked assertion that respondents should not be permitted to continue their allegedly unlawful detention of petitioners "in a way that interferes with legitimate diplomatic efforts to secure Petitioners' release." Id.

That assertion is not only without legal foundation, it is also factually groundless. Petitioners' contention that a personal visit with representatives of the UNCHR might become some sort of "'gating event' to more active United Nations' assistance with [their] resettlement," Pet'rs' Mot. at 2, is nothing but speculation. Petitioners describe no effort by the UNCHR to arrange for the resettlement of any detainees held at Guantanamo Bay, and respondents are aware of none. As noted above, the UNCHR and its representatives are engaged, in their own words, in a joint study "on the situation of detainees in Guantanamo Bay," U.N. Press Release, supra n. 2, and it was for that purpose that they were invited to observe operations, inspect facilities, and question officials at Guantanamo Bay, Media Note, Department of State, supra n. 1, not to arrange for anyone's resettlement. It cannot earnestly be maintained, as grounds for requiring that petitioners be permitted to meet with UNCHR representatives, that respondents are "block[ing] efforts [to resettle them] that might yield success through the assistance of the United Nations." Pet'rs' Mot. at 4. For this reason as well, petitioners' motion must be denied.

Petitioners' remaining contentions similarly lack a legal or factual basis. They casually assert that because "the Government has already authorized Professor Zerrougui to visit Guantanamo . . . access to the Naval Station . . . does not appear to be an obstacle." Pet'rs' Mot. at 2. This argument ignores that petitioners are not simply asking that Professor Zerrougui be given access to the base, but that she be permitted to meet privately with petitioners during their visits with counsel, exactly the sort of access that the U.N. Special Rapporteurs sought as a condition of visiting Guantanamo Bay, see U.N. Press Release, supra n. 2, and which the

5

government, exercising its authority to admit persons to a military post "under such restrictions as [it] may prescribe," McElroy, 367 U.S. at 893 (internal quotation marks and citation omitted), refused to allow.[3/] Petitioners also maintain that, "[i]f the Government is unwilling to consent to in-person visits by United Nations representatives" at Guantanamo Bay, "then it ought to be required to transport Petitioners to Washington, D.C., where such visits could also take place." Pet'rs' Mot. at 4. As respondents have already demonstrated, however, this Court has no authority under the *habeas corpus* statute, or otherwise, to order that non-resident aliens be permitted to enter this country from a foreign territory such as Guantanamo Bay, Cuba. Respondents' Supplemental Memorandum Pursuant to the Court's Invitation at the August 1, 2005 Hearing, at 2-10 (dkt. no. 27).

Moreover, regardless of where petitioners would like to meet with UNCHR representatives, their stated objective, "to assist the United Nations" in "diplomatic efforts" to resettle them, Pet'rs' Mot. at 2, is itself reason to deny their request. Efforts to resettle petitioners in another country fall squarely within the purview of the Executive Branch over foreign policy matters, see Schneider v. Kissinger, 412 F.3d 190, 195 (D.C. Cir. 2005) (President possesses

---

[3/] Of course, the government has provided the International Committee of the Red Cross (ICRC) with ongoing and regular access to individual detainees at Guantanamo, in keeping with the ICRC's unique mandate and competence. Respondents have also determined that it is appropriate to provide petitioners access to their counsel (albeit subject to the counsel-access provisions of the protective order entered in this and other cases requiring, among other conditions, that counsel obtain security clearances) consistent with the ruling by this Court in Al Odah v. United States, 346 F. Supp. 2d 1, 5-8 (D.D.C. 2004), that Guantanamo detainees are entitled to the assistance of counsel in presenting their *habeas corpus* claims to the Court. As noted above, however, Defense Department policy does not provide for routine access by civilians to wartime detainees, and respondents' decisions to provide such access under these exceptional circumstances in no way obligates them to provide such access for any reason whatever that petitioners may request, see Greer v. Spock, 424 U.S. at 838 n. 10, especially for reasons so unsubstantiated as those given by petitioners here.

"'plenary and exclusive' power in the international arena," and acts "'as the sole organ of the federal government in the field of international relations'") (citation omitted), as well as the Executive's authority to deal appropriately and effectively with issues of repatriating and resettling wartime detainees. See Curran v. Laird, 420 F.2d 122, 130 (D.C. Cir. 1969) (en banc) ("the Executive should be accorded wide and normally unassailable discretion with respect to the conduct of the national defense and the prosecution of national objectives through military means").

The government's diplomatic efforts to resettle petitioners and other ethnic Uighers in one or more suitable foreign countries are still ongoing, and this Court should avoid taking action that could impinge upon the government's endeavors in a sphere so firmly and traditionally committed to the Executive. See Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 381 (2000) (expressing disapproval of acts that "compromise the very capacity of the President to speak for the nation with one voice in dealing with other governments"); Ex parte Republic of Peru, 318 U.S. 578, 588 (1943) ("courts may not so exercise their jurisdiction . . . as to embarrass the executive arm of the government in conducting foreign relations"); Spacil v. Crowe, 489 F.2d 614, 619 (5th Cir. 1974) (courts must be reluctant "to interfere with or embarrass the executive in its constitutional role as the nation's primary organ of international policy," because "in the chess game that is diplomacy only the executive has a view of the entire board and an understanding of the relationship between isolated moves"). Just as importantly, the government's offer to the U.N. Special Rapporteurs to visit Guantanamo Bay still stands, as noted above, and the government hopes that a visit by the Special Rapporteurs to Guantanamo Bay can still be arranged. The Court should be equally hesitant to take actions at petitioners' behest that could impact upon the Special Rapporteurs' reconsideration of the Defense Department's invitation.

## CONCLUSION

For the forgoing reasons, petitioners' motion to grant them access to UNCHR representatives should be denied.

Dated: December 2, 2005

        Respectfully submitted,

        PETER D. KEISLER
        Assistant Attorney General

        KENNETH L. WAINSTEIN
        United States Attorney

        DOUGLAS N. LETTER
        Terrorism Litigation Counsel


         /s/ *James J. Gilligan*
        JOSEPH H. HUNT
        VINCENT M. GARVEY
        TERRY M. HENRY
        JAMES J. SCHWARTZPREEYA M.
        NORONHA
        ROBERT J. KATERBERG
        NICHOLAS J. PATTERSON
        ANDREW I. WARDEN
        EDWARD H. WHITE
        JAMES J. GILLIGAN
        Attorneys
        United States Department of Justice
        Civil Division, Federal Programs Branch
        P.O. Box 883
        Washington, D.C. 200044
        Tel: (202) 514-3358
        Fax: (202) 616-8470

        Attorneys for Respondents