UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

ABU BAKKER QASSIM, *et al.*,

    Petitioners/Plaintiffs,

v.

GEORGE W. BUSH, *et al.*,

    Respondents/Defendants.

Case No. 05 cv 0497 (JR)

## PETITIONERS' POST-HEARING MEMORANDUM

### I.    INTRODUCTION

On December 12, 2005, the Court advised that it was weighing three options: (1) denial of the *habeas corpus* petition outright; (2) an order that the petitioners be produced in Court for a hearing to consider terms of conditional release; and (3) an order that they be released outright. We believe Option One is insupportable. With any luxury of time, we would urge Option Two as the most efficient. **But we are out of time and urge the Court immediately to issue an order under Option Three.**

### II.    DISCUSSION

**A.    The Court Has Broad Discretion.**

The Court's discretion as to remedy is broad. 28 U.S.C. § 2243 (cl. 8th) provides that the Court is to "dispose of the matter as law and justice require" (emphasis added). This provision is intended to give the *habeas* judge broad discretion in forming a decree. *Carafas v. LaVallee*, 391 U.S. 234, 239 (1968); *cf. Hilton v. Braunskill*, 481 U.S. 770, 775 (1987). Because the remedy is equitable, the Court is to fashion its decree so as most effectively to do substantial

justice. *Bragg v. Norris*, 128 F. Supp. 2d 587 (E. D. Ark. 2000). Nowhere is the imperative for fashioning a practical decree more urgent than in a case of "actual innocence." *See Schlup v. Deleo*, 513 U.S. 298 (1995).

**B.     Given the Urgency of Time, Option Three is Most Preferable.**

   **1.     Option One is Insupportable.**

The first option the Court identified, outright denial of the petition, is the easiest to address.

*Habeas corpus* tests the legality of imprisonment. "[T]he office of the writ is 'to provide a prompt and efficacious remedy for whatever society deems to be intolerable restraints.'" *Harris v. Nelson*, 394 U.S. 286, 291(1969), *quoting Faye v. Noia,* 372 U.S. 391, 401-02 (1963). The writ tests requires the jailer to justify the detention in law. "At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive Detention, and it is in that context that its protections have been strongest." *Rasul v. Bush*, 542 U.S. 466, 474 (2004), *quoting INS v. St. Cyr*, 533 U.S. 289, 301 (2001). "The historic purpose of the writ has been to relieve detention by executive authorities without judicial trial." *Brown v. Allen*, 344 U.S. 443, 533 (1953) (Jackson, J., concurring).

*Rasul* obliges this Court now to make the determination whether the detention is lawful. In all material respects but one,[1] *Rasul* was the same case as this one. It involved Guantanamo prisoners who challenged their imprisonment on *habeas* grounds. It held "that section 2241 confers on the District Court jurisdiction to *hear* petitioners' habeas corpus *challenges* to the legality of their detention." *Id*. at 484 (emphasis added). A hearing on a petitioner's *challenge*

---

[1]     In the *habeas* petitions still at issue on remand from *Rasul*, the Government alleges, and the petitioners deny, that the petitioners are "enemy combatants" as defined in pertinent regulations. Here the Government concedes that they are not.

means a hearing on facts and law, not a mere test of pleadings under Rule 12(b) (which would be the Government's challenge, not petitioner's). That the Court had in mind such a contest was too plain to require anything more than a footnote (we know what "merits" means), but lest there should be confusion, the Court added one. *See id.* at 483 n.15. The Court then directed "the District Court to consider in the first instance the merits of the claims." 542 U.S. at 485. That mandate applies in all practical respects to all of the Guantanamo *habeas* cases, including this one. The Court did not remand to a military panel. And it did not remand so that a lower court might test the pleadings.[2]

The record is uncontested that (i) the only legal basis of imprisonment yet asserted is "enemy combatant" status,[3] (ii) Respondents agree that the prisoners are not "enemy combatants," and (iii) the prisoners' confinement has exceeded by months, if not years, that determination. The Government has sought to argue for an additional, indefinite "wind-up power," but the Court has already noted that there is no basis for the claim,[4] and the Government cites to none, other than one academic article that rests on the historical example of Joseph Stalin.[5] We have previously shown that the precedent of history in this country is all to the contrary: historically, "wind-up" of the imprisonment—even of POWs—has been a process measured in months, not the years involved in this case.[6]

---

[2] Although some are in a muddle on *Rasul*, the words of its mandate are plain, and we should hardly expect that after two years of litigation through the entire federal judicial system the Supreme Court in 2004 should have remanded to begin, anew, another metaphysical run through the judiciary that would do no more than test pleadings.

