UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ABU BAKKER QASSIM, *et al.*,          :
                                       :
        Petitioners,                   :
                                       :
    v.                                 :   Civil Action No. 05-0497 (JR)
                                       :
GEORGE W. BUSH, *et al.*,              :
                                       :
        Respondents.                   :

## MEMORANDUM

Abu Bakker Qassim and A'del Abdu Al-Hakim are Muslim Uighurs, natives of China's western semi-autonomous Xinjiang province. They were captured by Pakistani security forces in late 2001 or early 2002, delivered into U.S. custody, and held in Afghanistan for approximately six months. In June 2002 they were transferred to the naval base at Guantanamo Bay, Cuba, where they were detained as "enemy combatants," and where they remain to this day, even though as much as nine months ago[1] a Combatant Status Review Tribunal (CSRT) determined that "they should no longer be classified as enemy combatants." Resp't Mem. in Opp'n to Mot. to Vacate Stay Order at 4, n.5.

Qassim and Al-Hakim petitioned for a writ of habeas corpus on March 10, 2005. The government (which knew about the CSRT determination but advised nobody) moved for a stay of proceedings pending the Court of Appeals' decision in the

---

[1] The record does not reflect the date of the CRST determination.

consolidated appeals of <u>Khalid v. Bush</u>, 355 F. Supp. 2d 311 (D.D.C. 2005), and <u>In re Guantanamo Detainee Cases</u>, 355 F. Supp. 2d. 443 (D.D.C. 2005).  Petitioners (whose counsel were ignorant of the CSRT determination) moved for a preliminary injunction.  On April 13, 2005, I (also ignorant of the CSRT determination) denied the motion for preliminary injunction and granted a stay of all proceedings concerning these petitioners, including "their release, repatriation, or rendition."[2]

In the midst of this motions practice, counsel for petitioners twice sought information from the government about proceedings before the CSRT, <u>see</u> Manning Decl., Exs. G-H.  The government did not respond.[3]  It was only in mid-July, when petitioners' counsel traveled to Guantanamo Bay to meet their clients for the first time, that counsel were informed by their clients that the CSRT had found them not to be enemy combatants.  After this information was confirmed by a JAG officer stationed at Guantanamo Bay, Willett Decl. ¶ 15, counsel filed an emergency motion to vacate the stay order and for their clients' immediate

---

[2] Both sides have appealed that stay order, but the parties agree that the pendency of their appeals does not oust this Court of jurisdiction to decide the matters presented by petitioners' instant motions.

[3] At a hearing held on August 1, 2005, the government acknowledged receiving informal discovery requests for the 120 detainee cases it has, and stated that it generally did not respond to such requests "simply because we're not in a position to do it, especially when these cases should be stayed because the legal issues involved are before the Court of Appeals."  August 1, 2005 Tr. at 16.

release. The government opposed, and a hearing was held on August 1, 2005.

The status of "enemy combatant" has been, until now, the only handhold for the government's claim of executive authority to hold detainees at Guantanamo. It is the only rationale approved by the Supreme Court, see <u>Hamdi v. Rumsfeld</u>, 124 S.Ct. 2633, 2639-40 (2004). Now that these petitioners are classified as "no longer enemy combatants" (NLECs), the government has had to articulate a new reason for continuing to hold them. That reason, asserted at the August 1 hearing, again in the government's post-hearing memorandum, and yet again in open court on December 12, 2005, is "the Executive's necessary power to wind up wartime detentions in an orderly fashion." Resp't Supplemental Mem. at 12.

On August 19, 2005, I issued a memorandum order stating, "It is not necessary to decide whether such a 'wind up' power really exists..., because the parties agree that Qassim and Al-Hakim should be and will be released." In light of this agreement, and the government's assurance that diplomatic efforts were being made to find a country that would accept the petitioners, I withheld decision on the motion to vacate.

Four months have passed since that order, and four years have passed since the petitioners were locked up. At the December 12 hearing the government asserted that progress is

being made on the diplomatic front but declined to elaborate except in camera.  I declined to receive secret information on that subject--information that could have been offered only to coopt the court and seek further delay.  Petitioners now urge that action be taken promptly--immediately, in fact, because petitioners fear that Congress is about to enact legislation that will strip the federal courts of habeas jurisdiction over Guantanamo detainees.  I announced on December 12 that I would rule within two weeks, so that, whichever way the ruling went, the case might at least be put into an appealable posture.

The case presents two fundamental questions: Does the government have "wind up" authority indefinitely to detain non-U.S. citizens at Guantanamo Bay, if they are not enemy combatants?  If not, does a district court have the authority to fashion an effective remedy for the illegal detention?