[3] *See* August 19, 2005 Memorandum Opinion, Docket No. 34 at 3.

[4] *Id.*

[5] *See* Petitioners' Surreply, Docket No. 31 at 11 n.13.

[6] *See id.* at 7-11.

The equities are extraordinary, with innocent petitioners now entering their fifth year of imprisonment and isolation. Because *Rasul obliges* this Court to hear and decide the Guantanamo habeas cases on their merits,[7] and because we respectfully suggest that the Government has not proferred a legal basis for imprisonment, there is no lawful basis upon which the Court might deny the writ.

2. **With Sufficient Time, Option Two Would be Appropriate.**

Under Option Two, (i) the Court would conduct a further hearing with the Petitioners present, (ii) the Petitioners would seek a grant of conditions by which they might be paroled to the local community of expatriate Uighurs, (iii) in the event the Petitioners were so paroled, the Court would retain jurisdiction of the *habeas* petition, and (iv) the Government would retain the right and power to attempt to pursue its diplomatic resettlement efforts.

The Government has urged that the Court lacks power to "bring the petitioners here" to accomplish this result. As we show below, the authorities support each element of the remedy sought. The very point that this Court expressed as part of its dilemma—whether it might order the Government to "produce the body" in Washington—is one that the *Rasul* Court—both majority and dissent—expressly contemplated.

    a.    *The Authorities Support the Parole Remedy.*

    (i)    *The Bodies May and Should be Produced in Court.* In *Rasul*, the Supreme Court ruled that this Court has jurisdiction in a case governed by an act of Congress. That act, in 28 U.S.C. § 2243 (cl. 5th) directs in mandatory terms that the Petitioners be brought here: "Unless

---

[7] The Government likes to point to the pendency of the *Al Odah* appeal in cases involving a contest as to whether petitioners are enemy combatants. However, the Court of Appeals has never ruled, nor even intimated, that it is appropriate for this or any other Court to stay its hand from proceeding in any other *habeas* case. Neither this Court nor that one may not do so in light of the plain mandate of *Rasul*.

the application for the writ and the return present only issues of law the person to whom the writ is directed *shall be required* to produce at the hearing the body of the person detained" (emphasis added).[8]

This statutory injunction applies to persons outside the territorial boundaries of a judicial district, and the courts contemplate that such persons may need to be produced in court for the purposes of fashioning relief. In *Braden v. 30th Judicial Circuit Court*, 410 U.S. 484 (1973), the Supreme Court rejected earlier reliance on the physical location of the petitioner, and ruled that a Kentucky federal court had jurisdiction in *habeas* over a petition brought by a prisoner in Alabama, even though the necessary import of the decision was that the petitioner might have to be transported to Kentucky. The Supreme Court has made no distinction between citizen and alien as to this proposition. For while it involved a U.S. citizen, *Braden* felt it necessary to overrule *Ahrens v. Clark*, 335 U.S. 188 (1948), a case involving aliens, and *Rasul*, though itself an alien case, relied on *Braden*.[9] "In England prior to 1789, in the Colonies, and in this Nation during the formative years of our Government the writ of habeas corpus was available to nonenemy aliens as well as to citizens." *St. Cyr*, 533 U.S. at 301-02. *See also Ledesma-Valdez v. Sava*, 604 F. Supp. 675 (S.D.N.Y. 1985) (fact that aliens were in aircraft out of New York air space did not deprive court of *habeas* jurisdiction).

---

[8] Although there is no factual dispute as to the unlawfulness of the detention, the Government has filed a hearsay affidavit suggesting that Petitioners may not be "benign." This assertion is contested. Also, our earliest proposed "conditions of parole" —release into the civilian population at Guantanamo—was contested, and accordingly the conditions for release—the matter to be addressed at the hearing—remains contested.