**Legality of petitioner's indefinite detention**

The government claims that it has authority for petitioners' continued detention because the Executive has the "necessary power to wind up wartime detentions in an orderly fashion."  Resp't Supplemental Mem. at 12.  A major premise of that claim, of course, is that petitioners' detention was lawful in the first place.  Hamdi did confirm the proposition that the Executive has power to wage war and detain suspected enemy combatants, that is, persons alleged to be "'part of or

supporting forces hostile to the United States or coalition partners' in Afghanistan and who 'engaged in an armed conflict against the United States' there." 542 U.S. at 516 (quoting the government's proffered definition of enemy combatant), but the government has not stated that these petitioners were ever suspected of having engaged in armed conflict against the United States. What we know of them is only that they were captured as they fled towards Pakistan after the inception of coalition bombing. See Hood Decl. ¶ 2. The government's use of the Kafka-esque term "no longer enemy combatants" deliberately begs the question of whether these petitioners ever were enemy combatants.

The support the government offers for its assertion of "wind up" authority is unpersuasive and, in my view, actually cuts against the government's position. As the Supreme Court noted in Hamdi, the authority to detain in wartime is grounded in the need to prevent captured individuals from returning to the field of battle. 542 U.S. at 518-21; see also Naqvi, Doubtful Prisoner-of-War Status, 84 Int'l Rev. Red Cross 571, 572 (2002) ("[C]aptivity in war is 'neither revenge, nor punishment, but solely protective custody, the only purpose of which is to prevent the prisoners of war from further participation in the war'") (quoting decision of Nuremberg Military Tribunal, reprinted in 41 Am. J. Int'l L. 172, 229 (1947)). Because of this limited purpose, the laws of war require that detention last

no longer than the active hostilities.  Hamdi, 542 U.S. at 521 (citing Article 118 of the Geneva Convention (III) Relative to the Treatment of Prisoners of War, Aug. 12, 1949, [1955] 6 U.S.T. 3316, 3406, T.I.A.S. No. 3364 ("Prisoners of war shall be released and repatriated without delay after the cessation of active hostilities")).  Nothing in this record establishes that the government has or could reasonably have a concern that these petitioners would return to the battlefield if released.

Even if petitioners' initial detention was lawful, however, and even assuming that some reasonable wind up period of detention was allowable, their continued detention for nine months after the CSRT found them to be NLEC's far exceeds the presumptive limit of six months the Supreme Court applied in the analogous context of removable and  excludable aliens detained under immigration statutes.  See Zadvydas v. Davis, 533 U.S. 678 (2001) (presumptive limit to reasonable duration of post-removal-period detention under INA for removable alien is six months); Clark v. Martinez, 543 U.S. 371 (2005) (six-month presumptive limit to detention applies to inadmissible aliens).  The detention of these petitioners has by now become indefinite.  This indefinite imprisonment at Guantanamo Bay is unlawful.

**Availability of an effective remedy**

Ordinarily, a district judge reviewing a habeas petition does not need to proceed very far beyond determining that the detention is unlawful before ordering petitioner's release. The ordinary case, however, does not involve (I) aliens (ii) held outside the geographic territory of the United States (though not outside its "complete jurisdiction and control," see Rasul v. Bush, 542 US 466 (2004)) (iii) in a camp inside a secure military facility. The habeas statute requires a court after determining the facts to "dispose of the matter as law and justice require," 28 U.S.C. § 2243. The question in this case is whether the law gives me the power to do what I believe justice requires. The answer, I believe, is no.

Until a few days ago, petitioners were urging me to invoke the plain language of the habeas statute and order the government to "produce...the bod[ies]" of the petitioners at a hearing to be held in this court. At such a hearing, they argued, I would evaluate the government's security concerns and then set appropriate conditions for petitioners' release into the community, on parole, until the government could arrange for their transfer to another country. See, e.g., Baker v. Sard, 420 F.2d 1342, 1343 (D.C. Cir. 1969) (district court has "an inherent power to grant relief pendente lite, to grant bail or release

pending determination of the merits"); Mapp v. Reno, 241 F.3d 221, 226 (2d Cir. 2001) (citing Baker v. Sard in alien case).

The government's first objection to this suggestion, invoking the doctrine of consular non-reviewability, see, e.g., City of New York v. Baker, 878 F.2d 507, 512 (D.C. Cir. 1989), is wide of the mark. These petitioners are not applying for visas, and there has been no exclusion or removal order. If genuine issues of material fact existed with regard to the legality of petitioners' detention, I believe the language of the habeas statute and the authority of Rasul v. Bush would trump decisions like Baker and support an order to produce the bodies of the petitioners here. (Note that the Supreme Court issued its decision in Rasul over the dissent's reminder of "the dire warning of a more circumspect Court" in Johnson v. Eisentrager, 339 U.S. 763 (1950), of the burdens and even dangers of such a ruling. 542 U.S. at 499.) Here, however, there is no need for a hearing to resolve factual issues relating to the legality of petitioners' detention, for the government concedes that petitioners are NLECs. The command of the habeas statute is qualified. It requires the court to order the body of the petitioner produced "[u]nless the application for the writ and the return present only issues of law." 28 U.S.C. § 2243. Only issues of law are presented here, and there is no requirement to produce the body.