[9] *Ex parte Endo*, 323 U.S. 283 (1944), also supports this proposition, albeit indirectly. It involved a victim of the internment camps set up in California for Americans of Japanese ancestry. The Supreme Court reversed dismissal of a *habeas* petition where, during its pendency, the petitioner was removed by the Government from the district where she had brought her petition. Her absence did not prevent the case from proceeding. By inference then, the Supreme Court contemplated that the petitioner might have to be brought to the district where the Court sat.

The justices who decided *Rasul* contemplated that their ruling meant that district judges would be ordering produced in the District of Columbia the bodies of men imprisoned at Guantanamo. First, the words mean that very thing: production of the body. *Habeas corpus* is "a writ issuing out of a court of justice ... requiring the body of a person to be brought before the judge or into the Court for the purpose specified in the writ." *Johnson v. Eisentrager*, 339 U.S. 763, 778 n. 10 (1950) (quoting V The Oxford English Dictionary at 2 (1933)). By ruling that this Court had jurisdiction to "hear" a habeas case, the Supreme Court must have intended that the district judge would be subject to 28 U.S.C. § 2243 cl. 5, which makes production of the body mandatory in cases where there is a factual dispute.[10]

That the Court intended this result is seen most plainly in the close examination of *Eisentrager* found in each of the *Rasul* opinions—majority, concurrence, and dissent. *Eisentrager* arose out of the detention of prisoners of war after World War II in China and Germany. It held those places beyond the reach of *habeas*. The majority wrote, "a basic consideration in habeas corpus practice is that the prisoner will be produced before the court. This is the crux of the statutory scheme established by the Congress, indeed it is inherent in the very term, "habeas corpus." *Id.* at 778.[11] The Supreme Court proceeded, "[t]o grant the writ to these prisoners might mean that our army must transport them across the seas for hearing." In *Rasul*, six justices concluded that Guantanamo is a very different place than Germany, but the key point for present purposes is that those justices recognized that their ruling meant physically transporting prisoners from the U.S. naval base to Washington. *See id.* at 484-85. Indeed, Justice Scalia rested the most passionate lines of his dissent on this very point: he quoted

---

[10]  *See* n. 2, *supra*.

[11]  The statutory language at issue was identical.

*Eisentrager*'s admonition that a grant of the writ *would mean transporting men across the seas for hearing*, citing that as the baleful effect of the majority's decision. *Id.* at 499-500. In short, the Supreme Court majority intended, and the minority deplored, that Guantanamo prisoners would be present in this district for hearings.

The majority's analysis makes equally plain that it did not consider that this presence would conflict with laws of immigration. Courts would not be causing prisoners to immigrate here because, in law, they are already before the Court. Writing for the majority, Justice Stevens concluded that Guantanamo petitioners are within the "territorial jurisdiction" of the United States. *See id.* at 480. He found that the United States "exercises complete jurisdiction and control" over the Guantanamo Bay Naval Base." *Id.* at 481. Concurring, Justice Kennedy concluded that "Guantanamo Bay is in every practical respect a United States territory." *Id.* at 487. The majority rejected the notion that the "geographical coverage of the statute [varies] depending on the detainee's citizenship," *id.* at 481, and Justice Kennedy agreed. "From a practical perspective, the indefinite lease of Guantanamo Bay has produced a place that belongs to the United States, extending the 'implied protection' of the United States to it." *Id.* at 487. In short, when the Supreme Court concluded that this Court had jurisdiction of the Guantanamo *habeas* cases, and that the petitioners were in a "place that belongs to the United States," its ruling did not mean that Petitioners are to be "brought" to the United States. It meant they're already here. Thus there is ample statutory and case authority for the first step: ordering the jailer to produce the body in the court house.