Petitioners' alternative suggestion that I order them released into the general population of the base at Guantanamo Bay was summarily rejected by my order of August 19, 2005.  Such an order would raise serious constitutional problems without significantly improving petitioners' situation.  Guantanamo Bay is a secure military installation under the command of military officers whose mission is an ongoing part of the President's duties as commander in chief.  Petitioners cite no authority for the proposition that I can order the military to allow a civilian, much less a foreign national, access to a military base, and of course I cannot.  "The power of a military commandant over a reservation is necessarily extensive and practically exclusive, forbidding entrance and controlling residence as the public interest may demand."  <u>Cafeteria & Rest. Workers Union, Local 473 v. McElroy</u>, 367 U.S. 886, 890 (1961).  Accordingly, a commander may, "in his discretion, exclude private persons and property...or admit them under such restrictions as he may prescribe in the interest of good order and military discipline."  Id. at 893 (internal quotation marks and citations omitted).

At the December 12 hearing I postulated another alternative, as a sort of thought experiment: a simple order requiring the petitioners' release, without specifying how, or to where.  After thinking about it for a few days, the petitioners

embraced the idea (Memorandum of 12/16/05, Dkt. # 56).  The experiment cannot work, however.

"[H]abeas corpus is at its core, an equitable remedy." Schlup v. Delo, 513 U.S. 298, 319.  Judges have "broad discretion" to fashion an appropriate remedy.  It may extend beyond simply ordering the release of a petitioner, Carafas v. LaVallee, 391 U.S. 234 (1968), and is to "be administered with the initiative and flexibility essential to insure that miscarriages of justices within its reach are surfaced and corrected."  Harris v. Nelson, 394 U.S. 286, 291.  Habeas corpus "never has been a static, narrow, formalistic remedy; its scope has been to achieve its grand purpose-the protection of individuals against erosion of their right to be free from wrongful restraints upon their liberty."  Jones v. Cunningham, 371 U.S. 236, 243 (1963).  At its historical core, habeas corpus "has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest."  Rasul, 542 U.S. at 474 (citations omitted).  The Supreme Court has noted its "scope and flexibility--its capacity to reach all manner of illegal detention--its ability to cut through barriers of form and procedural mazes."  Harris, 394 U.S. at 291.

To order these petitioners released, however, would require cutting through more than "barriers of form and

procedural mazes." The obstacles are constitutional and involve the separation of powers doctrine. It appears to be undisputed that the government cannot find, or has yet not found, another country that will accept the petitioners. Thus, the only way to comply with a release order would be to grant the petitioners entry into the United States. Although, as noted above, the immigration/alien exclusion cases are not strictly applicable, a strong and consistent current runs through them that respects and defers to the special province of the political branches, particularly the Executive, with regard to the admission or removal of aliens. Long after the Chinese exclusion cases, <u>Fok Yung Yo v. United States</u>, 185 U.S. 296, 305 (1903); <u>Fong Yue Ting v. United States</u>, 149 U.S. 698, 713 (1893), it was settled law that the power to exclude aliens "is inherent in the executive power to control the foreign affairs of this nation," <u>Knauff v. Shaughnessy</u>, 338 U.S. 537, 542-43 (1950), and that "the conditions of entry for every alien...have been recognized as matters...wholly outside the power of [courts] to control." <u>Fiallo v. Bell</u>, 430 U.S. 787, 796 (1977).

These petitioners are Chinese nationals who received military training in Afghanistan under the Taliban. China is keenly interested in their return. An order requiring their release into the United States--even into some kind of parole "bubble," some legal-fictional status in which they would be here

but would not have been "admitted"--would have national security and diplomatic implications beyond the competence or the authority of this Court.[4]

**Conclusion**

In Rasul v. Bush, the Supreme Court confirmed the jurisdiction of the federal courts "to determine the legality of the Executive's potentially indefinite detention of individuals who claim to be wholly innocent of wrongdoing." 542 U.S. at 485. It did not decide what relief might be available to Guantanamo detainees by way of habeas corpus, nor, obviously, did it decide what relief might be available to detainees who have been declared "no longer enemy combatants." Now facing that question, I find that a federal court has no relief to offer.

An appropriate order accompanies this memorandum.

JAMES ROBERTSON
United States District Judge

---

[4] I reject the government's argument that Congress' enactment of the Real ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 302 (May 11, 2005) ("Real ID Act"), operates to repeal or override whatever powers the habeas statute may confer in this case. Congress amended the INA to exclude district court jurisdiction over immigration decisions. Real ID Act § 106(a).