  *(ii)     Parole is Appropriate Even in Cases Involving Aliens.* Case law then makes clear that this Court has inherent power to order "parole:" that is, release on conditions. The power is an incident to—a lesser-included subset of—*habeas* jurisdiction itself. It is not simply an analog

to a bail statute. *Johnston v. Marsh*, 227 F. 2d 528 (3d Cir. 1955) (court has power to order bail in habeas even in absence of bail statute). In *Baker v. Sard*, 420 F. 2d 1342 (D.C. Cir. 1969), the Court of Appeals stated that '[w]hen an action pending in a United States court seek release from what is claimed to be illegal detention, the court's jurisdiction to order release as a final disposition of the action *includes an inherent power* to grant relief pendente lite, to grant bail or release, pending determination of the merits." *Id.* at 1343 (emphasis added); *see also Gaines v. Manson*, 481 A.2d 1084 (Conn. 1984) (*habeas* judge not limited to dilemma of ordering discharge or denying all relief).

This inherent power applies equally in cases involving aliens. *See Mapp v. Reno*, 241 F. 3d 221 (2d Cir. 2001) (involved an alien). The Second Circuit held that there was *inherent* power to admit him to bail—power derivative not from any bail statute but from the power to grant final relief in a *habeas* case. *Id.* at 226. *Whitfield v. Hanges*, 222 F. 745 (8th Cir. 1915) was another *habeas corpus* challenge to deportation brought by aliens. The Eighth Circuit concluded, "the court has ample power to admit the alien to bail or to take his own recognizance." *Id.* at 756 (citing *Chick Yow v. United States*, 208 U.S. 8, 13 (1908)).

This proposition—that the *habeas* judge has power to grant release into the general population, goes beyond lawful aliens and *applies even to an alien who has not been admitted to the United States*. Two authorities bear close consideration on this point. First, in *Lee Fong Fook v. Wixon*, 170 F. 2d 245 (9th Cir. 1948), a *habeas* petitioner was denied admission at the Port of San Francisco as an alien. He claimed to be a citizen. While the dispute was pending—at a time when he had been deemed an alien by the authority with jurisdiction over the question—the petitioner was released on bail [*i.e.*, into California] "to enable him more effectively to pursue his administrative remedy [by gathering evidence of his birth in the U.S.]"

*Id.* at 246. The district court dismissed his petition. The Court of Appeals vacated, noting that the petitioner should have been afforded a full opportunity to contest the immigration finding at an administrative hearing. But the point is this: the Ninth Circuit specifically approved the parole into the continental United States of a *habeas* petitioner at a time when he had made no "entry" and had been found by the relevant authority to be an unlawful alien.

More recently, in *Clark v. Martinez,* 125 S. Ct. 716 (2005), the Supreme Court confirmed a similar principle and approved release into the population of aliens who had never been admitted to the United States. The case involved Cubans who arrived in the United States as part of the Mariel boatlift. Under the law then effective, such refugees were not lawful aliens, and not "admitted" to the United States, but rather "paroled" into the United States.[12] A year later, they could adjust their status to that of lawful permanent resident, unless they fell within statutory exclusions, including exclusions for those who commit crimes. Both petitioners committed serious crimes in the United States, and thus lost the right to be admitted. Thus they were unlawful aliens who had never been admitted to the United States—which is likely the immigration "status" that the Government would assert applies to the Petitioners.[13] The men were ordered deported to Cuba, but because Cuba would not accept them, they remained detained pursuant to statute. They brought *habeas corpus* petitions under the authority of *Zadvydas v. Davis,* 533 U.S. 678 (2001). But in *Zadvydas,* the petitioners were lawful, resident aliens whose criminal acts subjected them to deportation. The *Martinez* petitioners, on the other hand, were never lawful, resident aliens, had never even "admitted" to the United States, and had

---

[12] Under immigration law, the Attorney General has discretion to "parole" into the territory of the United States an alien who has never been admitted. 8 C.F.R. § 212.5(a) (2004).

[13] While Petitioners would reserve all their rights with respect to immigration matters (whatever those rights may be), those matters simply are not before the Court, and we seek no order in any way addressing their immigration status.

no express statutory right to release. The Government sought to distinguish their case on that basis. It failed. Following *Zadvydas'* proscription against indefinite imprisonment, the Supreme Court held that the illegal, criminal aliens were entitled to release into the U.S. population.

In sum, then, there is good precedent for release into the U.S. population of aliens who have never been "admitted" to the United States as lawful resident aliens, whether on parole or permanently.

### b. *Parole is No Longer the Most Effective Habeas Remedy.*

With sufficient time for another hearing, parole would best calculated to satisfy the Supreme Court's requirement that a *habeas* case "be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected." *Harris v. Nelson*, 394 U.S. at 291. "There is no higher duty of a court, under our constitutional system, than the careful processing and adjudication of petitions for writs of *habeas corpus*." *Id.* at 292. *Habeas corpus* "is not now and never has been a static, narrow, formalistic remedy; its scope has grown to achieve its grand purpose—the protection of individuals against erosion of their right to be free from wrongful restraints upon their liberty." *Jones v. Cunningham*, 371 U.S. 236, 243 (1963). The Supreme Court has noted its "scope and flexibility—its capacity to reach all manner of illegal detention—its ability to cut through barriers of form and procedural mazes." *Harris*, 394 U.S. at 291. As Justice Holmes once put it, the remedy "cuts through all forms and goes to the very tissue of the structure." *Frank v. Magnum*, 237 U.S. 309, 346 (1915) (Holmes, J., dissenting).

We are confident that the community of Uighur expatriates loyal to the United States can satisfy practical concerns regarding housing and work. Parole would permit easy access to refugee organizations, the United Nations, and representatives of the State Department. We

think the Marshal's Service certainly would honor any judicial request for assistance with respect to the conditions of release. Unfortunately, we are out of time. There is a significant risk that this case will be thrown into confusion *within days*. *The press is today reporting* legislation purporting to strip the Court of jurisdiction of *habeas* cases based on the geographical presence of a petitioner at Guantanamo Bay. Because the parole remedy requires the delay of another hearing, we have deep fears that such a hearing cannot be scheduled in time.

3. **The Time Urgency Requires us to Request Option Three.**

The Court has power, today, to issue a final order granting the petitions for habeas corpus. We believe the long suffering of the men justifies—indeed, cries out for—that relief. Absent the entry of such final relief immediately, there is grave risk that legislative changes will throw the matter into confusion.

We hope and trust the Government would not use such an order as "cover" to try to illegally render the men to China and wash its hands of its problem. We would urge the Court, in its order, to enjoin such action, particularly since the Government has already conceded that rendering to China would be inappropriate.

### III. CONCLUSION

We submit that the Court should order the immediate release of the petitioners. In the alternative, we request that the Court immediately enter an order directing that each of hte respondents cause the bodies to be produced in Court this week for further proceedings, such order to be enforceable by contempt.

Dated: December 15, 2005

　　　　　　　　　　　　　　　　　/s/ Susan Baker Manning
　　　　　　　　　　　　　　　　　Sabin Willett
　　　　　　　　　　　　　　　　　Neil G. McGaraghan
　　　　　　　　　　　　　　　　　Jason S. Pinney
　　　　　　　　　　　　　　　　　BINGHAM McCUTCHEN LLP
　　　　　　　　　　　　　　　　　150 Federal Street
　　　　　　　　　　　　　　　　　Boston, MA 02110-1726
　　　　　　　　　　　　　　　　　Telephone:　(617) 951-8000
　　　　　　　　　　　　　　　　　Facsimile:　(617) 951-8925

　　　　　　　　　　　　　　　　　Susan Baker Manning
　　　　　　　　　　　　　　　　　Farschad Farzan
　　　　　　　　　　　　　　　　　BINGHAM MCCUTCHEN LLP
　　　　　　　　　　　　　　　　　1120 20th Street NW, Suite 800
　　　　　　　　　　　　　　　　　Washington, D.C. 20036
　　　　　　　　　　　　　　　　　Telephone:　(202) 778-6150
　　　　　　　　　　　　　　　　　Facsimile:　(202) 778-6155

　　　　　　　　　　　　　　　　　Barbara Olshansky
　　　　　　　　　　　　　　　　　Deputy Director
　　　　　　　　　　　　　　　　　CENTER FOR CONSTITUTIONAL RIGHTS
　　　　　　　　　　　　　　　　　666 Broadway, 7th Floor
　　　　　　　　　　　　　　　　　New York, NY 10012
　　　　　　　　　　　　　　　　　Telephone:　(212) 614-6439